# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** § § § | |
| Plaintiff, § § | CASE NO  1:20-cv-889 (MAD/TWD) |
| v. § § | |
| **LETITIA JAMES, both individually and in her official capacity,** § § § | |
| Defendant. § § § § § § | JURY TRIAL DEMANDED |

### NATIONAL RIFLE ASSOCIATION OF AMERICA'S
### ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff the National Rifle Association of America (the "NRA") files this Original Complaint and Jury Demand ("Complaint") against Defendant New York State Attorney General Letitia James ("James"), in her individual and official capacity, upon personal knowledge of its own actions, and upon information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

In the wake of violent tragedies, amid a polarized political landscape, a candidate for the New York State Office of the Attorney General made a stunning campaign promise. If elected, James said, she would "take down the NRA"—not by refuting its policy positions or by advocating for gun control legislation, but by wielding the powers of the NYAG to dismantle the NRA as a not-for-profit corporation. James was explicit about her motivation: she saw "no

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

distinction"[1] between the NRA's charitable existence and its ability to engage in pro-gun political speech (characterized by James as "deadly propaganda"). To silence the NRA's advocacy, and neutralize it as an opposing political force, James promised that she would leverage "the constitutional power as an attorney general to regulate charities" to instigate a fishing expedition into the NRA's "legitimacy . . . to see whether or not they have in fact complied with the not-for-profit law in the State of New York."[2] She also maligned the NRA as a "terrorist organization" and a "criminal enterprise," and vowed that financial institutions and donors linked to the NRA would be pursued by law enforcement—just like supporters of Al Qaeda or the mafia.[3]

Importantly, James made these promises without a single shred of evidence, nor any sincere belief, that the NRA was violating the New York Not-For-Profit Corporation Law, or any other law.

Although NRA was disappointed by these threats, it was not surprised—because James's predecessor in office, New York Attorney General Eric Schneiderman, defied his own party loyalties to warn the NRA that this would happen.  In a telephone call to Tom King, an NRA director, in late 2017, Schneiderman emphasized that while he opposed the NRA's positions on the Second Amendment, he felt troubled by recent, extraordinary pressures being placed on his office by powerful political interests. Namely, Schneiderman said that key Democratic actors blamed the NRA for President Trump's 2016 election victory, and were brainstorming ways that

---

[1] *See Annual NRA Fundraiser Sparks Protests*, LI HERALD (Oct. 25, 2018), http://liherald.com/stories/nassau-protests-nra-fundraiser,107617.

[2] *See* Jillian Jorgensen, *Letitia James Says She'd Investigate NRA's Not-For-Profit Status If Elected Attorney General*, DAILY NEWS (July 12, 2018), https://www.nydailynews.com/news/politics/ny-pol-tish-james-nra-20180712-story.html.

[3] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), http://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

New York State could weaken the NRA as a political force in 2020.  Referencing efforts by the New York Department of Financial Services ("DFS") to target several of the NRA's insurance providers, Schneiderman noted that "one piece of this is already happening," but that a bigger "piece" was in the works: the NYAG, too, was being pressured to pursue the NRA for purely political purposes.  Schneiderman seemed to know that a sham prosecution of a political enemy would be blatantly improper, but advised King to "get ready."

Although the NRA believed it was already operating in compliance with New York State law, it took no chances in the face of this warning. To fortify its defenses, as well as inform litigation strategy against New York State and others, the NRA undertook a top-to-bottom compliance review of its operations and governance.  In the process, the NRA made enemies: vendors and executives who had grown comfortable with the status quo did not welcome the NRA's push for additional documentation and transparency.  Over the ensuing year, the NRA endured slings and arrows from those discontented with the principled path it had chosen and became embroiled in litigation.  But the NRA stuck to its guns, determined to prepare itself to fend off a political attack from the NYAG if one came.

Months after delivering his warning to Mr. King, Schneiderman resigned from office. Vying to succeed him, James—whom the New York Times expressly declined to endorse for Attorney General, due to perceived corrupt ties to Cuomo[4]—made the political prosecution of the NRA a central campaign theme.  Within months of James's inauguration, the NYAG predictably moved against the NRA by launching a sweeping investigation in April 2019.  In response, the NRA cooperatively engaged and furnished thousands of documents, along with

---

[4] New York Times Editorial Board, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's Primary*, THE NEW YORK TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

testimony from key executives and board members, some of whom patiently answered the NYAG's questions for multiple days on end. Despite hopes that playing by the rules would procure a just outcome, the NRA has not been treated fairly by James's office.

Though it continues unabated, this injustice has not gone unnoticed: Civil Procedure scholar Arthur Miller, the American Civil Liberties Union, the New Republic, and other voices not traditionally aligned with the NRA have rallied to express concerns about New York's conduct. Senior former prosecutors have also criticized James's apparent politicization of her office.[5]

The New York Democratic Party political machine seeks to harass, defund, and dismantle the NRA because of what it believes and what it says. Only this Court can stop it. The NRA accordingly brings this lawsuit for declaratory and injunctive relief under the First Amendment of the United States Constitution, as well as for a judicial declaration of what is obvious: the NRA operates in substantial compliance with New York not-for-profit law.

## II.

## PARTIES

1. The NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

2. James is the Attorney General of the State of New York and, at certain times relevant to the Complaint, was acting individually—as she sought political office—and at other

---

[5] *See* Jeffery C. Mays, N.Y.'s New Attorney General Is Targeting Trump. Will Judges See a 'Political Vendetta?', NEW YORK TIMES (December 31, 2018)

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

times under color of state law. Her principal place of business is 28 Liberty Street, 15th Floor, New York, NY 10005. James is sued in her individual and official capacities.

## III.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution, and because this action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

4. Venue is proper in this district under 28 U.S.C. § 1391(b).

5. There is a present and actual controversy between the parties.

6. The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

## IV.

## STATEMENT OF RELEVANT FACTS

A.   **The NRA: Support For Gun Safety And A Commitment To Core Political Speech.**

7. After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. The officers believed that the war would have

ended significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers. They obtained a charter from the State of New York in November of 1871; thereafter, the NRA built a proud legacy in the State of New York.

8. From the NRA's inception, it received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For many decades, the NRA partnered with the State to advance firearms safety, education, conservation, and other public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the resulting Public Schools Athletic League (PSAL) marksmanship program.[6] Likewise, in 1949, the NRA worked with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game departments across the country and in Canada, helping to make hunting among the safest sports in existence.

9. First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." Accordingly, political speech is a major purpose of the NRA. The NRA engages in extensive legislative advocacy to promote its purposes, as well as to vindicate the rights of its members and all Americans.

10. The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate in support of Second

---

[6] *See e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM (last visited May 11, 2018).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

Amendment privileges and to assist NRA members who engage in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

11.  To its critics, the NRA is best known as a "superlobby – one of the largest and most truly conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[7] In addition, the NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[8]

**B.    The State Of New York Targets The NRA Based On The Viewpoint Of Its Speech.**

12.  Since the NRA's founding, the NRA's corporate domicile—New York—has become a less hospitable political environment for Second Amendment advocacy. The NRA welcomes fair, full-throated policy debate, but cannot abide the opportunistic, corrupt misuse of government power by certain New York officials to squelch political opposition. Regrettably, this is what has occurred, and is already the subject of another ongoing federal court lawsuit.

---

[7] Christina Robb, HANDGUNS AND THE AMERICAN PSYCHE THE ATTEMPTED ASSASSINATION OF A PRESIDENT BRINGS THE ISSUE INTO SHARP FOCUS ONCE AGAIN. HANDGUNS – WHAT DO THEY MEAN TO AMERICANS? TO THE NRA, THEY ARE A SYMBOL OF FREEDOM; TO THOSE FRIGHTENED OF CRIME, THEY REPRESENT SAFETY – EVEN IF THE OWNER DOESN'T KNOW HOW TO USE THEM; TO GUN CONTROL ADVOCATES, THEY ARE SYMBOLS OF ULTIMATE EVIL., BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[8] *See, e.g.*, *Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

13. New York Governor Andrew Cuomo has a longstanding political vendetta against "Second Amendment Types,"[9] especially the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[10] For Cuomo, silencing the NRA is a career strategy. During 2018, Cuomo and several political allies, including Maria Vullo (then the Superintendent of the Department of Financial Services) orchestrated a campaign of selective enforcement, backroom exhortations, and public threats designed to coerce financial institutions to blacklist pro-gun advocacy groups, especially the NRA. The NRA's First Amendment claims arising from this conduct have withstood motions to dismiss and are currently pending in the United States District Court for the Northern District of New York.[11]

14. After New York's previous Attorney General, Eric Schneiderman, resigned amid allegations of sexual misconduct, several Democratic candidates vied to replace him. Nearly all of these candidates took affirmative steps to "distance themselves"[12] from Cuomo—who presided over a government that the *New York Times* called "historically corrupt" and "a chamber of ethical horrors."[13] But as the NRA's First Amendment lawsuit against Governor Cuomo received increased coverage during the summer of 2018 (and garnered support from the

---

[9] On February 15, 2018, Cuomo appeared on the MSNBC program "The Beat," where he discussed championing legislation that some believed "trampled the Second Amendment." YOUTUBE, Gov. *Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited May 7, 2018). However, Cuomo lamented that his "favorability rating" had dropped thereafter due to "backlash from conservatives and Second Amendment types." *Id.*

[10] *See* Kenneth Lovett, *Exclusive: Cuomo Fires Back at Jeb Bush for 'Stupid' and 'Insensitive' Gun Tweet*, NY DAILY NEWS (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

[11] *Nat'l Rifle Ass'n of Am. v. Cuomo,* Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.)

[12] *See* Jeffery Mays, *Letitia James Has Embraced Andrew Cuomo. Is It Worth It?* THE NEW YORK TIMES (Aug. 13, 2018), https://www.nytimes.com/2018/08/13/nyregion/letitia-james-attorney-general-independence.html.

[13] New York Times Editorial Board, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's Primary*, THE NEW YORK TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

American Civil Liberties Union),[14] James embraced Cuomo's endorsement, pursued contributions from his donors,[15] and promised to apply the same unconstitutional tactics against the NRA. On September 6, 2018, James announced that, if elected, she would follow in the footsteps of Cuomo's financial-blacklisting campaign, by "put[ting] pressure upon the banks that finance the NRA" in order to choke off support for Second Amendment speech.[16] She also reiterated her attacks on the NRA's legitimacy as a not-for-profit corporation.[17]

### C. To Contrive a Pretext For Law-Enforcement Action, James Conspires With Everytown—And Maliciously Defames the NRA.

15. To create air cover for their campaign against the NRA (which had begun to attract bipartisan criticism),[18] Cuomo and James coordinated actively with Everytown for Gun Safety ("Everytown"). Richly endowed by Michael Bloomberg, Everytown is an activist organization whose explicit political mission is to oppose the NRA. Documents that have surfaced to date in the NRA's First Amendment litigation against Cuomo show that Everytown was instrumental in orchestrating New York State's politically motivated investigation of certain

---

[14] *See* David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political* Speech, SPEAK FREELY (Aug. 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-allowed-stifle-nras-political-speech; *see also* Cheryl Chumley, *ACLU defends NRA - - Yes, you read that right*, The Washington Times (Aug. 27, 2018) https://www.washingtontimes.com/news/2018/aug/27/aclu-defends-nra-yes-you-read-right/; *see also* Declan McCullagh, *ACLU Sticks Up for the NRA?!*, REASON (Aug. 24, 2018), https://reason.com/2018/08/24/aclu-teams-up-with-nra/.

[15] New York Times Editorial Board, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's Primary*, THE NEW YORK TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

[16] *See* Our Time Press, *Attorney General Candidate, Public Advocate Letitia James*, https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (last visited Feb. 11, 2020).

[17] *Id.*

[18] *See, e.g.*, Matt Ford, *The NRA Is Not a Domestic Terrorist Organization*, THE NEW REPUBLIC (September 17, 2019), https://newrepublic.com/article/155085/nra-not-domestic-terrorist-organization; Jim Geraghty, *For Americans' Gun Rights, the Stakes in 2020 Are as High as Ever*, NATIONAL REVIEW (April 25, 2019), https://www.nationalreview.com/the-morning-jolt/for-americans-gun-rights-the-stakes-in-2020-are-as-high-as-ever/ ("Even if the IRS doesn't find the Bloomberg group's complaint compelling, New York State's new attorney general, Letitia James, pledged to investigate whether the NRA is complying with the requirements for nonprofit organizations. James, a fierce proponent of gun control, may very well be driven by political ambitions …").

NRA-related insurance products. The group has played a similar role in support of James's attacks on the NRA's legitimacy as a charitable organization.

16. Everytown funds a digital media outlet known as *The Trace*, which dedicates itself exclusively to publishing articles that advance a gun-control agenda. During late summer and early fall 2018, as James aligned herself with Cuomo and pledged that she would wield state power to "see whether or not the[] [NRA] ha[d] in fact complied with the not-for-profit law," *The Trace* began to publish articles that purported to focus on governance, spending, and personnel issues at the NRA.[19]

17. Simultaneously, James began to publicize false, defamatory assertions that the NRA had engaged in criminal activity. On September 4, 2018, during a debate between Democratic candidates, James stated that, if elected, her "top issue" would be "going after the NRA because *it is a criminal enterprise*."[20] Two days later, James doubled down on this assertion, and elaborated: "We need to again take on the NRA, which holds itself out as a charitable organization. But in fact, they are not. ***They are nothing more than a criminal enterprise.*** We are waiting to take on all of the banks that finance them, their investors."[21] James falsely, maliciously accused the NRA of criminal conduct in the hope of damaging its goodwill

---

[19] *See* Mike Spies, *Tom Selleck Quits NRA Board*, THE TRACE (Sept. 18, 2018), https://www.thetrace.org/2018/09/tom-selleck-quits-nra-board/; *see also* Mike Spies & John Cook, *Top NRA Executive's Trail of Business Flops and Unpaid Debt*, THE TRACE (Oct. 1, 2018), https://www.thetrace.org/2018/10/nra-josh-powell/; *see also* Mike Spies & John Cook, *For the Second Time in Two Years, the NRA Will Raise Dues on Members*, THE TRACE (Aug. 27, 2018), https://www.thetrace.org/2018/08/nra-membership-dues-increase/; *see also* Alex Yblon & Mike Spies, *FAQ: Is the NRA Going Broke?*, THE TRACE (Aug. 9, 2018), https://www.thetrace.org/2018/08/nra-financial-health-new-york-state-lawsuit-carry-guard/; *see also* Brian Freskos, *We Translated Maria Butina's Russian Blog Posts. Here's What They Reveal About Her Obsession with the NRA*, THE TRACE (July 24, 2018), https://www.thetrace.org/2018/07/maria-butina-nra-russian-blog-post-translation/.

[20] *See* New York City Bar Association, *Forum for the Democratic Attorney General Primary Candidates*, YOUTUBE (Sept. 4, 2018), https://www.youtube.com/watch?v=6n2_LHNEUW0 (statement at the 17:50 mark).

[21] *See* Our Time Press, *Attorney General Candidate, Public Advocate Letitia James*, https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (last visited Feb. 11, 2020).

among existing and potential members, donors, and business partners, as well as its access to funds. James's "criminal enterprise" language, accompanied by references to collateral action against financiers and bankers, deliberately invoked the specter of a broad, RICO-style action that could ensnare and punish anyone who supported the NRA. The purpose and effect of James's statement was to induce a belief that the NRA had engaged in criminal (likely, racketeering) activity that placed its banks and business counterparties at risk of law-enforcement action.

18. Similarly, on October 31, 2018, in an interview with *Ebony Magazine*, James stated that "the NRA holds [itself] out as a charitable organization, but in fact, [it] really [is] a ***terrorist organization***."[22] Against the backdrop of similar statements that were routinely couched in references to specific laws and promises of law-enforcement action, this statement was not mere heated political rhetoric. Rather, it was intended to reiterate and reinforce James's false, malicious assertion that the NRA had committed serious crimes, including crimes for which its financial backers might face repercussions.

19. Unsurprisingly, amid such wild accusations, investigative reporters from outlets other than *The Trace* began to inquire whether James's claims against the NRA had any merit. The NRA engaged patiently and extensively with Pulitzer Prize-winning journalists from both *The Wall Street Journal* and *The New York Times* to elucidate footnotes on its tax returns and rectify lies about its governance. Ultimately, neither newspaper reported anything to substantiate James's accusations—nor could they. As James knew, her claims were false.

---

[22] *See* Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorks-next-attorney-general/ (emphasis added).

20. Although it was confident in the propriety of its own finances and governance, the NRA sought to leave no stone unturned in the face of James's threats. Accordingly, in 2018, the NRA began to strengthen its demands for documentation and verification of compliance by third-party vendors with their NRA contracts. On April 11, 2019, the NRA filed an action for specific performance against one vendor, the advertising agency Ackerman McQueen, which had failed to comply with the NRA's requests for documents under a contractual record-inspection right. Determined to strike before the NRA could prevail against Ackerman (and duly repudiate, under New York not-for-profit law, any improper transaction or expenditure the agency had concealed), James, *The Trace*, and Everytown sprang into action. On April 17, 2019, Everytown filed complaints with the IRS and New York State targeting the NRA's tax-exempt status. The same day, *The New Yorker* published a purported exposé of the NRA—authored by *Trace* staffer Mike Spies—which replicated Everytown's claims.

21. Shortly thereafter, James delivered on the first part of her campaign promise to "take down the NRA." On April 27, 2019, she announced a Charities Bureau investigation into the NRA's not-for-profit status.

**D.   The Conduct Of The NYAG's Investigation Underscores James's Improper, Viewpoint-Discriminatory Purpose.**

22. Even though James had defamed and inveighed against the NRA, the NRA initially extended the benefit of the doubt to the Office of the Attorney General and offered to cooperate with any good-faith inquiry into its finances.[23] After all, the NYAG is the supervising regulator for all New York not-for-profits, including the NRA. The NRA hoped that, despite its

---

[23] Gabriela Resto-Montero, *New York's attorney general opens investigation into the NRA as its president steps down*, VOX, (April 28, 2019) https://www.vox.com/policy-and-politics/2019/4/27/18519685/nra-ceo-accuses-president-extortion-wayne-lapierre-oliver-north ("A lawyer for the NRA said the organization will 'fully cooperate' with the investigation, and added, 'The NRA is prepared for this, and has full confidence in its accounting practices and commitment to good governance.'").

political differences with James, it might rectify any misunderstandings and put the matter to rest—just as it had rectified misunderstandings in its interactions with the *Wall Street Journal* and the *New York Times*.

23.     The NRA's hopes were quickly dashed. While purporting to accept the NRA's offer of cooperation (and suggesting a meeting to such effect), James's staff secretly subpoenaed the NRA's accounting firm, demanding reams of sensitive records, including names of NRA members and donors—and tried to forbid the firm from alerting the NRA. And when the NRA requested that confidential documents produced to the NYAG Charities Bureau be maintained in confidence for purposes of James's purported charitable-compliance investigation—and not given to other NYAG staff who were adverse to the NRA on Second Amendment matters—the NYAG flatly refused.

24.     A state attorney general is obligated to seek justice and not just win at all costs. As counsel for a state or governmental agency, the attorney general owes duties similar to prosecutors in criminal cases,[24] and she is bound by the so-called "Neutrality Doctrine" even in civil litigation. The United States Supreme Court has stated that a government attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore is not that it shall win a case, but that justice shall be done."[25]

25.     Courts have recognized that this principle also applies in civil cases and have held that a "government lawyer in a civil action or administrative proceedings has the responsibility to seek justice and develop a full and fair record, and he should not use his position or the economic

---

[24] *See* Model Rules of Professional Conduct 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

[25] *See Berger v. United States*, 295 U.S. 78, 88 (1935) (criminal case).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

power of the government to harass parties or to bring about unjust settlements or results."[26] A government lawyer in such a scenario is held to a higher standard than a lawyer in private practice and "should refrain from instituting or continuing litigation that is obviously unfair."[27]

26. Put differently, a government attorney "'may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.'"[28] Additionally, a government lawyer "has obligations that might sometimes trump the desire to pound an opponent into submission."[29] Courts have expressly recognized that a state attorney general "is to decline the use of individual passions, and individual malevolence."[30]

27. As a pillar of her campaign platform, James boasted that she would strike foul blows against the NRA and pound the NRA into submission. She vowed that she would use the NYAG's investigative and enforcement powers for the precise purpose of stanching political speech ("deadly propaganda") with which she and Cuomo disagree. She has begun to deliver on her campaign promises to retaliate against the NRA for constitutionally protected speech on issues that James opposes. As NYAG, James has regrettably succumbed to "individual passions, and individual malevolence."

28. There can be no doubt that the James's actions against the NRA are motivated and substantially caused by her hostility toward the NRA's political advocacy.

---

[26] *See People ex rel. Clancy v. Superior Court*, 39 Cal.3d 740, 746 (1985) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[27] *Freeport McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[28] *Berger*, 295 U.S. at 88. *See also DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017) *reconsideration denied sub nom. DaCosta v. Tranchina*, 285 F. Supp. 3d 566 (E.D.N.Y 2018).

[29] *Freeport McMoRan Oil & Gas Co.*, 962 F.2d at 48.

[30] *State of R.I. v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008) (quoting *Foute v. State*, 4 Tenn. (3 Hayw.) 98, 99 (1816)).

29. James's Charities Bureau investigation is nothing more than a pretext for her goal of depriving the NRA, its members, and its donors of their constitutional right to freedom of speech under the First Amendment. In actual fact, the NRA's finances are more robust than ever, and it operates to a high standard of compliance with New York not-for-profit law.

**E.  The Damage Done.**

30. James's threatened, and actual, regulatory reprisals are a blatant and malicious retaliation campaign against the NRA and its constituents based on her disagreement with the content of their speech. This wrongful conduct threatens to destabilize the NRA and chill the speech of the NRA, its members, and other constituents.

V.

**COUNT ONE**

**Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 And Article 1, Section 8 Of The New York Constitution By Retaliating Against The NRA Based On Its Speech**

31. Under 42 USC § 1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

32. The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

33. The First Amendment, which applies to James by operation of the Fourteenth Amendment, and Article One, Section Eight of the New York Constitution, secures the NRA's

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND

right to free speech, including its right to express political beliefs concerning the constitutionally protected right to keep and bear arms.

34. The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although James disagrees with and opposes the NRA's political views, the NRA's freedom to express its views is a fundamental right protected by the First Amendment.

35. James's actions as NYAG—including, but not limited to, the investigation into the NRA's tax-exempt status—were undertaken directly in response to and substantially motivated by the NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech, which is protected by the First Amendment. Cuomo has actively directed and been continuously involved in the foregoing conduct.

36. Although influenced by Cuomo, James maintains the discretion in determining whether and how to carry out her actions, including the decision to initiate a wrongful investigation into the NRA's business practices. James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.

37. James's unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

38. James's intentional actions have resulted in significant damages to the NRA, including, but not limited to, damages due to reputational harm, as well as injury to the NRA's trade, business, or profession.

39. The NRA is also entitled to compensatory and punitive damages from James in her personal capacity, as well as an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

40. Absent an injunction against Defendants' violation of the NRA's rights to free speech, the NRA will suffer irrecoverable loss and irreparable harm.

## COUNT TWO

### Declaratory Judgment

41. The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

42. A substantial controversy exists between James and her office, on the one hand, and the NRA, on the other hand, regarding whether the NRA operates in compliance with New York State not-for-profit law. James and the NRA have adverse legal interests with respect to this controversy, and the conflict is sufficiently real and immediate to warrant the issuance of a declaratory judgment. James is maligning the NRA in the press (including by calling it a "criminal enterprise" that merely "masquerade[es] as a charity"), and harassing the NRA and its business counterparties and stakeholders with invasive subpoenas, and the NRA has been and continues to be damaged by James's actions. The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

43. Accordingly, the NRA seeks a judgment declaring that the NRA is operating in substantial compliance with New York not-for-profit law.

### VI.

### DEMAND FOR JURY TRIAL

44. The NRA hereby demands a trial by jury on all issues so triable.

## VII.

## **REQUEST FOR RELIEF**

WHEREFORE the NRA respectfully requests that the Court enter judgment in the Plaintiff NRA's favor and against Defendant James, as follows:

a. Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated and continue to violate the NRA's rights to free speech under both the Federal and New York Constitutions;

b. Granting, pursuant to 28 U.S.C. § 2202, a stay of James's and/or the Charities Bureau's investigations into the NRA's not-for-profit status;

c. Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering James, the Charities Bureau, its agents, representatives, employees and servants and all persons and entities in concert or participation with it and James (in her official capacity), to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution;

d. Granting such other injunctive or equitable relief to which the NRA is entitled;

e. Granting and entering a judgment declaring that the NRA is operating in substantial compliance with New York not-for-profit law;

f Granting and entering a judgment that in light of the retaliatory intent and chilling effect of James's actions, any further investigation of the NRA by the NYAG implicates First Amendment concerns, and should be narrowly tailored to further a compelling government interest;

Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

g. Awarding the NRA exemplary or punitive damages;

h. Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

i. Granting the NRA such other and further relief as this Court deems just and proper.

Dated: August 6, 2020

Respectfully submitted,

By: ___/s/ William A. Brewer III___
William A. Brewer III
wab@brewerattorneys.com
Sarah B. Rogers
sbr@brewerattorneys.com

**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
ORIGINAL COMPLAINT AND JURY DEMAND