**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | CASE NO. 1:20-CV-00889-MAD-TWD |
| v. | § § | |
| LETITIA JAMES, in her individual and official capacity, | § § § | |
| Defendant. | § § § § § § § | |

<u>**NATIONAL RIFLE ASSOCIATION OF AMERICA'S**</u>
<u>**AMENDED COMPLAINT AND JURY DEMAND**</u>

Plaintiff the National Rifle Association of America (the "NRA" or "Association") files this Amended Complaint and Jury Demand ("Complaint") against Defendant Letitia James, New York State Attorney General ("James"), in her individual capacity and official capacity, upon personal knowledge of its own actions, and upon information and belief as to all other matters, as follows:

**I.**

<u>**PRELIMINARY STATEMENT**</u>

In the wake of violent tragedies, amid a polarized political landscape, a candidate for the New York State Office of the Attorney General ("NYAG") made a stunning campaign promise. If elected, she would "take down the NRA"—not by refuting its policy positions or by advocating for gun control legislation, but by wielding the enforcement powers she hoped to possess if she were elected as NYAG. In short, James promised that, if elected, she would dismantle the NRA as a non-profit corporation.

Page **1** of **42**

James repeatedly made clear during her campaign that she saw "no distinction"[1] between the NRA's charitable existence and its ability to engage in pro-gun political speech (which she characterized as "poisonous" and "deadly propaganda").[2] She maligned the NRA as a "terrorist organization" and a "criminal enterprise." And she was explicit about her plan: her "top issue" would be to leverage her "power as an attorney general to regulate charities" to instigate a fishing expedition into the NRA's "legitimacy . . . to see whether or not they have in fact complied with the not-for-profit law in the State of New York."[3] In other words, she would use her office's dissolution power to seek a corporate death sentence for the NRA in order to silence its political advocacy. She further vowed that financial institutions and donors linked to the NRA would be pursued by law enforcement—akin to supporters of Al Qaeda or the mafia.[4]

James's promise to weaponize New York's law-enforcement apparatus against the NRA, its banks, and its financial supporters echoed prior, similar threats (and actions) by her longtime supporter, Governor Andrew Cuomo. In a stunning course of misconduct that drew dire criticism from the ACLU[5] and instigated another pending First Amendment lawsuit that has withstood

---

[1] *See Annual NRA Fundraiser Sparks Protests*, LI HERALD (Oct. 25, 2018), http://liherald.com/stories/ nassau-protests-nra-fundraiser,107617.

[2] *See* Jon Campbell, *NY AG Letitia James Called the NRA a 'Terrorist Organization.' Will It Hurt Her Case?*, USA TODAY (Aug. 19, 2020), https://www.usatoday.com/story/news/politics/2020/08/19/nra-lawsuit-ny-ag-letitia-james-past-comments/5606437002/.

[3] *See* Jillian Jorgensen, *Letitia James Says She'd Investigate NRA's Not-For-Profit Status If Elected Attorney General*, N.Y. DAILY NEWS (July 12, 2018), https://www.nydailynews.com/news/politics/ny-pol-tish-james-nra- 20180712-story.html.

[4] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), http://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

[5] See David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, *Speak Freely* (Aug. 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-

multiple motions to dismiss,[6] Cuomo conspired with willing leadership at the New York Department of Financial Services ("DFS") in a campaign to "#BankruptTheNRA"[7] by threatening its financial service providers with retaliatory, invasive investigations. This plan, originally concocted in 2017, called for the Attorney General's office to conduct a parallel "investigation" of the NRA to "find" reasons to commence legal actions against the Association. The NRA became aware of this scheme when the then-New York Attorney General Eric Schneiderman became so troubled by it that he telephoned the NRA with an advance warning. Unfortunately, Schneiderman later resigned, and his successor harbors no similar reservations about weaponizing the powers of her office over non-profits like the NRA.

Shortly after taking office, James commenced her long-promised investigation into the NRA's finances, personnel, operations, and political strategy, all with the purpose of damaging the NRA politically, diverting its corporate resources, and contriving a pretext to dissolve the NRA without ever making a meaningful effort to engage cooperatively with NRA leadership, or making a demand on the NRA Board and giving it a fair opportunity to take appropriate action to address compliance issues raised by the NYAG and correct alleged deficiencies. Instead, the NYAG served voluminous document requests encompassing virtually almost every scrap of digital and hard-copy

---

allowed-stifle-nras-political-speech; *see also* Cheryl Chumley, *ACLU defends NRA - - Yes, You Read That Right*, WASH. TIMES (Aug. 27, 2018) https://www.washingtontimes.com/news/2018/aug/27/aclu-defends-nra-yes-you-read-right/; *see also* Declan McCullagh, *ACLU Sticks Up for the NRA?!*, REASON (Aug. 24, 2018), https://reason.com/2018/08/24/aclu-teams- up-with-nra/.

[6] *Nat'l Rifle Ass'n of Am. v. Cuomo,* Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.). When the NRA filed this action, it designated it as a "related case" to the *Cuomo* proceedings, and the NRA believes these lawsuits are properly so-treated. Dkt. 1.

[7] *See* August 4, 2018 Facebook post by Andrew Cuomo, https://www.facebook.com/ andrewcuomo/posts/new-york-is-forcing-the-nra-into-financial-crisis-its-time-to-put-the-gun-lobby-/10155989594858401/.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

data at or pertaining to the NRA, and interfered with the NRA's vendors, professionals, and fiduciaries' obligations to protect the NRA's privileges—without any legal basis.

Notwithstanding that her unconstitutional, retaliatory investigation found no evidence to support her audacious claims, James predictably concluded it by filing a dissolution action on August 6, 2020 (the "State Dissolution Action")[8]. Despite surpassing 160 pages, the State Dissolution Action does not come close to alleging that the NRA is what she had claimed on the campaign trail: namely, a systemically fraudulent, "sham" charity of the kind NYAG has targeted for dissolution in the past. Indeed, the State Dissolution Action does not (and cannot) dispute that the NRA raises and spends hundreds of millions of dollars each year to advance its constitutionally protected and famously effective gun-rights advocacy. Rather, James seeks to shutter a five-million-member political advocacy organization based solely on allegations of misconduct by four individual executives, two of whom no longer work at the NRA (and one of whom was fired by the NRA for many of the same items alleged). Given that it is obviously political, the State Dissolution Action has shocked civil liberties advocates and legal and public policy scholars.[9]

---

[8] The State Dissolution Action was initially filed with a defective verification, rendering it a nullity under New York law. N.Y. CPLR 3022. The NRA promptly provided notice to the NYAG that it was treating it as such. *See* State Dissolution Action Dkt. 10. NYAG filed an amended complaint with a proper verification on August 10, 2020, rendering this case first-filed. State Dissolution Action Dkt. 11.

[9] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a*

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

More importantly, it violates freedoms guaranteed by the United States Constitution and the Constitution of the State of New York.

## II.

## PARTIES

1.      The NRA is a non-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of marksmanship and gun safety education for the military, law enforcement and civilians. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

2.      James is the Attorney General of the State of New York and, at certain times relevant to the Complaint, was acting individually—as she sought political office—and at other

---

*Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms.").

times under color of state law. Her principal place of business is The Capitol, Albany, New York 12224-0341. James is sued in her individual and official capacities.

## III.

## JURISDICTION AND VENUE

3.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution, and because this action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b).

5.     There is a present and actual controversy between the parties.

6.     The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

## IV.

## STATEMENT OF RELEVANT FACTS

A.     The NRA: Support For Gun Safety And A Commitment To Core Political Speech.

7.     After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. The officers believed that the war would have ended

significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers. They obtained a charter from the State of New York in November of 1871, and thereafter began a proud legacy of marksmanship training and Second Amendment and gun safety advocacy.

8.      From its inception, the NRA received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For decades, the NRA partnered with the State to advance marksmanship, firearms safety, education, conservation, and other public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the Public Schools Athletic League marksmanship program.[10] In 1949, President Harry Truman lauded this training, observing that it "materially aided our war effort" and that he hoped "the splendid program which the National Rifle Association has conducted for three-quarters of a century will be continued."[11] Also in 1949, the NRA partnered with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game departments across the country and in Canada, helping to make hunting among the safest sports in existence.

9.      First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." Accordingly, political speech is a major

---

[10] *See e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM.

[11] Letter of Pres. Truman to C.B. Lister, NRA Sec.-Treas., Nov. 14, 1945.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

purpose of the NRA and the NRA engages in extensive political speech and legislative advocacy
to promote and vindicate the rights of its members and all Americans.

10.     Today, the NRA spends tens of millions of dollars annually distributing pamphlets,
fact sheets, articles, electronic materials, and other literature to advocate in support of Second
Amendment freedoms and to assist NRA members who engage in national, state, and local firearm
dialogue and debate. The NRA's direct mail, television, radio, and digital communications seek to
educate the public about issues bearing on the Second Amendment, defend the right of the people
to keep and bear arms from infringement, defend the NRA and its members against political and
media attacks, and galvanize participation in the political process by NRA members and
supporters, and others who care about the right to keep and bear arms, and want to keep it.

11.     To its critics, the NRA is best known as a "superlobby – one of the largest and most
. . . conservative lobbying organizations in the country," able to mobilize its millions of members
in concerted efforts to protect the Second Amendment rights of all Americans.[12] In addition, the
NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying"
activities constitute precisely the type of political speech which rests "[a]t the core of the First
Amendment."[13]

---

[12] Christina Robb, *Handguns and the American Psyche: The Attempted Assassination of a
President Brings the Issue into Sharp Focus Once Again. Handguns – What Do They Mean to
Americans? To the NRA, They Are a Symbol of Freedom; To Those Frightened of Crime, They
Represent Safety – Even if the Owner Doesn't Know How to Use Them; To Gun Control Advocates,
They Are Symbols of Ultimate Evil*, BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[13] *See, e.g.*, *Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

**B.**     <u>Various Elected Officials in New York Target the NRA Based on the Viewpoints Expressed in Its Speech.</u>

12.     In recent years, the NRA's corporate domicile—New York—has witnessed the ascendancy of governmental officials determined to make the state a dangerous place for Second Amendment advocacy. Although the NRA welcomes fair, full-throated policy debate, it cannot abide the corrupt misuse of government power by certain New York officials attempting to squelch political opposition to benefit themselves and advance their own careers. Unfortunately, this is what has occurred, and is already the subject of another ongoing federal lawsuit.

13.     New York Governor Andrew Cuomo has a longstanding political vendetta against "Second Amendment types,"[14] especially the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[15] For Cuomo, silencing the NRA is a career strategy. During 2018, Cuomo and several political allies, including the former Superintendent of the Department of Financial Services ("DFS"), orchestrated a campaign of selective enforcement, backroom exhortations, retaliation and public threats designed to coerce financial institutions operating in New York to blacklist pro-gun advocacy groups, especially the NRA. The NRA's

---

[14] On February 15, 2018, Cuomo appeared on the MSNBC program *The Beat with Ari Melber*, where he discussed championing legislation that some believed "trampled the Second Amendment." *Gov. Andrew Cuomo On Background Checks: "Bunch of Boloney* [sic]*" | The Beat with Ari Melber MSNBC*, *available at* https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited June 6, 2020). However, Cuomo lamented that his "favorability rating" had dropped thereafter due to "backlash from conservatives and Second Amendment types." *Id.*

[15] *See* Kenneth Lovett, *Exclusive: Cuomo Fires Back at Jeb Bush for 'Stupid' and 'Insensitive' Gun Tweet*, N.Y. DAILY NEWS (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

First Amendment claims arising from this conduct have withstood motions to dismiss and are currently pending in the United States District Court for the Northern District of New York.[16]

14.     James's predecessor in office, New York Attorney General Eric Schneiderman, defied his own party loyalties to warn the NRA that he was being urged to use his office in support of these politically motivated efforts. In a telephone call to Tom King, an NRA director, in mid-2017, Schneiderman emphasized that while he opposed the NRA's positions on the Second Amendment, he was troubled by recent, extraordinary pressures being placed on him by Cuomo and others to weaken the NRA as a political force in 2020. Schneiderman advised King to "get ready."

15.     Although the NRA believed it was operating in compliance with New York State law, it also understood that a politically driven "compliance audit" was something for which it should carefully prepare. To fortify its defenses, the NRA undertook a top-to-bottom review of its operations and governance.[17] In the process, the NRA met with resistance from a handful of its

---

[16] *Nat'l Rifle Ass'n of Am. v. Cuomo*, Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.).

[17] Despite framing the NRA as a fraudulent organization beyond repair, James's own complaint extensively documents that the NRA voluntarily undertook efforts to improve its internal governance functions beginning in 2017, up to the present day. These efforts include replacing Defendant Wilson Phillips with a new treasurer that the complaint repeatedly lauds for engaging in remedial efforts such as a 50% reduction in travel expenses (Ex. A ¶ 156), "reengineering" the process for handling Defendant Wayne LaPierre's expense reimbursements to "make it . . . robust and appropriate" (Ex. A ¶ 197), investigating and terminating a complained-of vendor contract with HomeTelos in the spring of 2018 (Ex. A ¶ 225), examining Defendant Joshua Powell's improper expenses and engaging outside counsel to assist, and confronting Powell regarding improper conflicts of interest in mid-2018, resulting in Powell's removal and repayment of misappropriated monies to the NRA (Ex. A ¶¶ 249-50, 263), and investigating and examining the improper use of a corporate credit card by LaPierre's senior assistant (Ex. A ¶ 294). The NRA engaged outside counsel to do an extensive review of the NRA's relationship with its contractual partners and in service of that effort ultimately commenced litigation against Ackerman to obtain documentation that Ackerman has been withholding. (Ex. A ¶¶ 302, 455). The NRA has further been evaluating the establishment of an internal audit function (Ex. A ¶ 483) and adopted a revised whistleblower policy in January 2020. (Ex. A ¶ 115).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

executives and vendors who did not welcome the NRA Board's push for additional documentation and transparency. Over the ensuing year, the NRA became embroiled in litigation with those it determined had abused its trust. These fights were difficult, but the NRA stuck to its guns, determined to protect its mission, message, members and donors and prepare itself to fend off a political attack from the NYAG if one came.

16.     Months after delivering his warning to Mr. King, Schneiderman resigned from office. Nearly all other candidates to replace him took affirmative steps to distance themselves[18] from Cuomo—who presided over a government that the *New York Times* called "historically corrupt" and "a chamber of ethical horrors."[19] But as the NRA's First Amendment lawsuit against Governor Cuomo received increased coverage during the summer of 2018 (and garnered support from the American Civil Liberties Union),[20] James—whom the *New York Times* expressly declined to endorse due to perceived corrupt ties to Cuomo[21]—adopted Cuomo's plan and made the political prosecution of the NRA a central campaign theme. She embraced Cuomo's endorsement, pursued

---

[18] *See* Jeffery Mays, *Letitia James Has Embraced Andrew Cuomo. Is It Worth It?* N.Y. TIMES (Aug. 13, 2018), https://www.nytimes.com/*2018*/08/13/nyregion/letitia-james-attorney-general-independence.html.

[19] Editorial, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's Primary*, N.Y. TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

[20] *See* David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, SPEAK FREELY (Aug. 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-allowed-stifle-nras-political-speech; *see also* Cheryl Chumley, *ACLU defends NRA - - Yes, You Read That Right*, WASH. TIMES (Aug. 27, 2018) https://www.washingtontimes.com/news/2018/aug/27/aclu-defends-nra-yes-you-read-right/; *see also* Declan McCullagh, *ACLU Sticks Up for the NRA?!*, REASON (Aug. 24, 2018), https://reason.com/2018/08/24/aclu-teams- up-with-nra/.

[21] Editorial, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's* Primary, N.Y. TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

contributions from his donors,[22] and promised to apply the same unconstitutional tactics against the NRA. On September 6, 2018, James announced that, if elected, she would follow Cuomo's financial-blacklisting campaign by "put[ting] pressure upon the banks that finance the NRA" in order to choke off support for its Second Amendment speech.[23] She also reiterated her attacks on the NRA's legitimacy as a not-for-profit corporation.[24]

**C.**     **James Maliciously Defames the NRA to Create a Pretext for Law Enforcement Action.**

17.     To create air cover for her campaign against the NRA (which had begun to attract bipartisan criticism),[25] James coordinated actively with Everytown for Gun Safety ("Everytown"), an activist organization richly endowed by Michael Bloomberg whose explicit political mission is to oppose the NRA. The group has played a similar role in support of James's attacks on the NRA's legitimacy as a charitable organization.

18.     Everytown funds a digital media outlet known as *The Trace*, which dedicates itself to publishing salacious anti-NRA articles. During late summer and early fall 2018, as James pledged that she would wield state power to "see whether or not the[] [NRA] ha[d] in fact complied

---

[22] *Id.*

[23] *See Attorney General Candidate, Public Advocate Letitia James* OUR TIME PRESS (Sept. 6, 2018), https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/.

[24] *Id.*

[25] *See, e.g.*, Matt Ford, *The NRA Is Not a Domestic Terrorist Organization*, THE NEW REPUBLIC (Sept. 17, 2019), https://newrepublic.com/article/155085/nra-not-domestic-terrorist-organization; Jim Geraghty, *For Americans' Gun Rights, the Stakes in 2020 Are as High as Ever*, NAT'L REV. (Apr. 25, 2019), https://www.nationalreview.com/the-morning-jolt/for-americans-gun-rights-the-stakes-in-2020-are-as-high-as-ever/ ("Even if the IRS doesn't find the Bloomberg group's complaint compelling, New York State's new attorney general, Letitia James, pledged to investigate whether the NRA is complying with the requirements for nonprofit organizations. James, a fierce proponent of gun control, may very well be driven by political ambitions …").

with the not-for-profit law," *The Trace* began to publish articles that purported to focus on governance, spending, and personnel issues at the NRA.[26]

19.     Importantly, James began to publicize false, defamatory assertions that the NRA engaged in criminal activity. On September 4, 2018, during a debate between Democratic candidates, James stated that, if elected, her "top issue" would be "going after the NRA because ***it is a criminal enterprise***."[27] Two days later, James doubled down on this assertion, and elaborated: "We need to again take on the NRA, which holds itself out as a charitable organization. But in fact, they are not. ***They are nothing more than a criminal enterprise.*** We are waiting to take on all of the banks that finance them, their investors."[28] James maliciously accused the NRA of criminal conduct in the hope of damaging its goodwill among existing and potential members, donors, and business partners, as well as its access to funds. James's "criminal enterprise" language, accompanied by references to collateral action against financiers and bankers, deliberately invoked a determination to ensnare and punish anyone who supported the NRA. The

---

[26] *See* Mike Spies, *Tom Selleck Quits NRA Board*, THE TRACE (Sept. 18, 2018), https://www.thetrace.org/2018/09/tom-selleck-quits-nra-board/; *see also* Mike Spies & John Cook, *Top NRA Executive's Trail of Business Flops and Unpaid Debt*, THE TRACE (Oct. 1, 2018), https://www.thetrace.org/ 2018/10/nra-josh-powell/; *see also* Mike Spies & John Cook, *For the Second Time in Two Years, the NRA Will Raise Dues on Members*, THE TRACE (Aug. 27, 2018), https://www.thetrace.org/2018/08/nra-membership-dues-increase/; *see also* Alex Yablon & Mike Spies, *FAQ: Is the NRA Going Broke?*, THE TRACE (Aug. 9, 2018), https://www.thetrace.org/2018/08/nra-financial-health-new-york-state-lawsuit-carry-guard/; *see also* Brian Freskos, *We Translated Maria Butina's Russian Blog Posts. Here's What They Reveal About Her Obsession with the NRA*, THE TRACE (July 24, 2018), https://www.thetrace.org/2018/07/maria-butina-nra-russian-blog-post-translation/.

[27] *See* New York City Bar Association, *Forum for the Democratic Attorney General Primary Candidates*, (Sept. 4, 2018), *available at* https://www.youtube.com/ watch?v=6n2_LHNEUW0 (statement at the 17:50 mark).

[28] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

purpose and effect of James's statement was to induce a belief that the NRA engaged in criminal activity that placed its banks and business counterparties at risk of law-enforcement action.

20. Similarly, on October 31, 2018, in an interview with *Ebony Magazine*, James stated that "the NRA holds [itself] out as a charitable organization, but in fact, [it] really [is] a ***terrorist organization***."[29] Against the backdrop of similar statements that were routinely couched in references to specific laws and promises of law-enforcement action, this statement was not mere heated political rhetoric. Rather, it was intended to reiterate and reinforce James's false, malicious assertion that the NRA had committed serious crimes, including crimes for which its financial backers might face repercussions.

21. Unsurprisingly, amid such wild accusations, investigative reporters from outlets other than *The Trace* began to inquire whether James's claims against the NRA had any merit. The NRA engaged patiently and extensively with Pulitzer Prize-winning journalists from both *The Wall Street Journal* and *The New York Times* to rectify lies about its governance.

22. Although confident in the propriety of its own finances and governance, the NRA sought to leave no stone unturned in the face of James's threats. Accordingly, the NRA began to prepare for the predictable outcome of a James victory in the NYAG election: a pretextual investigation into its compliance with New York law. As it pursued its own internal review, the NRA determined that a relatively small group of vendors, executives and fiduciaries were not complying with NRA policies and/or reporting requirements. As such, the Association took steps to bring all into full compliance. On April 11, 2019, for example, the NRA filed an action for

---

[29] *See* Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorks-next-attorney-general/ (emphasis added).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

specific performance against its then-largest vendor, the advertising agency Ackerman McQueen, which had refused to comply with the NRA's requests for documents under a contractual record-inspection right. Rather than support the NRA's efforts, James coordinated with Everytown to undermine them. On April 17, 2019, Everytown filed complaints with the IRS and New York State targeting the NRA's tax-exempt status.[30] The sole source cited in those complaints was a *New Yorker* article published the same day—authored by *Trace* staffer Mike Spies—which replicated Everytown's claims.

23.     Ten days later, on April 27, 2019, James delivered on the first part of her campaign promise to target the NRA. Within months of her inauguration, the NYAG predictably launched a sweeping investigation.

**D.     The NYAG's Pretextual "Investigation" Underscores James's Plan to Destroy the NRA.**

24.     Even though James defamed and inveighed against the NRA, the NRA initially offered to cooperate with any good-faith inquiry into its finances.[31] After all, the NYAG is the supervising regulator for all New York non-profits, including the NRA.

25.     Rather than accept the NRA's offer of cooperation in good faith, James's staff secretly subpoenaed the NRA's accounting firm, demanding reams of sensitive records, including

---

[30] *See* Press Release, *Everytown Files Complaint About NRA's Tax-Exempt Status With IRS, Calls for Federal and State Investigations into the NRA* (Apr. 18, 2019), https://everytown.org/press/everytown-files-complaint-about-nras-tax-exempt-status-with-irs-calls-for-federal-and-state-investigations-into-the-nra/.

[31] Gabriela Resto-Montero, *New York's Attorney General Opens Investigation into the NRA as Its President Steps Down*, VOX, (Apr. 28, 2019), https://www.vox.com/policy-and-politics/2019/4/27/18519685/nra-ceo-accuses-president-extortion-wayne-lapierre-oliver-north ("A lawyer for the NRA said the organization will 'fully cooperate' with the investigation, and added, 'The NRA is prepared for this, and has full confidence in its accounting practices and commitment to good governance.'").

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

names of NRA members and donors—and tried to forbid the firm from alerting the NRA, despite its obligation under the Internal Revenue Code to do so. When the NRA requested that confidential documents produced to the NYAG Charities Bureau be maintained in confidence for purposes of James's purported charitable-compliance investigation—and not given to other NYAG staff who were adverse to the NRA on Second Amendment matters—the NYAG flatly refused.

26.     A state attorney general is obligated to seek justice and not just "win at all costs." As counsel for a state executive branch agency, the attorney general owes duties similar to prosecutors in criminal cases,[32] and she is bound by the so-called "Neutrality Doctrine" even in civil litigation. The United States Supreme Court has stated that a government attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore is not that it shall win a case, but that justice shall be done."[33] This state's highest court has similarly held that "conscious discrimination by public authorities taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action."[34]

---

[32] *See* Model Rules of Professional Conduct 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."); *see also "The Right Thing" Ethical Guidelines for Prosecutors*, District Attorneys Association of the State of New York (2016), http://www.daasny.com/wp-content/uploads/2016/02/2016-Ethics-Handbook.pdf ("District Attorneys . . . shall not . . . Misuse their public positions for the purpose of obstructing or furthering the political activities of any political party or candidate."); *see also* U.S. Department of Justice Manual § 9-27.260 ("In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government should not be influenced by: The person's . . . political association, activities or beliefs . . . [or] The attorney's own personal feelings concerning the person [or] the person's associates . . . .").

[33] *See Berger v. United States*, 295 U.S. 78, 88 (1935) (criminal case).

[34] *303 West 42nd St. v. Klein*, 46 N.Y.2d 686, 693 (1979).

27.     Courts have recognized that this principle also applies in civil cases and have held that a "government lawyer in a civil action or administrative proceedings has the responsibility to seek justice and develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results."[35] A government lawyer in such a scenario is held to a higher standard than a lawyer in private practice and "should refrain from instituting or continuing litigation that is obviously unfair."[36]

28.     Put differently, a government attorney "'may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.'"[37] Additionally, a government lawyer "has obligations that might sometimes trump the desire to pound an opponent into submission."[38] Courts have expressly recognized that a state attorney general "is to decline the use of individual passions, and individual malevolence."[39]

29.     As a pillar of her campaign platform, James boasted that she would strike blows against the NRA and pound the NRA into submission. She vowed that she would use the NYAG's enforcement powers for the precise purpose of stanching political speech ("deadly propaganda") with which she and Cuomo disagree. She has begun to deliver on her campaign promises to

---

[35] *See People ex rel. Clancy v. Superior Court*, 39 Cal.3d 740, 746 (1985) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[36] *Freeport McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[37] *Berger v United States*, 295 U.S. 78, 88 (1935). *See also DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017) *reconsideration denied sub nom. DaCosta v. Tranchina*, 285 F. Supp. 3d 566 (E.D.N.Y 2018).

[38] *Freeport McMoRan Oil & Gas Co*., 962 F.2d 45, 48 (D.C. Cir. 1992).

[39] *State of R.I. v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008) (quoting *Foute v. State*, 4 Tenn. (3 Hayw.) 98, 99 (1816)).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

retaliate against the NRA for constitutionally protected speech on issues that James opposes. As NYAG, James has regrettably succumbed to "individual passions, and individual malevolence."

30.     In truth, James's Charities Bureau investigation is nothing more than a pretext for her goal of depriving the NRA, its members, and its donors of their constitutional rights to freedom of speech and association under the First Amendment, and to the right to keep and bear arms under the Second Amendment.

**E.     James Seeks the Extraordinary and Unprecedented Relief of Dissolution Based Solely on Alleged Executive Misconduct.**

31.     On the evening of August 5, 2020, James teased a press conference the following morning regarding a "major national" announcement.[40] The next day, she took to the stage to announce that she would sue to dissolve the NRA. At the same time, the NRA commenced this lawsuit. A copy of the dissolution complaint and its exhibits is attached hereto as Exhibits A and B. Notably (and to the apparent surprise of one reporter attending the press conference), James made no attempt to settle her purported grievances against the NRA or monitor or reform the NRA to remedy the alleged corruption.[41] Of course, improving the NRA's governance is not James's goal—dissolving a political enemy is.

32.     The same day, in an obviously coordinated effort, the Attorney General for the District of Columbia also filed suit against the NRA and the NRA's 501(c)(3) arm, the NRA

---

[40] *See New York Attorney General to Deliver 'Major National Announcement,"* WASH. EXAMINER (Aug. 5, 2020), https://www.washingtonexaminer.com/news/new-york-attorney-general-to-deliver-major-national-announcement

[41] *See* Transcript of James's press conference at 20:13, *available at* https://www.rev.com/blog/transcripts/ny-attorney-general-letitia-james-sues-nra-press-conference-august-6.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

Foundation, which is domiciled there.[42] The DCAG's complaint alleges similar misconduct but does not seek dissolution.

33.     Although the State Dissolution Action vaguely purports to indict "the NRA" for actions it elsewhere alleges were undertaken by individual defendants and actively concealed from oversight by others,[43] it contains no allegations of fraud or intentional illegality by the employees of the NRA broadly, or by the NRA Board of Directors or any Committee of the Board. Instead, construed deferentially, the complaint at most accuses the NRA and its Board of failing to maintain fulsome records and of lax oversight. Specifically, the complaint alleges that: (i) although the Board did have a compensation committee[44] and hire compensation consultants,[45] it did not adequately benchmark peer compensation[46] or memorialize "evidence" of scrutiny given to executive performance;[47] (ii) forms filed with the IRS failed to properly account for expense reimbursements as compensation,[48] and failed to adopt the NYAG's view that the NRA's widely-disclosed executive salaries amounted to *per se* improper excess-benefit transactions;[49] (iii) the Audit Committee "failed to exercise a proper duty of care" in approving related party transactions

---

[42] *District of Columbia v. NRA Foundation et al.*, Case No. 2020-CA-003454 (Sup. Ct. D.C.).

[43] *See, e.g.*, Ex. A. ¶¶ 144, 158, 197, 201-03, 205, 207, 227, 228, 233, 262, 266, 286, 293, 307, 309-24, 326, 335, and 337.

[44] Ex. A ¶ 402.

[45] Ex. A ¶¶ 396-417.

[46] Ex. A ¶ 403.

[47] Ex. A ¶ 406.

[48] *See, e.g.*, Ex. A ¶ 434.

[49] Ex. A ¶ 443.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

and conflicts of interest,[50] and failed to diligently supervise or audit the NRA's outside auditors[51]; (iv) the Audit Committee made an *ultra vires* decision to indemnify a board member for legal fees in 2019, a decision that should have been left to the full Board[52]—although the complaint fails to allege that the Board was unaware of, or did not duly ratify, the Audit Committee's indemnification resolution; and (v) the Audit Committee failed to implement an effective compliance program,[53] although no specific inadequacies or deficiencies in the NRA's current compliance training regime are identified. (The State Dissolution Action does take issue with one individual defendant's erstwhile involvement in administering compliance training, but concedes that he was fired by the NRA for the same issues raised in the complaint).[54]

34.     The NRA disputes the legitimacy of even these allegations, but viewed in the worst possible light, they cannot justify James's decision to commence a dissolution action. The dissolution causes of action were brought under New York Not-for-Profit Corporation Law Sections 1101 and 1102. Section 1101 authorizes the NYAG to commence a dissolution action where a corporation "has exceeded the authority conferred upon it by law, or has violated any provision of law whereby it has forfeited its charter, or carried on, conducted or transacted its business in a persistently fraudulent or illegal manner, or by the abuse of its powers contrary to

---

[50] Ex. A¶ 498. Notably, the NYAG nowhere alleges in the State Dissolution Action that any of these related-party transactions were not for the NRA's benefit or in furtherance of the NRA's corporate mission; rather, the NYAG alleges only disagreements about the prices paid for these transactions and failure to follow appropriate procedures for authorizing them. NRA policy did not prohibit such transactions.

[51] Ex. A ¶¶ 518-31.

[52] Ex. A ¶¶ 532-33

[53] Ex. A ¶¶ 532-43.

[54] Ex. A. ¶ 251.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

public policy of the State." Section 1102 gives the NYAG the right to commence the equivalent of a derivative action by a director, who may seek dissolution where "directors or members in control of the corporation have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner." Despite the wording of Section 1102, New York's highest court has ruled that dissolution under this section is only available in cases of "egregious" conduct, which "go far beyond charges of waste, misappropriation and illegal accumulations of surplus, which might be cured by a derivative action for injunctive relief and an accounting."[55]

35.    As such, this extreme remedy is reserved for non-profits that themselves were deemed to be a *sham*—a word that appears nowhere in the NYAG's complaint. Cases where a puppy rescue organization was really a puppy mill,[56] cancer charities performed no such work,[57] a leukemia foundation spent less than one percent of its revenue to help children suffering from

---

[55] *Liebert v. Clapp*, 13 N.Y.2d 313, 316 (1963).

[56] *See* Press Release, *A.G. Schneiderman Obtains Consent Order Shuttering Long Island Puppy Flipper* (Mar. 16, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-obtains-consent-order-shuttering-long-island-puppy-flipper.

[57] *See Coalition Against Breast Cancer Dissolved By New York Attorney General's Office*, CHARITY WATCH (May 7, 2013), https://www.charitywatch.org/charity-donating-articles/coalition-against-breast-cancer-dissolved-by-new-york-attorney-general39s-office; Press Release, *A.G. Schneiderman Announces Settlement with Two Sham Cancer Charities That Bilked More Than $75 Million From Donors* (Mar. 30, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-two-sham-cancer-charities-bilked-more-75; Press Release, *A.G. Schneiderman Announces $350,000 Settlement with Sham Breast Cancer Charity* (Jun. 16, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-announces-350000-settlement-sham-breast-cancer-charity.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

cancer,[58] a tobacco industry-funded non-profit spread disinformation about tobacco's health effects,[59] or a non-profit was a front for the child pornography outfit NAMBLA.[60]

36.     The State Dissolution Action nowhere alleges that the NRA does not conduct activities consistent with its stated corporate purposes, nor that it fails to honor requests by donors regarding the specific application of their gifts. The complaint is also silent with regard to the NRA's finances and whether any alleged looting or waste by the individual defendants rendered the NRA insolvent or incapable of continuing to carry out its stated purpose.

37.     To the NRA's knowledge, since at least 1999 and perhaps for its entire existence, the New York Attorney General's Office has never sought dissolution of a non-profit corporation on the sole basis of alleged self-dealing or related-party transactions engaged in by corporate executives, whether known or unknown to the corporation's board and regardless of whether those transactions were approved and regardless of how substantially those transactions diminished corporate assets. Not when NARAL Pro-Choice's president looted hundreds of thousands of dollars for personal expenses and intimidated others into staying quiet to perpetuate the fraud.[61]

---

[58] *See New York Attorney General Schneiderman Announces $1 Million Settlement with Officials of So-Called Children's Leukemia Foundation and Their Auditor, National Association of Charity Officials,* NASCO (Dec. 17, 2015), https://www.nasconet.org/2015/12/new-york-attorney-general-schneiderman-announces-1-million-settlement-with-officials-of-so-called-childrens-leukemia-foundation-and-their-auditor/.

[59] *See* Bill McAllister, *N.Y. Judge Places Tobacco Institute Under Control of Receiver*, WASH. POST (May 3, 1998), https://www.washingtonpost.com/archive/politics/1998/05/03/ny-judge-places-tobacco-institute-under-control-of-receiver/fd082867-5a96-4f8b-9d7c-202d4eb88701/.

[60] *People v. Zymurgy, Inc.*, 233 A.D.2d 178 (1 Dept. 1996).

[61] *See* Press Release, *New York Attorney General Sues Former NARAL President for Siphoning Over $250,000 from Charity for Personal Use* (Jun 29, 2012), https://ag.ny.gov/press-release/2012/office-attorney-general-sues-former-naral-president-siphoning-over-250000-charity.

Not when the leader of the National Arts Club was found to have "systematically abused his authority" to steal millions for himself and his brother.[62] Not when the Thoroughbred Retirement Foundation was found to be so "dysfunctional" that it was driven into insolvency by the "reckless" actions of its board and caused the suffering and death of horses in its charge.[63] Not when the former president of the New York Legal Assistance Group was found to have diverted millions over 15 years to other entities he controlled, *with board approval*, and NYLAG was found to have filed "materially misleading" financial statements.[64] Not when NYAG found a "shocking" "breakdown in governance" at the Victor E. Perley Fund that allowed its leader to loot over a million dollars and waste the fund's *entire* investment portfolio.[65] Not when former executives of the Metropolitan Council on Jewish Poverty were indicted for grand larceny, money laundering, tax fraud and criminal conspiracy for taking millions through an illegal insurance-inflation scheme stretching back 20 years.[66] Nor in any of the more than two dozen other instances since 1999 when

---

[62] *See* Press Release, *A.G. Schneiderman Obtains $950k Settlement from Former National Arts Club Leaders for Years of Self-Dealing* (Jul. 10, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-obtains-950k-settlement-former-national-arts-club-leaders-years.

[63] *See* Press Release, *A.G. Schneiderman Sues to Remove Board of Thoroughbred Retirement Foundation That Put Horses in Danger and Finances in Ruin* (May 3, 2012), https://ag.ny.gov/press-release/2012/ag-schneiderman-sues-remove-board-thoroughbred-retirement-foundation-put-horses.

[64] *See* Press Release, *A.G. Schneiderman Announces Settlement of Lawsuit Against Yisroel Schulman, Former Director of NYLAG, For Breaching His Fiduciary Duty to NYLAG and Other Charities* (Nov. 29, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-announces-settlement-lawsuit-against-yisroel-schulman-former.

[65] *See* Press Release, *A.G. Schneiderman Announces $1.025 Million Settlement with Trustees of Nonprofit that Squandered Assets Intended for Underprivileged Children* (Apr. 29, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-1025-million-settlement-trustees-nonprofit-squandered.

[66] *See* Press Release, *A.G. Schneiderman & Comptroller DiNapoli Announce Agreement with Met Council to Restore Charity's Operations* (Dec. 19, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-comptroller-dinapoli-announce-agreement-met-council-restore.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

NYAG alleged self-dealing by non-profit executives. In every single one of those cases, NYAG considered the non-profit a *victim* and engaged in collaborative discussions with the organizations to implement measures designed to tighten internal controls.

38.     A survey of non-profit enforcement by the National Association of State Charity Officials, a consortium of attorneys general similarly demonstrates that, for the past two years, almost none of the actions categorized as "Governance and Breach of Fiduciary Duty" sought dissolution.[67] Even where they did, the remedy was sought in the alternative only if other, less-severe injunctive relief was not obtained.[68] It is notable that the Attorney General of the District of Columbia, which commenced an action on the same day as James making similar allegations against the NRA and one of its D.C.-domiciled foundations, *did not seek dissolution* of the foundation. When asked during her August 6, 2020 press conference what precedent existed for this action, James offered only two, neither of which were sought on the basis of fraudulent expenditures by management.[69] The first, the Federation of Multicultural Programs, ran a series of

---

[67]     *See* NASCO's 2019 and 2020 annual reports, *available at* https://www.nasconet.org/annual-reports/, at 11-15 (2019, identifying the Trump Foundation action as the only one seeking dissolution); and 7-10 (identifying only the Trump Foundation and two sham charity actions where looting also occurred as dissolution actions).

[68]     *Id.* Michael West, the senior attorney at the New York Council of Nonprofits, called the dissolution action "unprecedented." *See* Alex Yablon, *Get Ready for a Feeding Frenzy Over the NRA's Corpse*, SLATE (Sept. 3, 2020). Anne Milgram, former Attorney General for the State of New Jersey similarly noted on the Café Insider podcast after learning of this lawsuit, "The thing I kept thinking about as somebody who's overseen charities, is that, as a rule, you, you know there were instances where we took the most aggressive actions were instances where charities have already been given an opportunity to reform, or they'd been identified as being problematic and flagged for and basically told 'You're going to lose your status unless you do this.'" CAFÉ INSIDER PODCAST, August 11, 2020 at 42:00, *available at* https://cafe.com/insider-podcast/cafe-insider-8-11-the-executives-privilege/.

[69]     *See* Transcript of James's press conference at 14:46, *available at* https://www.rev.com/blog/transcripts/ny-attorney-general-letitia-james-sues-nra-press-conference-august-6.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

homes and programs for the disabled, had accumulated 27 safety violations, was determined to be actively harming patients in its care because of a lack of funds, and had been warned repeatedly by the New York State Office for People With Disabilities for five years before it was shut down.[70] The second, the Trump Foundation, was an action in which the dissolution claim was premised not on waste or misspending, but because the Foundation, *unlike the NRA*, was prohibited from engaging in political activity but had been found to operate as little more than a "checkbook" that was "co-opted" by a presidential campaign.[71] It was notably already in the process of winding down its affairs.

39.     The difference here is James's well-documented animus against the NRA. James's radical departure from precedent to pursue dissolution cannot therefore be reasonably viewed as anything other than abuse of the non-profit laws to silence a political enemy.

40.     The dissolution action has rightfully drawn widespread condemnation as a blatant abuse of power and a threat to democratic principles from both sides of the political spectrum, including the American Civil Liberties Union, the New Republic, and other voices not traditionally aligned with the NRA.[72]

---

[70] *See* Russ Buetner, *An Operator of Group Homes Keeps State Aid Despite Faults*, N.Y. TIMES (Dec. 27, 2011), https://www.nytimes.com/2011/12/28/nyregion/operator-of-ny-group-homes-thrived-despite-lapses-in-care.html.

[71] *People v. Donald J. Trump*, et al., Index No. 451130/2018, Dkt. 1 ¶¶ 108, 116 ("The Foundation exceeded the authority conferred to it in its certificate of incorporation and acted in a persistently illegal manner by repeatedly intervening in Mr. Trump's campaign for president in 2016 . . ." and "[the Foundation] has conducted its business in a persistently illegal manner and abused its powers contrary to the public policy of the State of New York by operating without any oversight or control by a board of directors.").

[72] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the

41.     NYAG's decision to seek this severe remedy—effectively seizure of the NRA's remaining assets and annulment of its existence—constitutes impermissible selective enforcement of the New York Not-for-Profit Corporation Law by NYAG. Both the U.S. and New York constitutions prohibit the government from applying or enforcing a valid law "with an evil eye and an unequal hand."[73] Such behavior "taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action," "even though the party … may well have been guilty of violating the law."[74] Discrimination on the basis of political

---

right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms.").

    [73] See *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *303 West 42nd St. v. Klein*, 46 N.Y.2d 686 (1979).

    [74] *303 West 42nd St. v. Klein*, 46 N.Y.2d 686 (1979).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

speech is such an impermissible standard.[75] If "'conscious, intentional discrimination'" exists, then [defendant] will be entitled to a dismissal of the prosecution as a matter of law."[76]

42.     Here, both James's documented animus against the NRA and more than 20 years' worth of action by NYAG against non-profits make clear that the dissolution causes of action are included for no reason other than to punish a political enemy and stifle its speech. The record on James's—as well as her boss, Governor Cuomo's—hatred of the NRA is extensive. While campaigning, James repeatedly called the NRA a "terrorist organization" and a "criminal enterprise" and called its constitutionally protected Second Amendment agenda "poisonous." She stated explicitly that, once elected, she would use the New York Not-for-Profit Corporation Law to "target" the NRA. A similar federal lawsuit against her boss for other actions taken against the NRA has sustained a motion to dismiss.

43.     As the New York Court of Appeals has acknowledged, proof of intent in these matters is often hard for a defendant to come by, but here it permeates the public record. Proof of intent may also be found by a "showing of a grossly disproportionate incidence of nonenforcement against others similarly situated in all relevant respects save for" the impermissible motive.[77] While the totality of NYAG's enforcement history against non-profits is not a matter of easily searchable public record, an exhaustive search of its press releases, consent orders, publicly filed enforcement actions, and news articles stretching back more than 20 years yields not a single example where the NYAG has sought outright dissolution of any non-profit corporation (or a for-profit one, for that matter), based solely on allegations of executive misconduct and lack of

---

[75] *Id.*; *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999).

[76] *People v. Utica Daw's Drug Co.*, 16 A.D.2d 12, 19 (4 Dep't 1962).

[77] *303 West 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979).

oversight. Regardless of whether the looting was board-sanctioned or not, regardless of whether the transgressor allegedly controlled the board, regardless of whether the corporation had deficient policies and procedures, regardless of the amount allegedly looted, regardless of whether the looting *completely depleted the assets of the corporation*, regardless of whether it was tied to illegal activity such as kickback schemes and money laundering, regardless of whether the individual defendants pled guilty to crimes, regardless of whether it resulted in false filings made with State regulators, and regardless of whether the corporation was no longer able to continue its purpose. James could not identify one at her press conference. The NRA has not identified a single such action where dissolution was sought on the basis that governance reforms would be futile.

44.     The State Dissolution Action identifies no basis for its extreme departure from prior enforcement practice. The NRA is unaware of any similar pending actions and to the NRA's knowledge the NYAG has not announced any.

**F.      N.Y.'s Not-for-Profit Law's Dissolution Provisions are Unconstitutional As-Applied to Political Entities Like the NRA.**

45.     Although NYAG has never before alleged, and no New York court has ever held, that executive misconduct alone constitutes the persistent corporate fraud necessary to sustain a dissolution action, James now seeks a dissolution order based on this theory.

46.     Given the NRA's constitutionally protected activity, NYAG must demonstrate that dissolution is "the least restrictive means of achieving a compelling state interest."[78]

47.     The State Dissolution Action identifies no compelling state interest; it relies on the general *parens patriae* principles underlying non-profit laws that ensure charities perform in the

---

[78] *Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 719 (1981).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

public interest. Nor does NYAG explain how dissolving rather than reforming the NRA will be in the interest of its millions of members, who will find themselves deprived of their political voice.

48.     NYAG's long enforcement history demonstrates that dissolution is not the least restrictive means to ensuring that non-profits serve the public interest.[79] In every prior instance where non-profit executives were accused of looting corporate assets, NYAG has always worked with the non-profit to implement reform measures that strengthen corporate governance in order to prevent looting from occurring in the future and to allow the non-profit to continue performing its charitable purpose.

49.     The State Dissolution Action contains only one sentence concerning NRA reform, stating without any supporting facts that reform would be "futile."[80] Such an allegation is

---

[79] This has also been the consensus of various legal commentators. As constitutional scholar Jonathan Turley noted, where other instances of self-dealing and even outright racketeering at identified by officials at politically-engaged non-profits The United Way and the Teamsters Union, "[n]o prosecutor would have dreamed of dissolving [them]." And indeed no dissolution was sought in either case. Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Op-Ed). Alan Z. Rozenshtein of Lawfare noted, "a lawsuit threatening to destroy any major political group should be held to a high standard. In particular, the government should bend over backwards, even while it enforces the law, to preserve the institution if at all possible . . . [b]ut the priority should be reform, not dissolution. To seek dissolution, especially out of the gate, is to ignore the millions of Americans for whom the NRA is a vital avenue for political participation. . . . [S]eeking such a radical remedy every time that occurs clearly go beyond what the legislature intended, and what good public policy countenances. The breadth of the law only makes sense if paired with discretion on the part of those who enforce it."" Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Aug. 11, 2020). Noah Feldman, another constitutional law scholar noted that "If an organization has really fallen into a condition of fundamental corruption, a state attorney general can demand it get new leaders, or replace its board of directors and its management in their entirety . . . . But asking the court not to order reform of the organization, but to dismantle and dissolve it altogether, creates the impression that the attorney general is trying to use the legal system to intervene in the very political dispute in which the NRA is such an important player: the fight over Second Amendment rights and gun control." Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit.

[80] Ex. A ¶ 663.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

contradicted by the remainder of the State Dissolution Action. Indeed, the setup of the NRA's governance structure is so extensive the State Dissolution Action complaint requires over 70 paragraphs just to describe it.[81] The organization encompasses 11 divisions, each overseen by the Executive Vice President.[82] The NRA's bylaws establish a 76-member board of directors to have general oversight of the organization.[83] The bylaws also establish a leadership structure of eight officers, six of whom are elected annually by the Board.[84] Five of these officers are ex officio members of the Board but lack voting power.[85] The Board is aided by "dozens of standing and Special Committees," including an officer compensation committee, a nominating committee, an executive committee, and an audit committee (with its own charter).[86] The NRA has formalized policies maintained in an employee handbook and a Board policy manual, including policies and procedures on employee selection, compensation, time off, work standards, insurance and pension benefits, a statement of corporate ethics, purchase policy, a contract review policy, travel and business expense reimbursement policy, and an officer and board of directors policy on disclosure of conflicts of interest, a conflict of interest and related party transaction policy that requires financial and conflict of interest disclosures by directors, officers and employees, and a new whistleblower policy.[87]

---

[81] Ex. A ¶¶ 60-132.

[82] Ex. A ¶ 62.

[83] Ex. A ¶ 64.

[84] Ex. A ¶ 66.

[85] Ex. A ¶ 67.

[86] Ex. A ¶¶ 82-94.

[87] Ex. A ¶ 98 and Ex. B.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

50.     Despite framing the NRA as a fraudulent organization beyond repair, the NYAG's own complaint extensively documents and makes the case that the NRA has undertaken efforts to improve its internal governance functions up to the present day. The State Dissolution Action is moreover replete with allegations concerning dissident board members who acted as whistleblowers and were focused on reform as well as the introduction of more robust policies in recent years; and avers the current treasurer has been investigating the alleged malfeasance by the former treasurer and has implemented stricter controls.[88]

## G.     The Damage Done.

51.     James's threatened, and actual, regulatory and civil reprisals are a blatant and malicious retaliation campaign against the NRA and its constituents based on her disagreement with the content of their speech. This wrongful conduct threatens to destabilize the NRA and chill the speech of the NRA, its members, and other constituents.

52.     Notwithstanding that the NRA was already in the process of undertaking an expensive internal audit of its compliance with New York's non-profit law, James commenced her crusade against the NRA with the sole purpose of seeking to dissolve a political enemy. Its pretextual "investigation" not only caused the NRA to incur millions of dollars in unnecessary expenditures, James then turned around and used those expenditures as the basis to claim a violation of New York's Prudent Management of Institutional Funds Act in support of the NRA's dissolution. The NRA will now further incur more needless debt litigating a dissolution action that, in essence, will require litigation regarding actions the NRA has already commenced against vendors and other wrongdoers like Ackerman McQueen.

---

[88] *E.g.* Ex. A. ¶¶ 115, 156, 197, 225, 249-50, 263, 294, 302, 455, 483.

## V.

## COUNT ONE

### Violation of the NRA's First and Fourteenth Amendment Rights
### Under 42 U.S.C. § 1983 by Retaliating Against the NRA Based on Its Speech

53.   The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

54.   The First Amendment, which applies to James by operation of the Fourteenth Amendment secures the NRA's right to free speech, including its right to express political beliefs concerning the constitutionally protected right to keep and bear arms.

55.   The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although James disagrees with and opposes the NRA's political views, the NRA's freedom to express its views is a fundamental right protected by the First Amendment.

56.   James's actions as NYAG—including, but not limited to, the investigation into the NRA's tax-exempt status—were done under color of state law and undertaken directly in response to and substantially motivated by the NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech, which is protected by the First Amendment.

57.   James maintains discretion in determining whether and how to carry out her actions, including the decision to initiate a wrongful investigation into the NRA's business practices and whether to seek dissolution. James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.

58.   James's unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

59.     The remedy of dissolution is not the least restrictive means of achieving any such interest.

60.     James's intentional actions have resulted in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

61.     The NRA is entitled to a declaratory judgment that James has violated its First Amendment rights.

62.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

63.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

64.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free speech, the NRA will suffer irrecoverable loss and irreparable harm.

**VI.**

**COUNT TWO**

**Violation of the NRA's Rights
Under Article I, Section 8 of the New York State Constitution
by Retaliating Against the NRA Based on Its Speech**

65.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

66.     Article I, Section 8 of the New York State Constituion secures the NRA's right to free speech, including its right to express political beliefs concerning the constitutionally protected right to keep and bear arms.

67.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although James disagrees with and opposes the NRA's political views, the NRA's freedom to express its views is a fundamental right protected by the New York Constitution.

68.     James's actions as NYAG—including, but not limited to, the investigation into the NRA's tax-exempt status—were done under color of state law and undertaken directly in response to and substantially motivated by the NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech, which is protected by the New York Constitution.

69.     James maintains discretion in determining whether and how to carry out her actions, including the decision to initiate a wrongful investigation into the NRA's business practices and whether to seek dissolution. James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.

70.     James's unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

71.     The remedy of dissolution is not the least restrictive means of achieving any such interest.

72.     James's intentional actions have resulted in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

73.     The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

74.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

75.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

76.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free speech, the NRA will suffer irrecoverable loss and irreparable harm.

## VII.

## COUNT THREE

**Violation of the NRA's First and Fourteenth Amendment Rights
Under 42 U.S.C. § 1983 by Retaliating Against the NRA
Based on Its Members' Exercise of Association Rights**

77.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

78.     The First Amendment, which applies to James by operation of the Fourteenth Amendment recognizes and protects the right to freedom of association.

79.     The NRA's more than five million members are an association that desires to engage in advocacy, expression and protection of Second Amendment rights.

80.     James's intentional actions are designed to punish the NRA and its members for associating to engage in Second Amendment advocacy and to chill NRA members' future exercise of such freedom of association and have resulted in and will continue to result in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

81.     The NRA is entitled to a declaratory judgment that James has violated its First Amendment rights.

82.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

83.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

84.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free association, the NRA will suffer irrecoverable loss and irreparable harm.

## VIII.

## <u>COUNT FOUR</u>

**Violation of the NRA's Rights Under Article I, Section 9
of the New York State Constitution by Retaliating Against the NRA
<u>Based on Its Members' Exercise of Association Rights</u>**

85.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

86.     Article I, Section 9 of the New York State Constitution recognizes and protects the right to freedom of association.

87.     The NRA's more than five million members are an association that desires to engage in advocacy, expression and protection of Second Amendment rights.

88.     James's intentional actions are designed to punish the NRA and its members for associating to engage in Second Amendment advocacy and to chill NRA members' future exercise of such freedom of association and have resulted in and will continue to result in significant

damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

89.     The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

90.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

91.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

92.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free association, the NRA will suffer irrecoverable loss and irreparable harm.

### IX.

### COUNT FIVE

**Selective Enforcement of N.Y. Not-for-Profit Corporation Law
Against the NRA in Violation of the Fourteenth Amendment**

93.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

94.     The Equal Protection Clause of the Fourteenth Amendment prohibits State actors from uneven application of the law based on an impermissible standard. Discrimination based on political speech is such an impermissible standard.

95.     James's decision to seek dissolution on the sole basis of executive misconduct for the very first time against the NRA despite more than two decades of non-enforcement against similarly situated non-profits demonstrates selective enforcement of the not-for-profit law.

James's repeated hostile statements regarding the NRA demonstrate that this selective enforcement has occurred on the impermissible basis of the NRA's disfavored political speech.

96.     NYAG routinely announces investigations it is conducting, and since James took office, NYAG has announced no other investigations into other New York-based non-profits for similar alleged misconduct.

97.     The NRA is entitled to a declaratory judgment that James has violated its Fourteenth Amendment rights.

98.     The NRA is also entitled to dismissal of the dissolution actions.

99.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

100.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

101.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's equal protection rights, the NRA will suffer irrecoverable loss and irreparable harm.

## X.

## COUNT SIX

### Selective Enforcement of N.Y. Not-for-Profit Corporation Law Against the NRA in Violation of Article I, Section 11 of the New York State Constitution

102.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

103.    Article I, Section 11 of the New York State Constitution prohibits State actors from uneven application of the law based on an impermissible standard. Discrimination based on political speech is such an impermissible standard.

104.    James's decision to seek dissolution on the sole basis of executive misconduct for the very first time against the NRA despite more than two decades of non-enforcement against similarly situated non-profits demonstrates selective enforcement of the not-for-profit law. James's repeated hostile statements regarding the NRA demonstrate that this selective enforcement has occurred on the impermissible basis of the NRA's disfavored political speech.

105.    NYAG routinely announces investigations it is conducting, and since James took office, NYAG has announced no other investigations into other New York-based non-profits for similar alleged misconduct.

106.    The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

107.    The NRA is also entitled to dismissal of the dissolution actions.

108.    The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

109.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

110.    In addition to the above-described damages, absent an injunction against James's violation of the NRA's equal protection rights, the NRA will suffer irrecoverable loss and irreparable harm.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

## XI.

## COUNT SEVEN

### Declaratory Judgment

111.    The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

112.    The First Amendment requires that state action infringing on such a right be warranted by a compelling state interest and accomplished by the least restrictive means.

113.    Dissolving an entity like the NRA that is engaged in constitutionally protected activity is not warranted by a compelling state interest and is not the least restrictive means of achieving any alleged compelling state interest.

114.    NYAG seeks, under color of state law, to impute the actions of four individuals to over five million members and subject them to statutory dissolution liability on a theory of corporate fraud or alternately under laws allowing dissolution where executives have looted a corporation, despite clear court precedent disallowing such a severe remedy. Any such reading of New York's Not-for-Profit Law Sections 1101 or 1102 would be unconstitutional when applied to organizations such as the NRA that are engaged in constitutionally protected speech.

115.    The NRA is entitled to a declaratory judgment that allegations of executive misconduct do not constitute corporate fraud or criminality and that Sections 1101 and 1102 are unconstitutional as-applied to the NRA absent such a showing.

## XII.

### DEMAND FOR JURY TRIAL

116.    The NRA hereby demands a trial by jury on all issues so triable.

XIII.

**REQUEST FOR RELIEF**

WHEREFORE the NRA respectfully requests that the Court enter judgment in the Plaintiff NRA's favor and against Defendant James, as follows:

a.      Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA's rights to free speech under both the Federal and New York State Constitutions;

b.      Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA's equal protection rights under both the Federal and New York State Constitutions;

c.      Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA members' rights to free association under both the Federal and New York State Constitutions;

d.      Declaring that Sections 1101 and 1102(d) of New York's Not-for-Profit Law are unconstitutional insofar as they may be used—as the NYAG attempts to do here—to dissolve organizations engaged in constitutionally protected activities based solely on allegations of executive looting;

e.      Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, preventing NYAG from further pursuing its dissolution causes of action;

f.      Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering James, the Charities Bureau, its agents, representatives, employees and servants and all persons and entities in concert or participation with it and James (in her official capacity), to immediately cease and refrain from engaging in any further conduct or activity which has the purpose or effect of

interfering with the NRA's exercise of the rights afforded to it under the First Amendment to the United States Constitution and Sections 8, 9 and 11 of the New York State Constitution;

      g.      Granting such other injunctive or equitable relief to which the NRA is entitled;

      h.      Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

      i.      Awarding the NRA exemplary or punitive damages;

      j.      Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

      k.      Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

      l.      Granting the NRA such other and further relief as this Court deems just and proper.

Dated: October 9, 2020

                    Respectfully submitted,

                    By:     */s/ William A. Brewer III*
                        William A. Brewer III
                        wab@brewerattorneys.com
                        Sarah B. Rogers
                        sbr@brewerattorneys.com
                        Jennifer H. Blecher
                        jhb@brewerattorneys.com

                    **BREWER, ATTORNEYS & COUNSELORS**
                    750 Lexington Avenue, 14th Floor
                    New York, New York 10022
                    Telephone: (212) 489-1400
                    Facsimile: (212) 751-2849

                    **ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**