UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC.,                                         20-CV-000889 (MAD)(TWD)

                Plaintiff,

     v.

LETITIA JAMES, both individually and in
her official capacity,

                Defendant.
_____


## ATTORNEY GENERAL LETITIA JAMES'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS


LETITIA JAMES
*Attorney General*
*of the State of New York*
28 Liberty St.
New York, New York 10005


Monica Connell
Yael Fuchs
Stephen Thompson
Assistant Attorneys General
*of Counsel*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF PROCEDURAL HISTORY AND RELEVANT FACTS ............................. 3

I.   The Attorney General is Authorized to Oversee Registered Not-for-Profit Entities like the NRA. ........................................................................................................ 3

II.  The OAG Charities Bureau Initiates an Investigation of the NRA Culminating in the Commencement of a State Court Enforcement Action Against the NRA. ............................... 4

III. The OAG Commences the State Enforcement Action. ................................................. 7

IV.  The NRA Filed This Countersuit Seeking to Preclude Regulatory Oversight of Its Operation as a Not-for-Profit Entity. ....................................................................... 8

V.   The NRA has Undertaken Multiple Procedural Maneuvers to Transfer this Action to the Northern District of Texas and to Move the State Court Enforcement Action Out of the Supreme Court, New York County. ......................................................................... 10

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT .............................................................................................................. 12

I.   ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY BAR MANY OF THE NRA'S CLAIMS. ....................................................................................................... 12

II.  ABSTENTION IS APPROPRIATE GIVEN THE SUBSTANTIAL FEDERALISM AND COMITY CONCERNS PRESENT HERE. .................................................................. 13

   A.  This Court should abstain under the *Younger abstention doctrine*. ......................... 14

   B.  Abstention is also appropriate under the *Burford* abstention doctrine. ...................... 16

III. THE NRA'S CLAIMS AGAINST THE ATTORNEY GENERAL UNDER THE NEW YORK STATE CONSTITUTION FAIL TO STATE A CLAIM. ......................................... 18

IV.  THE NRA'S ALLEGATIONS OF POLITICAL BIAS IN REGARD TO THE ATTORNEY GENERAL'S INVESTIGATION DO NOT STATE PLAUSIBLE FIRST OR FOURTEENTH AMENDMENT CLAIMS. ....................................................................... 18

   A.  The NRA has failed to plausibly plead the elements of a First Amendment retaliation claim. ............................................................................................................. 19

   B.  The NRA Does Not State a Fourteenth Amendment Selective Prosecution Claim. ....... 22

V.   THE NRA LACKS STANDING TO ASSERT A CLAIM ON BEHALF OF ITS MEMBERS FOR VIOLATION OF THEIR RIGHT TO ASSOCIATION. ........................... 28

VI. THE NRA'S AS-APPLIED CHALLENGE TO NOT FOR PROFIT CORPORATION LAW §§ 1101 AND 1102 FAILS. ............................................................................. 30

VII. THE NRA'S § 1983 CLAIMS AGAINST THE ATTORNEY GENERAL IN HER INDIVIDUAL CAPACITY MUST BE DISMISSED. .............................................. 34

    C.   The Attorney General is entitled to absolute immunity in relation to her decision to commence an action against the NRA. ........................................................ 34

    B.   The NRA's claims against the Attorney General for money damages are barred by qualified immunity. ........................................................................................ 35

CONCLUSION ................................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*303 West 42nd St. Corp. v. Klein,*
46 N.Y.2d 686 (1979) ........................................................................................27

*Abrams v Temple of the Lost Sheep, Inc.,*
148 Misc 2d 825 (Sup. Ct., N.Y. Co. 1990) ............................................................3

*Aguayo v. Richardson,*
473 F.2d 1090 (2d Cir. 1973).......................................................................... 28-29

*Allen v. Antal,*
665 Fed. Appx. 9 (2d Cir. 2016) .......................................................................18

*Alleyne v. N.Y. State Educ. Dep't,*
691 F.Supp.2d 322 (N.D.N.Y. 2010) .................................................................13

*Allstate Ins. Co. v. Elzanaty,*
916 F. Supp. 2d 273 (E.D.N.Y. 2013) .................................................................11

*Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin,*
46 F. Supp. 2d 143 (D. Conn. 1999), aff'd, 205 F.3d 1321 (2d Cir. 2000) ............................29

*American Disposal Services, Inc. v. O'Brien,*
839 F.2d 84 (2d Cir.1988)...............................................................................17

*Annis v. Cty. Of Westchester,*
136 F.3d 239 (2d Cir. 1998)...............................................................................34

*Aron v. Becker,*
48 F.Supp.3d 347 (N.D.N.Y. 2014) ...................................................................12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).....................................................................................11, 21

*Avery v. DiFiore,*
2019 WL 3564570 (S.D.N.Y. Aug. 6, 2019) ...................................................11, 20

*Bernard v. Cnty. of Suffolk,*
356 F.3d 495 (2d Cir. 2004)...............................................................................34

*Bridas Int'l S.A. v. Repsol, S.A.,*
2013 WL 4437189 (Sup. Ct. N.Y. Co. 2013) .......................................................15

iii

*Brierwood Shoe Corp. v. Sears, Roebuck & Co.*,
  479 F. Supp. 563 (S.D.N.Y. 1979) ...................................................................15

*Bryant v. New York State Dept. of Correction Services Albany*,
  146 F.Supp.2d 422 (S.D.N.Y. 2001)...............................................................12

*Burford v. Sun Oil Co.*,
  319 U.S. 315 (1943)..................................................................................14, 16

*Butz v. Economou*,
  438 U.S. 478 (1978).........................................................................................34

*Capital Associated Indus., Inc. v. Stein*,
  283 F. Supp. 3d 374 (M.D.N.C. 2017) ...........................................................29

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)..............................................................................4

*Citizens United v. Schneiderman*,
  882 F.3d 374 (2d Cir. 2018).......................................................................3, 31

*Cornejo v. Bell*,
  592 F.3d 121 (2d Cir. 2010)............................................................................34

*Corr. Officers Benevolent Ass'n v. Kralik*,
  2009 WL 856395 (S.D.N.Y. Mar. 26, 2009) ..................................................13

*Curley v. Vill. of Suffern*,
  268 F.3d 65 (2d Cir. 2001)..............................................................................22

*DeMartino v. New York State Dep't of Labor*,
  167 F. Supp.3d 342 (E.D.N.Y. 2016) .............................................................14

*Diggs v. Marikah*,
  2012 WL 934523 (S.D.N.Y. Mar. 20, 2012) ..................................................35

*Dorsett v. City of Nassau*,
  732 F.3d 157 (2d Cir. 2013).....................................................................19, 22

*Eagleston v. Guido*,
  41 F.3d 865 (2d Cir. 1994)..............................................................................34

*Ex parte Young*,
  209 U.S. 123 (1908).........................................................................................13

*Exxon Mobil Corp. v. Schneiderman*,
  316 F. Supp. 3d 679 (S.D.N.Y. 2018).......................................................20, 27

*Faulkner v. Verizon Comm., Inc.*,
   156 F.Supp.2d 384 (S.D.N.Y.2001) ............................................................5

*Felmine v. N.Y.C.*,
   2012 WL 1999863 (E.D.N.Y. June 4, 2012) ............................................18

*Fox v. State Univ. of N.Y.*,
   497 F. Supp. 2d 446 (E.D.N.Y. 2007) ......................................................13

*Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*,
   736 F.3d 213 (2d Cir. 2013) .......................................................................4

*Hablin Realty Corp. v. McCain*,
   123 Misc. 2d 777 (App. Term 1st Dep't 1984) ........................................15

*Hartman v. Moore*,
   547 U.S. 250 (2006) ...........................................................................19, 21

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010) ....................................................................11

*Hirschfeld v. Spanakos*,
   909 F.Supp. 174 (S.D.N.Y. 1995) ...........................................................35

*Huffman v. Pursue, Ltd.*,
   420 U.S. 592 (1975) .................................................................................14

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003) .................................................................................20

*In re FDIC*,
   58 F.3d 1055 (5th Cir. 1995) ...................................................................27

*In re McDonell*,
   195 Misc.2d 277 (Sup. Ct. N.Y. Co. 2002) ..............................................3

*In re Standard & Poor's Rating Agency Litig.*,
   23 F. Supp.3d 378 (S.D.N.Y. 2014) ..................................................15-16

*Lanning v. City of Glens Falls*,
   2017 WL 922058 (N.D.N.Y. Mar. 8, 2017) .............................................23

*Leibert v. Clapp*,
   13 N.Y.2d 313 (1963) ...............................................................................25

*Levy v. Lewis*,
   635 F.2d 960 (2d Cir.1980) ......................................................................17

*Liberty Mut. Ins. Co. v. Hurlbut*,
   585 F.3d 639 (2d Cir. 2009)....................................................................17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).....................................................................11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..................................................................................29

*Martinez v. City of Schenectady*,
   97 N.Y.2d 78 (2001) .................................................................................18

*Matter of Cuomo v Dreamland Amusements Inc.*,
   2008 WL 4369270 (Sup. Ct. N.Y. Co. 2009) ......................................3, 16

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
   457 U.S. 423 (1982)..................................................................................14

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
   815 F. Supp. 2d 679 (S.D.N.Y. 2011).....................................................24

*MyInfoGuard, LLC v. Sorrell*,
   2012 WL 5469913 (D. Vt. Nov. 9, 2012) ...........................................14-15

*N.Y. State Citizens' Coal. for Children v. Velez*,
   629 F. App'x 92 (2d Cir. 2015) ...............................................................28

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958)..................................................................................29

*Nash v. City of New York*,
   2003 WL 22455641 (N.Y. Civ. Ct. Oct. 21, 2003).................................36

*Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*,
   336 F. Supp. 3d 50 (E.D.N.Y. 2018) .......................................................29

*Nat'l Rifle Ass'n of Am. v. North*,
   69 Misc. 3d 1201(A) (Sup. Ct. Albany Co. 2020) ...................................5

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989)..................................................................................17

*Nieves v. Bartlett*,
   139 S. Ct. 1715 (2019)........................................................................19-20

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011).....................................................................28

*O'Brien v. City of Syracuse*,
54 N.Y.2d 353 (1981) ...................................................................................6

*Pearson v. Callahan*,
555 U.S. 223 (2009)...................................................................................35

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)...................................................................................13

*People by Underwood v. Trump*,
62 Misc. 3d 500 (Sup. Ct. N.Y. Co. 2018) ....................................................19, 26

*People v. Ackerman McQueen*,
67 Misc. 3d 1206(A) (Sup. Ct. N.Y. Co. 2020)..............................................4, 21

*People v. Goodman*,
31 N.Y.2d 262 (1972) ...............................................................................27

*People v. Grasso*,
54 A.D.3d 180 (1st Dep't 2008) ....................................................................3

*People v. N. Leasing Sys., Inc.*,
2020 NY Slip Op 20243 (Sup. Ct. N.Y. Co., May 29, 2020) ....................... 24-26, 27

*People v. Oliver Schs., Inc.*,
206 A.D.2d 143 (4th Dep't 1994)...............................................................26, 32

*People v. Utica Daw's Drug Co.*,
16 A.D.2d 12 (4th Dept. 1962) ...................................................................27

*Rockland Vending Corp. v. Creen*,
2009 WL 2407658 (S.D.N.Y. Aug. 4, 2009)...................................................13

*Schneiderman v Tierney*,
2015 WL 2378983 (Sup. Ct. N.Y. Co. 2015) .....................................................3

*Spear v. Town of West Hartford*,
954 F.2d 63 (1992)...................................................................................34

*Stauber v. City of New York*,
2004 WL 1593870 (S.D.N.Y. July 16, 2004) ..................................................29

*Tango v. Tulevech*,
61 N.Y.2d 34 (1983) ................................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................5

*Temple of Lost Sheep Inc. v. Abrams*,
    930 F.2d 178 (2d Cir. 1991)....................................................6, 14, 16

*Texas v. Johnson*,
    491 U.S. 397 (1989)...............................................................31

*Trainor v. Hernandez*,
    431 U.S. 434 (1977)...............................................................14

*United States v. Bassford*,
    812 F.2d 16 (1st Cir. 1987)......................................................23

*United States v. Konstantakakos*,
    121 F. App'x 902 (2d Cir. 2005) ..............................................20

*United States v. O'Brien*,
    391 U.S. 367 (1968)...........................................................30-31

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018).......................................................23

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)...............................................................32

*White Light Prods., Inc. v. On the Scene Prods., Inc.*,
    231 A.D.2d 90 (N.Y. 1st Dep't 1997).........................................15

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989)................................................................12

*Winfield v. Trottier*,
    710 F.3d 49 (2d Cir. 2013).......................................................35

*Young v. New York City Transit Authority*,
    903 F.2d 146 (2d Cir. 1990).................................................31-32

*Younger v. Harris*,
    401 U.S. 37 (1971)................................................................14

## CONSTITUTIONS

New York State Constitution Article 1 ........................................... passim

United States Constitution
    First Amendment ................................................................ passim
    Eleventh Amendment..............................................................2, 12
    Fourteen Amendment.........................................................18-19, 22

STATUTES

42 U.S.C. § 1983 .................................................................................................... passim

N.Y. BCL 11. ................................................................................................................ 24

N.Y. N-PCL
    § 112 .................................................................................................................... 24
    Art. 5 ...................................................................................................................... 4
    Art. 7 ...................................................................................................................... 4
    Art. 11 ............................................................................................................ passim


RULES

Fed. R. Evid. 201 ........................................................................................................... 5

Fed. R. Civ. P. 12 .................................................................................................. passim

MISCELLANEOUS AUTHORITIES

Alex Yablon, *New Gun Rights Campaign Seeks to Reform the Scandal-Plagued
    NRA Scandal-Plagued NRA*, THE TRACE (July 1, 2019) ........................................... 6

Beth Reinhard, Katie Zezima, Tom Hamburger, and Carol D. Leonning, *NRA
    money flowed to board members amid allegedly lavish spending by top
    officials and vendors*, WASHINGTON POST (June 9, 2019, 9:22 PM) ......................... 5

Beth Reinhard, *Three NRA Board Members Resign in Latest Sign of Upheaval at
    Gun Rights Group*, WASHINGTON POST (August 1, 2019) ......................................... 5

Brian Freskos, *The NRA Ousts Oliver North and Stifles Debate on Financial
    Wrongdoing*, THE NEW YORKER (April 28, 2019) ..................................................... 5

F. Riehl, *NRA Board Members' Maloney, Knight, Schneider Resign from NRA-
    BOD*, AMMO LAND (August 1, 2019) ...................................................................... 6

Jillian Jorgenson, *Letitia James Says She'd Investigate NRA's Not-For-Profit
    Status If Elected Attorney General*, N.Y. DAILY NEWS (July 12, 2018) .................... 9

Mark Maremont, *NRA Awarded Contracts to Firms with Ties to Top Officials*,
    WALL STREET JOURNAL (November 30, 2018) ........................................................... 5

Mike Spies, *Secrecy, Self-Dealing, and Greed at the N.R.A.*, THE NEW YORKER
    (April 17, 2019) ..................................................................................................... 5

LETITIA JAMES, Attorney General of the State of New York (the "Attorney General"), sued herein in her individual and official capacities, respectfully submits this memorandum of law in support of her motion, brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint in this action, dated October 9, 2020 (Dkt. No. 13) (the "Am. Compl."), in its entirety, with prejudice.[1]

## PRELIMINARY STATEMENT

This action is an attempt by a regulated entity to immunize itself from regulatory action by improperly asking a federal court to interfere with an ongoing state proceeding. The National Rifle Association of America, Inc. ("NRA"), as a not-for-profit entity chartered in New York, is subject to regulatory oversight by the Charities Bureau of the Office of the Attorney General. On August 6, 2020, after an extensive investigation, the New York Attorney General filed a civil enforcement action in New York State Supreme Court against the NRA and four of its current and former officers and directors (the "State Enforcement Action"). The complaint's 163 pages include 18 causes of action, and detailed factual allegations of pervasive illegal conduct at the NRA -- the diversion of millions of dollars away from the NRA's charitable mission for private benefit, the lack of internal controls enabling this abuse, the false regulatory filings, the lucrative no-show contracts used to buy loyalty, and the retaliation against those who tried to seek reform. The complaint seeks multiple forms of relief, including restitution, an accounting, removal of those wrongdoers who are still leading the NRA, and judicial dissolution.

After the Attorney General filed the State Enforcement Action, on the same day, the NRA

---

[1] A copy of the State Enforcement Action complaint is attached as Exhibit 1 to the Amended Complaint. Dkt. No. 13-1 (hereinafter, the "State Enforcement Action Compl."). Other documents referenced here are annexed to the accompanying Declaration of Monica Connell, dated November 20, 2020 ("Connell Decl."). A copy of the Amended Complaint, dated October 9, 2020, is attached as Exhibit A.

commenced this federal action. In its Amended Complaint, the NRA minimizes or ignores the extensive allegations of illegal conduct set out in the State Enforcement Action and instead points to the Attorney General's campaign statements about the NRA and falsely claims that she seeks dissolution of the NRA "solely based" upon "executive misconduct." Despite the more than 600 paragraphs of detailed factual allegations in the State Enforcement Action Complaint, the NRA states in a conclusory fashion that the Attorney General's "investigation found no evidence to support her audacious claims." Ironically, it is in the State Enforcement Action where the merits of the Attorney General's evidence will be determined; yet the NRA, in what appears to be procedural gamesmanship, brought this action in federal court seeking relief which would have the effect of enjoining the State Enforcement Action.

But the NRA's attempt to forestall the State Enforcement Action fails for a number of reasons.

*First*, many of the NRA's claims and requests for relief are barred by the Eleventh Amendment to the United States Constitution as well as New York's sovereign immunity.

*Second*, given the pending State Enforcement Action, which will assess and determine whether the Attorney General's claims against the NRA have merit, this is a textbook case for abstention under either the *Younger* or *Burford* abstention doctrines. To the extent that any of the NRA's claims could survive, they are more appropriately heard in the State Enforcement Action.

*Third*, the NRA's direct claims under the New York State Constitution are not permitted.

*Fourth*, each of NRA's efforts to plead a plausible constitutional claim fails. Illegal conduct is not subject to First Amendment protection and the NRA has not come close to pleading, as it must, that viewpoint discrimination was the but-for cause of the Attorney General's decision to commence the State Enforcement Action. The NRA's mischaracterization of the State

Enforcement Action and misstatement of the standards governing dissolution of not-for-profit entities are not sufficient to state a viable selective prosecution claim. Nor has the NRA established that the dissolution statutes are unconstitutional as-applied to it. Finally, the NRA lacks standing to assert a violation of its members' association rights and has not established a violation of that right in any event.

*Fifth*, the NRA's claims for monetary relief are barred by absolute and qualified immunity.

For all of these reasons, it is respectfully submitted that this action should be dismissed.

## STATEMENT OF PROCEDURAL HISTORY AND RELEVANT FACTS

**I.    The Attorney General is Authorized to Oversee Registered Not-for-Profit Entities like the NRA.**

The Office of the New York State Attorney General ("OAG") is vested under State law, specifically the Not-for-Profit Corporations Law ("N-PCL"); the Estates, Powers and Trusts Law; and the Executive Law, with expansive authority to oversee not-for-profit entities, like the NRA, which are organized under New York law. *See Schneiderman v. Tierney*, 2015 WL 2378983, at *2–3 (Sup. Ct., N.Y. Co. 2015); *Matter of Cuomo v. Dreamland Amusements Inc*., 2008 WL 4369270, at *4 (Sup. Ct., N.Y. Co. 2009); *In re McDonell*, 195 Misc.2d 277, 278-79 (Sup. Ct. N.Y. Co. 2002); s*ee also Citizens United v. Schneiderman*, 882 F.3d 374, 379 (2d Cir. 2018).

The Attorney General is responsible, by statute, for ensuring that not-for-profit charitable corporations and their assets are not abused or misused, and for protecting "the public interest in charitable property." *Tierney*, 2015 WL 2378983, at *3; *see also Abrams v Temple of the Lost Sheep, Inc.*, 148 Misc. 2d 825, 828-29 (Sup. Ct., N.Y. Co. 1990). As the State's chief law enforcement officer, *People v. Grasso*, 54 A.D.3d 180, 204 (1st Dep't 2008), the Attorney General safeguards the public interest through investigations and enforcement actions to prevent, among other things, fraud and misconduct.

3

New York law provides for various types of relief against charitable entities and their officers for violations of the law. Potential remedies vary from orders directing restitution, unwinding transactions, and requiring an accounting, to removing officers and directors, up to and including judicial dissolution of an entity and distribution of its remaining assets for charitable uses consistent with its charitable mission. *See, e.g.,* N-PCL §§ 706, 714, 715, 717, 720, 1008(a)(15), 1101, 1102, 1109(b), and 1115(a); *see also* N-PCL, Art. 5.

## II. The OAG Charities Bureau Initiates an Investigation of the NRA Culminating in the Commencement of a State Court Enforcement Action Against the NRA.

By document preservation notice dated April 26, 2019, the OAG Charities Bureau notified the NRA that it was the subject of an investigation. Am. Compl. ¶ 23. In June 2019, the Attorney General served the NRA with an initial subpoena for documents and the investigation continued for 15 months thereafter. Connell Decl., Ex. B. Commencement of the OAG's investigation followed review of the NRA's regulatory filings, including the organization's IRS Form 990 and CHAR500 official filings, and its audited financials, some of which noted substantial inaccuracies in earlier mandated filings.[2] *See People v. Ackerman McQueen*, 67 Misc. 3d 1206(A) (Sup. Ct. N.Y. Co. 2020) ("Ackerman Subpoena Action"). Examples of substantial irregularities were apparent from the filings. *See* Connell Decl., Ex. C (Ackerman Subpoena Action Dkt. #14) ¶ 7.[3]

---

[2]  The IRS Form 990 is the federal information tax return that the NRA must file annually with the Internal Revenue Service and as part of its OAG CHAR500, an annual regulatory filing required by the OAG.

[3]  On a motion to dismiss for failure to state a claim, courts may consider the pleading, as well as any written instrument attached to the pleading as an exhibit, information incorporated in it by reference, any document upon which the complaint heavily relies, as well as certain other documents. *Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). For example, courts may consider a document where a complaint "relies heavily upon its terms and effect," or "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint…." *Chambers*, 282 F.3d at 153. Courts may also consider

The serious dysfunction, governance and financial problems within the NRA were publicly reported in the press, publicly available documents, and litigation filings.[4] Whistleblowers within the NRA also raised concerns. *See* State Enforcement Action Compl. ¶¶ 7, 10, 220, 226, 263, 266, 279, 452, 453, 472-73 484-497. Longtime members of the NRA's own Board of Directors— including its then-President, Lt. Col. Oliver North—were raising credible concerns about alleged financial misconduct within the organization. After North attempted to investigate these concerns, he was denied re-nomination and pushed from his leadership position at a deeply divided and highly publicized annual convention in April 2019.[5]

Similarly, when other dissident board members called for an independent investigation, they were allegedly "stonewalled, accused of disloyalty, stripped of committee assignments and denied effective counsel," and ultimately resigned from the board.[6] As these board members were

matters that are subject to judicial notice, *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007), including prior proceedings and official filings in plaintiff's possession. *See Faulkner v. Verizon Comm., Inc.*, 156 F.Supp.2d 384, 391 (S.D.N.Y.2001); Fed. R. Evid. 201.

[4] *See, e.g.,* Mark Maremont, *NRA Awarded Contracts to Firms with Ties to Top Officials*, WALL STREET JOURNAL (November 30, 2018) (https://www.wsj.com/articles/nra-awarded-contracts-to-firms-with-ties-to-top-officials-1543590697); Mike Spies, *Secrecy, Self-Dealing, and Greed at the N.R.A.*, THE NEW YORKER (April 17, 2019), (https://www.newyorker.com/news/news-desk/secrecy-self-dealing-and-greed-at-the-nra); Beth Reinhard, Katie Zezima, Tom Hamburger, and Carol D. Leonning, *NRA money flowed to board members amid allegedly lavish spending by top officials and vendors*, WASHINGTON POST (June 9, 2019, 9:22 PM), https://www.washingtonpost.com/investigations/nra-money-flowed-to-board-members-amid-allegedly-lavish-spending-by-top-officials-and-vendors/2019/06/09/3eafe160-8186-11e9-9a67-a687ca99fb3d_story.html).

[5] *See, e.g.,* Brian Freskos, *The NRA Ousts Oliver North and Stifles Debate on Financial Wrongdoing*, THE NEW YORKER (April 28, 2019), https://www.newyorker.com/news/news-desk/the-nra-ousts-oliver-north-and-stifles-debate-on-financial-wrongdoing; *see also Nat'l Rifle Ass'n of Am. v. North*, 69 Misc. 3d 1201(A) (Sup. Ct. Albany Co. 2020) (discussing North's whistleblowing status).

[6] Beth Reinhard, *Three NRA Board Members Resign in Latest Sign of Upheaval at Gun Rights* Group, WASHINGTON POST (August 1, 2019), https://www.washingtonpost.com/politics/three-nra-board-members-resign-in-latest-sign-of-upheaval-at-gun-rights-group/2019/08/01/aad49bc0-

sounding the alarm internally, a group of longtime NRA members was also vocalizing its concerns about the organization's management by launching the "Save the Second" campaign, which purportedly arose out of a "Facebook discussion concerning the NRA's poor management."[7] Reports of abuses within the NRA were detailed in lawsuits and press coverage, including by The Trace, The New Yorker, The Wall Street Journal, The Washington Post and The New York Times.

During the pendency of the Attorney General's investigation, the NRA never moved to quash the subpoenas served upon it nor commence an action asserting that the investigation constituted selective prosecution or First Amendment retaliation.[8] Indeed, in its own pleading, it discusses its own efforts to "bring all into full compliance" and the resistance it met from some quarters. Am. Compl. ¶¶ 15, 22. These admissions by the NRA contradict its assertions that there

---

b49d-11e9-8f6c-7828e68cb15f_story.html; *see also* F. Riehl, *NRA Board Members' Maloney, Knight, Schneider Resign from NRA-BOD*, AMMO LAND (August 1, 2019), https://www.ammoland.com/2019/08/nra-board-members-maloney-knight-schneider-resign-from-nra-bod/#axzz6dKJIw0xd.

[7] Alex Yablon, *New Gun Rights Campaign Seeks to Reform the Scandal-Plagued NRA*, THE TRACE (July 1, 2019), https://www.thetrace.org/2019/07/save-the-second-nra-gun-rights-campaign/.

[8] On or about August 16, 2019, the NRA commenced a special proceeding demanding to be present during the subpoenaed testimony of its former president, Lt. Col. Oliver North. *See National Rifle Association of America, Inc. v. Letitia James*, Supreme Ct., N.Y. Co. Index No. 158019/2019 (the "North Subpoena Action"). As part of its application, the NRA asserted some of the same arguments it now puts forward, *i.e.,* that the Attorney General was biased against the NRA and had made statements to the effect that she would "take down" the NRA, using language identical to that used in the NRA's current complaint. Compare North Subpoena Action Dkt. 43 (NRA Reply Mem.), pp. 4-5 with Dkt. 1 (Compl.) p. 1. The Supreme Court rejected the NRA's arguments and denied the application. The Appellate Division, First Department, denied the NRA's stay application and the NRA declined to pursue further appeal. *Id.*, Ex. E (collecting the NRA's application and orders). Since the NRA could have, and did, raise its claims of bias in the North Subpoena Action, it is precluded from re-litigating them here. *See O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981); *Temple of Lost Sheep Inc.*, 930 F.2d at 185 (holding that a regulated entity could bring constitutional claims of bias in state court proceeding challenging investigatory subpoenas).

were no compliance issues.

The investigation continued, with numerous witnesses interviewed or examined, including current NRA employees, and tens of thousands of documents reviewed. Based upon the evidence uncovered, the OAG determined that enforcement action was warranted.

### III.    The OAG Commences the State Enforcement Action.

On August 6, 2020, the Attorney General filed the 163-page State Enforcement Action against the NRA and four of its current and former leaders.[9]

The State Enforcement Action sets forth detailed allegations of pervasive and persistent illegal conduct at the NRA. The facts alleged demonstrate that the wrongdoing was not limited to isolated bad acts, but rather was part of a system of misuse of assets for private benefit, combined with inadequate controls, favors and retaliation that corrupted the organization from within. It sets forth facts establishing that the NRA and its Board permitted the diversion of tens of millions of dollars, perhaps much more, away from the NRA's charitable mission, imposing substantial reductions in its expenditures for core program services, including gun safety, education, training, member services. State Enforcement Action Compl. ¶ 2. It alleges that the NRA ignored, and in some cases retaliated against, those who raised concerns about its operation and finances. These whistleblowers included multiple board members and a former NRA President who began to investigate the governance of the NRA upon learning of complaints by other whistleblowers, senior staff and donors. Many whistleblowers have resigned or been ousted. *Id*., ¶¶ 444-475.

The State Enforcement Action sets forth facts alleging that the NRA has persistently engaged in illegal conduct. As a result of these persistent violations of law, the Attorney General

---

[9]  *People of the State of New York by Letitia James, Attorney General of the State of New York v. The National Rifle Association of America, Inc., et al.*, Supreme Court N.Y. Co. Index No. 451625/2020.

asserted 18 causes of action and requested multiple forms of relief, including but not limited to an order directing an accounting; mandating that the individual defendants pay restitution and penalties, be removed from office, and be enjoined from future leadership roles in any New York not-for-profit or charitable organization; rescinding certain transactions and classes of transactions; directing the NRA to account for its official conduct with respect to management of the NRA's institutional funds; and ordering repayment of illegal, unauthorized or ultra vires compensation, reimbursements, benefits or amounts unjustly paid. *Id*., ¶¶ 560-666.

Among the relief requested in the State Enforcement Action, the OAG also seeks a finding by the State Court that the NRA is liable to be dissolved pursuant to the standard for such actions set forth in the N-PCL. *See* N-PCL §§ 1101 and 1102. The N-PCL requires, as the Attorney General's complaint expressly acknowledges, that the State court determine, in the exercise of its discretion under N-PCL § 1109(b)(1), that the interest of the public and the members of the NRA supports a decision to dissolve the NRA.

## IV. The NRA Filed This Countersuit Seeking to Preclude Regulatory Oversight of Its Operation as a Not-for-Profit Entity.

On the same day that the OAG commenced the State Enforcement Action, just hours after the filing, the NRA commenced this countersuit.[10] In the original complaint, the NRA did not address the State Enforcement Action but instead sought an order enjoining the OAG investigation, which had already ended with the filing of the State Enforcement Action. Dkt. No. 1. The OAG filed a pre-motion conference letter seeking leave to move to dismiss the complaint. Dkt. No. 8. On September 21, 2020, after a pre-motion conference, the Court granted the NRA's request to

---

[10] In its Amended Complaint, at fn 8, the NRA alleges that notwithstanding that this action was commenced after the State Enforcement Action, this action was "first filed." As set forth in Point II(A), *infra*, the NRA is incorrect on this point as a matter of law.

amend the complaint and gave the OAG leave to move to dismiss the amended pleading, when filed. On October 9, 2020, the NRA filed the Amended Complaint.

In its Amended Complaint, the NRA cites the Attorney General's campaign statements, sometimes out of context,[11] and claims that the State Court Enforcement Action was instituted in retaliation for the NRA's First Amendment-protected activities. The NRA acknowledges the OAG's regulatory authority and that it was aware of the investigation as of April 2019. Am. Compl. ¶¶ 23, 24. At that time, the NRA was aware of the Attorney General's campaign statements and the alleged political bias against it. Am. Compl. ¶¶ 14-24. Yet the NRA waited until the end of the investigation and the commencement of the State Enforcement Action to file this case in an effort to effectively immunize itself from accountability.

Throughout its Amended Complaint, the NRA mischaracterizes the nature and scope of the Attorney General's State Enforcement Action. The NRA implies that dissolution is the only claim for relief asserted against it and portrays the action as one that is based "solely on allegations of misconduct by four individual executives." Am. Compl., pp. 4, 8. This characterization is fundamentally at odds with the allegations of the NRA's systemic misconduct, illegality, mismanagement of charitable assets, and abuse of its powers and charitable status.[12]

---

[11] For example, the NRA edits the Attorney General's quote about her intention to investigate the NRA if elected. Am. Compl., p. 2. The quote reads in full, "I will use the constitutional power as an attorney general to regulate charities that includes the NRA, to investigate their legitimacy." Jillian Jorgenson, *Letitia James Says She'd Investigate NRA's Not-For-Profit Status If Elected Attorney General*, N.Y. DAILY NEWS (July 12, 2018), https://www.nydailynews.com/news/politics/ny-pol-tish-james-nra-20180712-story.html. The "top issue" quote that the NRA links to this statement in its Amended Complaint is found nowhere in the cited article.

[12] For example, the State Enforcement Action asserts the NRA's violation of numerous laws; pervasive and persistent lack of oversight of expenditures; allowance of waste and misuse of charitable assets; long-running self-dealing with board members without requisite disclosures and approvals; false filings; improper setting and reporting of compensation paid to officers; whistleblower retaliation; suppression of reform efforts; and a sustained and systemic failure of

Ignoring most of the claims and requests for relief in the State Enforcement Action, the NRA focuses on the request for judicial dissolution and argues that it is retaliatory and unlawful because allegedly (1) the Attorney General is motivated by animus towards the NRA; (2) the request for dissolution is based "solely on allegations of executive misconduct"; and (3) the OAG has supposedly never sought dissolution based solely upon claims of executive misconduct before. Am. Compl., p. 18, sec. E, ¶¶ 43, 95, 104, 115, Wherefore Cl, (d). In regard to other allegations against it, the NRA concludes that "construed deferentially, the [OAG] complaint at most accuses the NRA and its Board of failing to maintain fulsome records and of lax oversight." *Id.* ¶ 33.

The NRA asks this Court to enjoin the State Enforcement Action, in particular, to:

- issue declaratory relief that the Attorney General, in taking action against the NRA, has violated its rights to free speech, equal protection, and its members' right to free association under the United States and New York State Constitutions;

- declare N-PCL §§ 1101 and 1102 unconstitutional as applied to the NRA;

- enjoin the Attorney General from pursuing any requests for dissolution of the NRA in the State Enforcement Action;

- direct the Attorney General and non-party Charities Bureau and OAG employees "to immediately cease and refrain from engaging in any further conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First Amendment to the United States Constitution and Sections 8, 9 and 11 of the New York State Constitution"; and

- award compensatory and punitive damages as well as an award of fees and costs.

*See* Am. Compl. Wherefore Cl.

## V.    The NRA has Undertaken Multiple Procedural Maneuvers to Transfer this Action to the Northern District of Texas and to Move the State Court Enforcement Action Out of the Supreme Court, New York County.

On October 20, 2020, the NRA moved to have this action transferred to the Judicial Panel on Multidistrict Litigation. Dkt. No. 14. It seeks to have this matter joined with four other cases

_____

exercise oversight. *See, e.g.,* State Enforcement Complaint State Enforcement Compl. at ¶¶ 308, 365, 401, 408, 473, 487, 531.

and moved to the Northern District of Texas for pre-trial purposes. In the Supreme Court, New York County, on October 19, 2020, respectively, the NRA moved to dismiss the State Enforcement Action on *forum non conveniens* grounds, arguing that this Court is the more convenient forum for litigating the OAG's exclusively state law claims. State Enforcement Action, Dkt. 99. Also in its October 19, 2020 motion to dismiss, as well as in a November 3, 2020 motion, the NRA moved to transfer the State Enforcement Action to the Supreme Court, Albany County. *Id.*, Dkt. 99, 133.

The Attorney General is opposing all of the NRA's applications and now moves to dismiss this action in its entirety.

## STANDARD OF REVIEW

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), in deciding a motion to dismiss, the Court must accept all well pled factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). "A plaintiff must show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Avery v. DiFiore*, 2019 WL 3564570, at *2 (S.D.N.Y. Aug. 6, 2019) (quoting *Twombly*, 550 U.S. at 555). Conclusory allegations are not entitled to any assumption of truth, and therefore, will not support a finding that the plaintiff has stated a valid claim. *See Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

"The standard for reviewing a 12(b)(1) motion to dismiss is essentially identical to the 12(b)(6) standard, except that '[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Allstate Ins. Co. v. Elzanaty*, 916 F.

Supp. 2d 273, 286 (E.D.N.Y. 2013) (quoting *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000)).

## ARGUMENT

**I.    ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY BAR MANY OF THE NRA'S CLAIMS.**

The NRA has asserted seven causes of action against the Attorney General. The NRA's causes of action seeking retroactive relief or damages against the Attorney General in her official capacity under 42 U.S.C. § 1983—*see* Am. Compl. Counts One, Three, and Five—and for any relief under Article 1, Sections 8, 9, and 11 of the New York State Constitution—*see* Am. Compl. Counts Two, Four, and Six—are barred by the Eleventh Amendment. The Court should dismiss these claims under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction.

The Eleventh Amendment to the United States Constitution "bars a suit in law or equity in federal court against a State absent the State's consent to such a suit or congressional abrogation of immunity." *Aron v. Becker,* 48 F.Supp.3d 347, 366 (N.D.N.Y. 2014). "[I]t is beyond dispute that the State of New York … [has] never consented to be sued in federal court." *Bryant v. New York State Dept. of Correction Services Albany*, 146 F.Supp.2d 422, 425 (S.D.N.Y. 2001) (citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594-95 (2d Cir. 1990)) (internal quotation marks omitted). Since Congress did not abrogate Eleventh Amendment immunity by enacting § 1983, a suit against a state officer in her official capacity is a suit against the state and cannot be maintained. *Aron v. Becker*, 48 F. Supp.3d 347, 366 (N.D.N.Y. 2014). Further, state officials sued in their official capacities are not "persons" subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Therefore, the NRA's damages claims against the Attorney General in her official capacity, in Counts One, Three, and Five of the Amended Complaint, must be dismissed.

Furthermore, "[s]overeign immunity bars state constitutional claims against the state, its

agencies, or against its employees in their official capacity, regardless of the relief sought." *Alleyne v. N.Y. State Educ. Dep't*, 691 F.Supp.2d 322, 335 (N.D.N.Y. 2010) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-106 (1984)). Sovereign immunity similarly bars the NRA's state constitutional claims against the Attorney General in her individual capacity. Those claims seek to block the regulation and civil prosecution of the NRA and are thus against the State, regardless of whether the NRA seeks damages or injunctive or declaratory relief.[13] *Pennhurst*, 465 U.S. at 101-102. The exception to sovereign immunity for prospective injunctive or declaratory relief set forth in *Ex parte Young*, 209 U.S. 123 (1908), does not apply to alleged violations of state law. *Pennhurst*, 465 U.S. at 106.

Accordingly, the NRA's claims for retroactive injunctive and declaratory relief are barred, as are all claims for monetary relief against the Attorney General in her official capacity and all claims under the State Constitution.

## II.   ABSTENTION IS APPROPRIATE GIVEN THE SUBSTANTIAL FEDERALISM AND COMITY CONCERNS PRESENT HERE.

This action is an explicit attempt by the NRA to evade its regulator and, by extension, its responsibility for the pervasive violations of New York state laws that are the subject of the State Enforcement Action. The NRA's request that this Court enjoin the Attorney General's pending State Enforcement Action constitutes an unwarranted federal intrusion into New York's oversight of charitable entities that raises serious federalism and comity concerns. Given the pending State Enforcement Action, the NRA's claims here, including the constitutional issues it raises, may be

---

[13] To the extent that the NRA is seeking injunctive relief against the Attorney General in her individual capacity, that relief is unavailable, since injunctive relief against a state official may be recovered, if at all, only in an official capacity suit. *Rockland Vending Corp. v. Creen*, 2009 WL 2407658, fn. 2 (S.D.N.Y. Aug. 4, 2009); *Corr. Officers Benevolent Ass'n v. Kralik*, 2009 WL 856395, fn.7 (S.D.N.Y. Mar. 26, 2009); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007).

litigated as defenses in the state forum. This is a textbook example of an instance where abstention is justified under both the *Younger* and *Burford* abstention doctrines. *See Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co*., 319 U.S. 315 (1943); *Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178, 185 (2d Cir. 1991); *see also MyInfoGuard, LLC v. Sorrell*, 2012 WL 5469913, at *3 (D. Vt. Nov. 9, 2012).

### A.  This Court should abstain under the *Younger* abstention doctrine.

In recognition of fundamental principles of federalism and comity, the *Younger* abstention doctrine mandates that federal courts refrain from enjoining state criminal and certain civil state enforcement proceedings absent extraordinary circumstances where the risk of irreparable injury is "both great and immediate." *Younger*, 401 U.S. at 45-46 (addressing state criminal proceedings); *Huffman v. Pursue, Ltd*., 420 U.S. 592, 604–05 (1975) (addressing civil state enforcement proceedings); *see also Trainor v. Hernandez*, 431 U.S. 434, 440-445 (1977). The doctrine reflects "a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).

"*Younger* abstention is required when three elements are met: 1) there is an ongoing state proceeding; 2) an important state interest is implicated; and 3) the plaintiff has a state court avenue open for review of constitutional claims." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp.3d 342, 354 (E.D.N.Y. 2016), aff'd in part, 712 F. App'x 24 (2d Cir. 2017). All criteria are met here.

It cannot be disputed that the State Enforcement Action is an ongoing proceeding which meets the necessary criteria for the application of *Younger*. It "(1) was 'initiate[d]' by 'a state actor' (namely, the state attorney general in his or her official capacity) to (2) 'sanction the federal

plaintiff . . . for some wrongful act' (namely, [the federal plaintiff] for its allegedly false and misleading representations)); and (3) 'involved' a lengthy 'investigation [] . . . culminating in the filing of a formal complaint or charges.'" *In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp.3d 378, 409 (S.D.N.Y. 2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79-80 (2013)).

The State Enforcement Action is both ongoing and preceded this action. The NRA's argument that this counter-action was "first filed" due to a typographical error in the verification to the State Enforcement Action, Am. Compl. fn 8, is unavailing. Under New York law, a typographical error does not nullify the commencement of the action[14] and the "first filed" rule precludes such gamesmanship.

In any event, "*Younger* abstention only requires that the state action be initiated 'before any proceedings of substance on the merits have taken place in federal court.'" *MyInfoGuard, LLC*, 2012 WL 5469913, at *8 (abstaining where state court proceeding was commenced two days after the federal proceeding) (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)). In fact, in *Standard & Poors*, the court held that under *Younger*, the federal court was required to abstain for later-filed

---

[14]  Under New York law, even where a verification is legally required, an allegedly incomplete or defective verification is "inconsequential in nature, nonprejudicial in substance and correctable at any stage of the proceedings" and does not require dismissal or re-starting of proceedings. *Hablin Realty Corp. v. McCain*, 123 Misc. 2d 777, 778 (App. Term 1st Dep't 1984) (internal citation omitted). Accordingly, even if the verification in the State Enforcement Action was legally "defective"—a fact the Attorney General disputes—such defect would not nullify the complaint or the commencement of the action. In any event, the "first filed"' rule would not assist the NRA in the present case. In filing this counter action immediately on the heels of Attorney General's filing of the State Enforcement Action and subsequently claiming "first filed" status based on an allegedly defective verification, the NRA has engaged in the type of pre-emptive and strategic filing that courts routinely reject. *See e.g. White Light Prods., Inc. v. On the Scene Prods., Inc.*, 231 A.D.2d 90, 98 (1st Dep't 1997); *Brierwood Shoe Corp. v. Sears, Roebuck & Co.*, 479 F. Supp. 563, 568 (S.D.N.Y. 1979); *Bridas Int'l S.A. v. Repsol, S.A.*, 2013 WL 4437189, at *4 (Sup. Ct. N.Y. Co. 2013).

state actions where the federal plaintiff had commenced federal actions as a preemptive strike to have the issues heard by federal court rather than state courts. 23 F. Supp. 3d at 408-09.

Nor can it be disputed that the State has an important interest in exercising its authority over the NRA, a New York-chartered not-for-profit charity, to protect the public interest and prevent fraud, theft and waste of charitable assets. *In re Standard & Poor's Rating Agency Litig*., 23 F. Supp. 3d at 410 (federal courts should broadly interpret state's interest, noting that "courts have repeatedly held that state actions to enforce consumer-protection statutes and laws against deceptive business practices" qualify under *Younger*); *Dreamland Amusements, Inc*., 2008 WL 4369270, at *10 (abstaining and reasoning that a "state's interest in enforcing its own laws and investigating their violation cannot seriously be disputed").

Finally, the state court provides the NRA with a venue to vindicate its federal rights. *Temple of Lost Sheep Inc.*, 930 F.2d at 183 ("*Younger* abstention derives from the recognition that a pending state proceeding, in all but unusual cases, would provide the federal plaintiff with the necessary vehicle for vindicating his constitutional rights") (internal quotation marks omitted); *see also Dreamland Amusements, Inc*., 2008 WL 4369270, at *10-11.

Given the State's interest in enforcing its laws governing charitable entities, the ongoing State Enforcement Action and the ability of the NRA to assert its constitutional claims and defenses in the State Court, abstention is clearly appropriate and the NRA's claims should be heard, if at all, before the State Court.

### B.  Abstention is also appropriate under the *Burford* abstention doctrine.

In *Burford v. Sun Oil Co*., 319 U.S. 315 (1943), the Supreme Court held that where "timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings…where the 'exercise of federal review … would be disruptive of

state efforts to establish a coherent policy with respect to a matter of substantial public concern.'"

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)

(hereinafter "*NOPSI*") (internal citation and quotation marks omitted).

　　*Burford* abstention applies to prevent federal courts from "interfering with state efforts …

in an area of comprehensive regulation or administration," even where a federal question may be

present. *American Disposal Services, Inc. v. O'Brien*, 839 F.2d 84, 87 (2d Cir.1988) (noting also

that abstention may be appropriate "in deference to parallel state court proceedings. . . .in order to

further the interests of '[w]ise judicial administration, giving regard to conservation of judicial

resources and comprehensive disposition of litigation.'"). *See also Levy v. Lewis*, 635 F.2d 960,

963–64 (2d Cir.1980). Burford abstention applies when "the subject matter of the litigation is

traditionally one of state concern." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639 (2d Cir. 2009),

and charities regulation certainly qualifies.

　　New York has a comprehensive statutory scheme for the oversight of not-for-profits and

charities, which empowers the Attorney General to carry out the important state interest of

ensuring the proper use of charitable assets to fulfill a legitimate charitable mission. Following a

16-month investigation, the Attorney General commenced the State Enforcement Action, alleging,

in a highly particularized pleading, substantial violations of New York laws governing charities

by the NRA and its current and former officers. The appropriate place to assess the NRA's

assertions that the Attorney General's claims of illegal conduct lack merit, are a purported unlawful

exercise of the Attorney General's authority or infringe constitutional rights is in the ongoing

proceeding in New York State Supreme Court.

　　In light of the foregoing, it is respectfully submitted that abstention is appropriate here.

### III. THE NRA'S CLAIMS AGAINST THE ATTORNEY GENERAL UNDER THE NEW YORK STATE CONSTITUTION FAIL TO STATE A CLAIM.

The NRA's claims for damages from the Attorney General, in her individual capacity, for alleged violations of Article 1, Sections 8, 9, and 11 of the New York State Constitution—*see* Am. Compl. Counts Two, Four, and Six—fail. Federal courts have repeatedly held that a cause of action will be implied only "where remedies are otherwise unavailable at common law or under [42 U.S.C. § 1983]." *Allen v. Antal*, 665 Fed. Appx. 9, 13 (2d Cir. 2016) (summary order).

Where a plaintiff has § 1983 claims available, a direct claim for damages under the State Constitution will not lie. *See Felmine v. N.Y.C.*, 2012 WL 1999863, at *6 (E.D.N.Y. June 4, 2012) (noting that private cause of action under New York Constitution is only available when there are no alternative remedies); *see also Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001).

Here, the NRA has access to § 1983 claims to vindicate its asserted constitutional rights. Accordingly, the NRA's claim for damages against the Attorney General in her individual capacity arising out of alleged violations of Article 1, Sections 8, 9, and 11 of the New York State Constitution should be dismissed.

### IV. THE NRA'S ALLEGATIONS OF POLITICAL BIAS IN REGARD TO THE ATTORNEY GENERAL'S INVESTIGATION DO NOT STATE PLAUSIBLE FIRST OR FOURTEENTH AMENDMENT CLAIMS.

The complaint in the State Enforcement Action sets out in exacting detail the Attorney General's findings of persistent and pervasive illegal conduct within the NRA. The NRA's allegations that the investigation and the Attorney General's assertion of a dissolution claim are the product of bias do not provide a basis to allow the NRA to evade accountability in the State Enforcement Action. Neither the First nor Fourteenth Amendment bar a state from conducting a proper investigation to uncover wrongful conduct. Nor is it "within the province of the courts to subjectively determine the motivation of a government agency in commencing an enforcement

proceeding, or to dismiss the proceeding because of the political disagreements of the parties." *People by Underwood v. Trump*, 62 Misc. 3d 500, 509 (Sup. Ct. N.Y. Co. 2018). Where an enforcement action sets forth serious or substantial allegations of wrongdoing, courts may hold that there is no basis for "finding that animus and bias were the sole motivating factors for initiating the investigation and pursuing [a] proceeding." *Id*.

For the reasons set forth below, the NRA's pleading does not state a plausible claim of First Amendment retaliation or Fourteenth Amendment selective enforcement. Counts One and Five of the NRA's amended complaint should therefore be dismissed.

### A. The NRA has failed to plausibly plead the elements of a First Amendment retaliation claim.

To state a First Amendment retaliation claim, the NRA must adequately plead that "(1) [it] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [its] exercise of that right; and (3) the defendant's actions caused [it] some injury." *Dorsett v. City of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). With respect to the third element, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (emphasis in original).

The NRA fails to adequately plead all three elements. *First*, the wrongdoing at issue in the State Enforcement Action is not First Amendment-protected activity. *Second*, the NRA has not, and cannot, plead that the Attorney General's investigation was illegitimate. The NRA's allegations cannot overcome the "presumption of regularity" afforded the Attorney General's actions. *See Hartman v. Moore*, 547 U.S. 250, 263 (2006). *Third*, the NRA has not pleaded that retaliatory animus was the but-for cause of any injury.

1.   Fraud and illegal conduct are not protected by the First Amendment.

The NRA fails to support its First Amendment claim with allegations of any protected conduct at issue. The NRA does not contend, and could not, that the conduct at issue in the State Enforcement Action—misrepresentations, fraud, self-dealing, looting of charitable assets, waste, false filings—is protected by the First Amendment. There is no First Amendment right to use charitable funds on no-show consulting contracts, approving lavish expenditures for insiders, and other violations of applicable law. *See Illinois ex rel. Madigan v. Telemarketing Assocs.*, *Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 710 (S.D.N.Y. 2018) ("Ensuring that 'accurate information' reaches the market and the public is consistent with a *bona fide* investigation—not retaliation."); *see also United States v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005) ("[I]t has long been established that the First Amendment does not shield knowingly false statements made as part of a scheme to defraud."). The NRA can express itself and engage in First Amendment-protected conduct. But it has no right to engage in the pervasive illegal conduct alleged in the State Enforcement Action. The NRA's conduct at issue here is thus not protected by the First Amendment.

2.   The NRA has not and cannot plead "but for" causation, as it must, because no First Amendment claim can arise from an objectively justified investigation.

The NRA's First Amendment retaliation claim also fails because the NRA has not, and cannot, plead that the Attorney General's investigation was not justified by legitimate concerns. The Supreme Court has held that to state a prima facie claim under § 1983, a plaintiff must plead and prove that the action was independently unjustified and "but for" the retaliatory motive, the action would not have been taken. *Nieves*, 139 S.Ct. at 1722 (citing *Hartman v. Moore*, 547 U.S.

250, 259-260 (2006)); *see also Avery v. DiFiore*, 2019 WL 3564570, at *3 (S.D.N.Y. Aug. 6, 2019) (applying *Nieves* on a motion dismiss).

The requirement of "but for" causation is consistent with the "presumption that a prosecutor has legitimate grounds for the action he takes." *Hartman*, 547 U.S. at 263 (citing *Wayte v. United States*, 470 U.S. 598, 607-608 (1985)). As a matter of law, allegations of an improper motive cannot raise a plausible claim of bad faith when the complaint also alleges an "obvious alternative explanation" for the conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quotation marks and citation omitted).

Here, even on a motion to dismiss, the record is replete with evidence of pervasive and persistent illegal contact by and within the NRA. *Ackerman McQueen*, 2020 WL 1878107, at *2; State Enforcement Action Compl. Even in its own complaint, while alleging bias or error, the NRA admits that there was widespread press coverage of its internal financial and governance problems. Am Compl. ¶¶ 17-18, 21. The NRA admits that the accusations were not baseless, since the NRA's own internal inquiry resulted in the NRA cutting off relationships with certain executives and vendors "who did not welcome the NRA Board's push for additional documentation and transparency"—one of whom is a defendant in the State Action. Am. Compl. pg. 4 & ¶ 15. The NRA's present claim that it is in full compliance with New York charities law is belied by such admissions and the allegations in the State Enforcement Action Complaint demonstrating that the NRA's compliance attempts were abject failures fraught with retaliation against whistleblowers against reform efforts. *See* State Enforcement Action, ¶¶ 444-475, 534-543. In any event, the NRA's assertion of full compliance is a conclusory legal assertion that carries no weight on a motion to dismiss. *See Iqbal*, 566 U.S. at 679.

In sum, the NRA cannot use the First Amendment to enjoin or receive damages because of

a well-supported enforcement action, which sets forth claims of pervasive illegal conduct, by claiming that the OAG was acting with political motivations.

### 3. The NRA fails to plead that illicit animus caused it injury.

In addition, the NRA has also failed to set forth facts to establish an actionable injury due to the OAG action, as it must. *Dorsett*, 732 F.3d at 160. The NRA's only allegations of injury from the State Enforcement Action are 1) the conclusory assertion that the action "threatens to destabilize the NRA and chill the speech of the NRA, its members, and other constituents" and 2) the cost of defense of the litigation. Am. Compl. ¶ 51, 52. This is inadequate. The NRA's allegations of an abstract threat are not sufficient to make out the prima facie case. Given its allegations that it is continuing activities, it has not suffered an actionable injury. *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Further, given that the NRA has not contested the OAG's non-dissolution claims, it admittedly would have to defend itself in the State Enforcement Action in any event and so cannot even try to claim the defense costs of the litigation as an injury.

For these reasons, the First Amendment claims fail.

### B. The NRA does not state a Fourteenth Amendment selective prosecution claim.

Counts Four and Five of the NRA's Amended Complaint accuse the Attorney General of selective prosecution exclusively with respect to the claims seeking dissolution of the organization. The NRA does not challenge the other statutory claims in the State Enforcement Action asserted against the organization. *See* State Enforcement Action Compl. ¶¶ 626-645. Instead it attacks the OAG's request for judicial dissolution, which it argues is sought "on the sole basis of executive misconduct for the very first time against the NRA despite more than two decades of non-enforcement against similarly situated non-profits." *Id.* ¶ 95. A selective-enforcement claim

requires a plaintiff to establish "(1) that it was treated differently from other similarly situated businesses and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (quotation marks, citation, and edit omitted). The NRA's allegations fail on both prongs.

1. The Attorney General is authorized to seek dissolution in appropriate cases and her decisions are entitled to a presumption of good faith.

As an initial matter, in the State Enforcement Action, the OAG seeks dissolution based on the findings of an extensive investigation and pursuant to its well-established statutory authority. The OAG's complaint speaks for itself and the Attorney General is entitled to a presumption that it is acting in good faith. *United States v. Bassford*, 812 F.2d 16, 19 (1st Cir. 1987). Whether dissolution is warranted is ultimately a decision for a New York state court based on the record established in the State Enforcement Action. Here, multiple remedies are sought to which the NRA does not object. The NRA's constitutional challenge to the State Enforcement Action is undercut by its tacit admission of the propriety of the other relief sought. Further, dissolution will only be imposed upon a judicial determination that the requisite standards for such relief are met.

2. The NRA has failed to plausibly allege that it was treated differently than similarly situated charities.

To survive a motion to dismiss, a plaintiff must set forth well-pled facts showing that the plaintiff has been treated differently from others who were similarly situated. *Lanning v. City of Glens Falls*, 2017 WL 922058, at *8 (N.D.N.Y. Mar. 8, 2017), *aff'd*, 908 F.3d 19 (2d Cir. 2018). Similarly situated means "comparators whom a prudent person would think were roughly equivalent". *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (internal quotation marks omitted). The NRA has failed to state a plausible claim.

The NRA has set up a straw man argument: it claims that it is subject to dissolution "solely" due to "executive misconduct," and that to obtain dissolution the OAG must establish that the NRA is a "sham" organization that does not carry out any activities that advance its mission. Am. Compl. Comp ¶¶ 35, 43, 95. The NRA's argument mischaracterizes the facts and the law.

*First*, the NRA's description of the State Enforcement Action as a case for dissolution "on the sole basis of executive misconduct" (Am. Compl. at ¶ 95), is inaccurate and frivolous on its face. Rather, the complaint describes, in great detail, the OAG's findings of pervasive and persistent illegality. It is also significant that, unlike many of the executives involved in wrongdoing in past OAG actions, the chief wrongdoers at the NRA remain at the helm. As such, the NRA's citations to other OAG actions, which the NRA characterizes as instances of executive misconduct where the Attorney General did not seek dissolution, are inapposite. *See* Am. Compl. ¶ 37. As set forth above, the State Enforcement Action alleges far more than isolated instances of misconduct by a small number of rogue executives.

*Second*, contrary to the NRA's interpretation of the law and the OAG's past practice, there is no requirement that the OAG prove that an entity is a "sham" in order to dissolve it. The term "sham" or any equivalent requirement, does not appear in the N-PCL statutes or cases regarding dissolution. The Attorney General's authority to seek dissolution of a corporation is a well-established statutory power, found in both Article 11 of the N-PCL[15] and the analogous article of the Business Corporation Law. *See* Bus. Corp. Law § 1101 et seq.; *see also People v. N. Leasing Sys., Inc.*, 2020 NY Slip Op 20243, at *14 (Sup. Ct., May 29, 2020) (dissolving corporate entity

---

[15]   Section 112 of the N-PCL, which enumerates the Attorney General's enforcement powers, provides that the Attorney General is authorized to maintain an action or special proceeding to dissolve a corporation that has acted beyond its capacity or power or to restrain it from carrying on unauthorized activities. N-PCL § 112(a)(1). Article 11 elaborates on the bases for dissolution.

under Bus. Corp. Law and noting "Section 1101 merely vests in the Attorney-General, or merely only codifies, his standing to vindicate the State's right and provides for dissolution of the corporate abuser of the State's grant of corporate existence.") (internal quotation marks omitted). Under N-PCL § 1101(a)(2), the Attorney General may bring an action seeking dissolution when "the corporation has exceeded the authority conferred upon it by law, or has … carried on, conducted or transacted its business in a persistently fraudulent or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved." Under N-PCL § 1102(a)(2)(D), dissolution is appropriate where the "directors or members in control of the corporation have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner."

The NRA's legal argument that it can't be dissolved because it is not a total sham and carried out some mission-advancing activities is beside the point. "Sham" is not the relevant legal standard. The NRA's citation to *Leibert v. Clapp*, 13 N.Y.2d 313 (1963), Am. Compl. fn. 55, does not advance its argument. There the Court of Appeals held that it *is not* a bar to the grant of dissolution that an entity might operate profitably, *i.e.,* not be a total sham. *Leibert*, 13 N.Y.2d at 316; *see also N. Leasing Sys., Inc.,* 2020 WL 5755495, at *14 (dissolution held appropriate where entity engaged in persistently fraudulent conduct, even where the majority of its business was legitimate).

The OAG's actions fit squarely within enforcement cases it has brought after findings of breaches of fiduciary duty. Each case presents a unique set of facts, and the OAG, in a wholly appropriate use of its discretion, determines which remedies to seek based on a wide variety of factors, including the severity of the wrongdoing, available resources, and willingness of the organization to take meaningful remedial steps. Most recently, the OAG sought and obtained

dissolution of the Trump Foundation, which conducted some charitable grant making. The OAG deemed that dissolution was an appropriate remedy because of pervasive mismanagement and repeated self-dealing. *People of the State of New York v. Trump*, 62 Misc. 3d 500, 516-18 (Sup. Ct. N.Y. Co. 2018), *see also People of the State of New York v. Federation of Multicultural Programs*, (https://www.openminds.com/market-intelligence/news/new-york-opwdd-shuts-dd-provider-organization-federation-multicultural-programs-due-poor-service-financial-problems) obtaining dissolution of a provider of services to people with disabilities because of extensive financial mismanagement); *N. Leasing Sys., Inc*., 2020 NY Slip Op 20243, at *14 (in the for-profit context, granting Attorney General's action for dissolution despite defendant's claims that the allegedly abusive leases at the heart of the OAG's complaint were only a small fraction of defendant's total business).   In other instances, including the matters cited by the NRA (all of which were settlements that followed the departure of the chief wrongdoers), the OAG has obtained other remedies, including permanent bars on fiduciary service and monitorships, as well as criminal convictions. *See e.g.* Settlement Agreement with the Metropolitan Council on Jewish Poverty, signed December 19, 2013 (following removal upon felony conviction of Executive Director, mandating staff changes and adoption of new policies, and imposing a multiyear monitorship on the organization); *In the Matter of the Investigation of the Richenthal Foundation*, AOD No. 18-034 (imposing permanent bars on fiduciary service, board reforms, training, and disclosure requirements).

The Attorney General has broad discretion and may seek the statutory remedy of dissolution where an entity meets the statutory standards, rather than the fabricated standards the NRA has devised. *People v. Oliver Schs., Inc*., 206 A.D.2d 143, 148 (4th Dep't 1994) (noting the Attorney General's discretion); *N. Leasing Sys., Inc*., 2020 WL 5755495, at *14 (rejecting the

respondent's suggested standards for dissolution and contentions that dissolution was not appropriate when the majority of its business was not fraudulent.)

> 3.  The Attorney General is not treating the NRA differently than similarly situated entities based upon impermissible considerations.

The NRA also fails to adequately plead that the State Enforcement Action is based on impermissible considerations. *See Exxon Mobile Corp.*, 316 F. Supp. 3d at 704 (finding that Exxon failed to establish a plausible inference that the Attorney Generals of New York and Massachusetts did not act on a good faith belief that Exxon may have violated state laws); *Trump*, 62 Misc. 3d at 509. The NRA's claims regarding the Attorney General's statements do not alter this analysis. Allegations of political disagreement cannot insulate the subject of an ongoing investigation from law enforcement activity. *In re FDIC*, 58 F.3d 1055, 1062 (5th Cir. 1995) (taking political considerations into account could not establish "bad faith or improper behavior" by agency officials). A rule that prosecutors and enforcement agencies cannot investigate any subject with whom they are alleged to disagree politically would allow subjects to avoid investigation for wrongdoing wholly unrelated to their protected activity.

The Attorney General's exercise of her prosecutorial discretion, including what relief to seek, is well within her authority. Courts unsurprisingly acknowledge that some selectivity is inevitable in State law enforcement decisions. *People v. Goodman*, 31 N.Y.2d 262, 268 (1972); *see also, 303 West 42nd St. Corp. v. Klein*, 46 N.Y.2d 686, 693 (1979) ("latitude must be accorded authorities charged with making decisions related to legitimate law enforcement interests."); *People v. Utica Daw's Drug Co.*, 16 A.D.2d 12, 21 (4th Dept. 1962) ("Selective enforcement may also be justified when a striking example or a few examples are sought in order to deter other violators, as part of a bona fide rational pattern of general enforcement, in the expectation that general compliance will follow and that further prosecutions will be unnecessary."). **The extensive**

and serious allegations in the OAG complaint undermine the notion that bias was the sole motivating factor for the investigation and the proceeding.

In sum, in an effort to have this Court enjoin the State Enforcement Action, the NRA asks this Court to ignore the detailed and extensive allegations of illegal conduct against the NRA and its current and former officers, almost all of which the NRA does not contest, and instead to find (1) that the OAG alleges bad conduct solely by individual officers and (2) the OAG has never sought dissolution in such circumstance or in any case in which the charity was not totally lacking in any charitable activities. Because neither supposition is true and for the reasons set forth above, the NRA's selective enforcement claim fails.

## V.   THE NRA LACKS STANDING TO ASSERT A CLAIM ON BEHALF OF ITS MEMBERS FOR VIOLATION OF THEIR RIGHT TO ASSOCIATION.

The NRA's constitutional claims "based upon its members' exercise of association rights," Counts Three and Four, fail under established Second Circuit authority that an organization may not bring § 1983 claims on behalf of its members rather than on its own behalf. *Nnebe v. Daus,* 644 F.3d 147, 156 (2d Cir. 2011) ("it is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983"); *N.Y. State Citizens' Coal. for Children v. Velez*, 629 F. App'x 92, 93 (2d Cir. 2015).

There is a narrow exception that permits organizations to assert claims of abridgment of members' right of association in certain circumstances, but it is inapplicable here. To fit within the exception, an organization must show that the challenged action threatens the very ability of both the organization and its members to assemble and carry out their First Amendment activities. *Aguayo v. Richardson*, 473 F.2d 1090, 1100 (2d Cir. 1973) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459–460 (1958)). In *Patterson*, the NAACP challenged a state statute that forced disclosure of all member information. *Id.*, 357 U.S. at 451. The Supreme Court found

28

that the NAACP had standing to assert the rights of its members where it had "made an uncontroverted showing that … revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," clearly impacting the associational rights of the NAACP and its members and requiring the members to individually participate would be untenable in such circumstances. *Id.*, 357 U.S. at 462-63.

Accordingly to fit within this exception, standing hinges on the right of organizations to oppose compelled disclosure of member identities or other conduct which has "adverse effects" on the right of the collective exercise of protected First Amendment activity. *Aguayo*, 473 F.2d at 1100; *Capital Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374, 387–88 (M.D.N.C. 2017), *aff'd*, 922 F.3d 198 (4th Cir. 2019); *Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 71 (E.D.N.Y. 2018); *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Shiffrin*, 46 F. Supp. 2d 143, 153 (D. Conn. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).

Where an organization cannot establish an injury to its own and its members' right of association, particularly impacting its ability to engage in First Amendment protected activities, it lacks standing under this exception. *See Capital Associated Indus., Inc.*, 283 F. Supp.3d at 387–88; *Stauber v. City of New York*, 2004 WL 1593870, at *14 (S.D.N.Y. July 16, 2004); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992).

In this case, the NRA has not alleged facts showing that it and its members have or imminently will have their associational rights violated, as it must. *Shiffrin*, 46 F. Supp. 2d at 152-53. Instead, the Amended Complaint describes the NRA's continuing successful association and advocacy activities, claiming it is "America's leading provider of gun-safety and marksmanship education" and "the foremost defender of the Second Amendment…. The NRA has over five

29

million members, and its programs reach millions more." Am. Compl. ¶ 1. It further claims that it is best known as a "superlobby" and "one of the largest. . . conservative lobbying organizations in the country, able to mobilize its millions of members". *Id*., ¶ 11, *see also* ¶ 40.  Indeed, in the original Complaint, the NRA claimed that "In actual fact, the NRA's finances are more robust than ever." Dkt # 1, ¶ 27, see also ¶¶ 1, 10, 11. ¶ 27.

The NRA has not alleged any non-conclusory facts showing any impairment of the organization's and its members' ability to associate and pursue First Amendment protected activities. Accordingly, the NRA lacks standing and its Third and Fourth Causes of Action must be dismissed.

## VI. THE NRA'S AS-APPLIED CHALLENGE TO NOT-FOR-PROFIT CORPORATION LAW §§ 1101 AND 1102 FAILS.

In its Seventh Cause of Action, the NRA seeks a declaration that the "allegations of [NRA] executive misconduct do not constitute corporate fraud or criminality and that [N-PCL] Sections 1101 and 1102 are unconstitutional as-applied to the NRA absent such a showing." Am. Compl. ¶ 115. The dissolution statutes in N-PCL §§ 1101 and 1102 (hereinafter collectively referred to as the "Dissolution Statutes") are constitutional as applied to the NRA because they are unrelated to the suppression of free expression and thus, at most, are subject to, and survive, the intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367 (1968). Accordingly, the NRA's challenge to the N-PCL statutes fail to state a claim.

The NRA's suggestion that any dissolution of the NRA must be examined under the lens of strict scrutiny because the NRA engages in unspecified "constitutionally protected activity," Am. Compl. ¶ 46, is incorrect as a matter of law. Instead, at most, it is the intermediate scrutiny standard set forth in *United States v. O'Brien* that applies. 391 U.S. 367 (1968). The *O'Brien* test is applicable where a plaintiff brings an as-applied challenge to a regulation that is "unrelated to

the suppression of expression." *Texas v. Johnson*, 491 U.S. 397, 407 (1989). There is no question that the Dissolution Statutes are facially neutral and "unrelated to the suppression of expression." Neither statute regulates expression protected by the First Amendment.

Accordingly, at most the four-part test in *O'Brien* governs: "[A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial government interest; [3] if the government interest is unrelated to the suppression of free expression; [4] and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. The Dissolution Statutes, as applied to the NRA, satisfy all four requirements.

The first and second prongs cannot seriously be disputed. The NRA admits that "the [Attorney General] is the supervising regulator for all New York non-profits, including the NRA." Am. Compl. ¶ 24. And, while the NRA decries the Attorney General's reliance on "general *parens patriae* principles underlying non-profit laws that ensure charities perform in the public interest," Am. Compl. ¶ 47, it is settled law that the State has an important interest in "preventing fraud and self-dealing in charities." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). The Dissolution Statutes further that interest by authorizing the Attorney General to seek the dissolution of a charity that is systematically and persistently violating charities laws.

Regarding the third prong, a determination of whether "the government's interest is unrelated to the suppression of free expression" is "equivalent to the 'content neutrality' requirement" that triggers application of the *O'Brien* test in the first instance. *Young v. New York City Transit Authority*, 903 F.2d 146, 158 (2d Cir. 1990). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989)). As explained *supra*, the Dissolution Statutes are content neutral on their face and the NRA has not alleged that the Dissolution Statutes were passed for the purpose of suppressing constitutionally protected activity.

Regarding the fourth prong, the State's interest in preventing fraud and abuse of the charitable form would be achieved less effectively without its ability to petition courts and, where appropriate, seek dissolution of persistent and systematic offenders like the NRA. Contrary to the NRA's assertion that the Attorney General is required to demonstrate that dissolution is "the least restrictive means of achieving a compelling state interest," Am. Compl. ¶ 46 (internal quotation marks and citation omitted), the fourth *O'Brien* factor is similar to the test for a content neutral time, place, or manner regulation:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation . . . promotes a substantial government interest that would be achieved less effectively absent the regulation.

*Ward*, 491 U.S. at 798-99 (discussing the fourth *O'Brien* factor) (internal quotation marks and citations omitted).

Here, the Dissolution Statutes do not permit the Attorney General to summarily dissolve a charity, but rather place a burden upon the Attorney General to prove to a court that dissolution is called for under the law in a given circumstance. With respect to N-PCL § 1101, the Attorney General must show a regulated entity's misconduct "has produced, or tends to produce, injury to the public. The transgression must not be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare." *People v. Oliver Schools*, *Inc.*, 206 A.D.2d 143, 145 (4th Dep't 1994) (interpreting BCL § 1101, from which N-PCL § 1101 is derived) (quoting *People v. North River Sugar Refining Co.*, 121 N.Y. 582, 609 (1890)). And it is the court

that ultimately decides whether dissolution of the NRA is in the best interest of the public. N-PCL § 1109(b)(1).

With respect to § 1102, the Attorney General stands in the shoes of the NRA's members and, as relevant here, must prove that the "directors or members in control of [the NRA] have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner." N-PCL § 1102(a)(2)(D); 112(a)(7). And it is the court that must ultimately decide whether dissolution of the NRA is in the best interest of its members. *See* N-PCL § 1109(b)(2).

The Attorney General is confident that the allegations in the State Enforcement Action of persistent and systemic waste, lack of oversight, false filings, conflicts of interest, related party transactions, financial mismanagement, and whistleblower retaliation that the NRA perpetuated over the course of years warrant the dissolution of the NRA. *See* State Enforcement Action Compl. ¶¶ 560-579. But it will be the New York State courts that ultimately decide whether the Attorney General has met her burden, and whether dissolution of the NRA is in the public's and its member's interests. *See* N-PCL § 1109(b). Therefore, the Dissolution Statutes are narrowly tailored to serve the State's legitimate interest in preventing systematic abuse of the charitable form. Of course, in the State Enforcement Action, dissolution is one form of relief among many sought by the OAG. The New York State Supreme Court will ensure that dissolution is imposed only where necessary.[16]

For all of these reasons, the NRA's as-applied challenge to the Dissolution Statutes fails to state a claim for which relief may be granted, and should be dismissed

---

[16]   To the extent that the NRA argues that it is capable of and engaged in internal reform, see Am. Compl. ¶¶ 49-50, those arguments go to the merits of the Attorney General's State Enforcement Action and favor *Younger* abstention. *See* Point II(A), *supra*.

VII. **THE NRA'S § 1983 CLAIMS AGAINST THE ATTORNEY GENERAL IN HER INDIVIDUAL CAPACITY MUST BE DISMISSED.**

To establish a claim under § 1983, the NRA must show that the Attorney General, while acting under color of state law, was personally involved in the violation of the NRA's federal statutory or constitutional rights. *Annis v. Cty. Of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994). Here, the NRA fails to show that its federal statutory or constitutional rights have been violated. *See* Point IV-VI, *supra*. But even if it had, its claims for monetary damages are barred by absolute and qualified immunity.

A. **The Attorney General is entitled to absolute immunity in relation to her decision to commence an action against the NRA.**

The Attorney General is entitled to absolute immunity from monetary damages for her decision to commence a suit against the NRA. *See, e.g., Spear v. Town of West Hartford*, 954 F.2d 63, 66 (1992) (absolute immunity applies "to government attorneys who initiate civil suits"). Government officers are entitled to absolute immunity from damages in suits in connection with the initiation of civil litigation. *Id.* at 66; *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

Government officials who determine whether to commence proceedings have broad discretion and are entitled to absolute immunity to suit for the same. *Butz v. Economou*, 438 U.S. 478, 515 (1978)(such "discretion "might be distorted if their immunity from damages arising from that decision was less than complete."). Where absolute immunity applies, an official's motivations for initiating an action are irrelevant. *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (holding that, where a defendant entitled to absolute immunity has acted within their statutory authority, "the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity").

Here, the Attorney General's decision to commence proceedings against the NRA is protected by absolute immunity regardless of her motivation and any request for damages premised on such commencement fails.

### B. The NRA's claims against the Attorney General for money damages are barred by qualified immunity.

The NRA's claims for monetary relief are barred by qualified immunity.

Qualified immunity is an immunity from suit, not just liability. Accordingly, the question of whether the doctrine applies should therefore be decided "at the earliest possible opportunity . . . if the defendant officer, confronted with the facts as alleged by the plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *Diggs v. Marikah*, 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012). Under the federal qualified immunity doctrine, government officials are protected from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Here, the Attorney General has the legal authority to investigate whether charitable entities comply with applicable statutory requirements. Given the Attorney General's obligation to oversee not-for-profit corporations and the indicators of illegal conduct by and within the NRA, which the NRA admits led to its own internal investigation, it is objectively reasonable for the Attorney General to believe that an investigation and civil action against the NRA are appropriate and do not violate a clearly established right. *See Winfield v. Trottier*, 710 F.3d 49, 57 (2d Cir. 2013). As such, she is entitled to federal qualified immunity.

Official immunity under New York law is "considerably greater" than that offered under the federal qualified immunity doctrine. *Hirschfeld v. Spanakos*, 909 F.Supp. 174, 180 (S.D.N.Y.

1995). New York law provides immunity for state employees in the performance of conduct that involves "the exercise of reasoned judgment which could typically produce different acceptable results." *Tango v. Tulevech,* 61 N.Y.2d 34, 40-41 (1983). The question of whether to pursue an investigation or commence a civil action are quintessential examples of the type of conduct that requires "reasoned judgement" on the part of officials and could result in various satisfactory outcomes. *See Nash v. City of New York*, 2003 WL 22455641 at *3 (N.Y. Civ. Ct. Oct. 21, 2003). The Attorney General is thus entitled to qualified immunity under state law.

## CONCLUSION

For the foregoing reasons, Attorney General Letitia James respectfully requests that the Court issue an order dismissing this action in its entirety and granting such other and further relief as it deems just and proper.

Dated: November 20, 2020  
      New York, New York

LETITIA JAMES  
*Attorney General*

Monica Connell  
Yael Fuchs  
Stephen Thompson  
Assistant Attorneys General of Counsel  
NYS Office of the Attorney General  
28 Liberty Street  
New York, New York 10005  
212-416-8965  
Monica.Connell@ag.ny.gov