# Exhibit E

EXECUTION COPY

ATTORNEY GENERAL OF THE STATE OF NEW YORK
CHARITIES BUREAU

In the Matter of the

**Investigation by ERIC T. SCHNEIDERMAN,
Attorney General of the State of New York**, of

The Richenthal Foundation, David Richenthal
and Peter Graham,

                    Respondents.

Assurance No. 18-034

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("OAG" or "Attorney

General") has conducted an investigation ("Investigation"), pursuant to Section 8-1.4 of the

Estates, Powers, and Trusts Law ("EPTL") and Section 63(12) of the New York State Executive

Law ("Exec. Law") to determine whether a proceeding or action should be instituted against the

trustees of the The Richenthal Foundation ("Foundation") for failing to properly administer the

charitable assets entrusted to their care by, among other things, permitting the waste of the

Foundation's assets.

This Assurance of Discontinuance ("Assurance") contains the findings of the

Investigation and the relief agreed to by the OAG and the Foundation and two of its trustees,

David Richenthal ("Richenthal") and Peter Graham ("Graham").[1]

---

[1]  The OAG, the Foundation, Richenthal and Graham are referred to collectively as the "Parties" and individually as
a "Party."  The Parties other than the OAG are referred to collectively as the "Foundation Parties" or "Respondents"
and individually as a "Foundation Party" or "Respondent".  Scott Wetzler, one of the current trustees, is not an
individual respondent herein because he joined the Board after the events that are the focus of this Assurance.

EXECUTION COPY

## OAG's FINDINGS

The OAG finds as follows:

The Establishment of the Foundation

1.      The Foundation is a tax-exempt private foundation established as a charitable

trust by Arthur Richenthal, as the donor and a trustee, and Vivian Richenthal and Irving Moss,

as trustees, in 1961.  Vivian and Arthur Richenthal were married and had three children,

Donald, David, and Susan.

The Trustees

2.      Vivian and Arthur Richenthal remained trustees of the Foundation until their

deaths in 1994 and 2007, respectively.  In 1995, after Vivian Richenthal passed away, Donald

Richental was appointed as a trustee of the Foundation.  Donald Richenthal continued to serve

as a trustee until January 2010, when he resigned and appointed his brother, David Richenthal,

as the sole trustee.  David Richenthal is an experienced producer of theatrical productions and a

non-practicing attorney.[2]

3.      In March 2010, David Richenthal appointed his wife, Diana von Mueffling, as a

co-trustee of the Foundation.  In April 2011, David Richenthal and Ms. von Mueffling

appointed Peter M. Graham, a long-time close friend of Mr. Richenthal, as the third co-trustee

of the Foundation.  Mr. Graham is an experienced businessman and, in particular, a

sophisticated investor.

4.      Ms. von Mueffling's role in the Foundation's affairs started to diminish over the

course of 2011 and 2012, as her marriage to David Richenthal was breaking up (they are now

divorced) and she ceased serving as a trustee in late 2012.

---

[2] David Richenthal's license to practice law was suspended in 2010 for failing to keep his registration with the New York State bar current.

EXECUTION COPY

The Trustees' Management of the Foundation's Affairs

5.      During most of 2010, the day-to-day affairs of the Foundation were overseen by Ms. von Mueffling.  Ms. von Mueffling was charged with overseeing the Foundation's affairs because David Richenthal was unable to do so for medical reasons.  However, beginning in or about late 2010 or early 2011, David Richenthal started to take on a more active role in the management of the Foundation.

6.      As set forth in more detail below, under David Richenthal's leadership, particularly in the years 2011 through 2013, the Foundation lacked adequate internal controls over its finances and incurred excessive and improper expenses, many of which benefitted him personally.  Although the Foundation's assets have grown in recent years, the lack of internal controls resulted in the waste of hundreds of thousands of dollars of charitable assets.  In permitting this waste, the trustees of the Foundation failed to adequately fulfill their fiduciary duty to oversee the charitable assets entrusted to their care.

7.      After the Attorney General commenced the Investigation into the management of the Foundation, the Foundation retained experienced not-for-profit counsel and instituted a number of governance changes and changes to its internal controls.  In addition, the Foundation required David Richenthal to reimburse it for a portion of the charitable assets that had been wasted and used for his personal benefit.

8.      As set forth below, in connection with this Assurance, the Foundation has agreed to make a number of additional governance changes and David Richenthal has agreed to make additional restitution payments, relinquish authority over the Foundation's finances, step down as a trustee of the Foundation and accept a ban on future service as an officer or director of New York charitable entities.  Provided he satisfies certain prerequisites, David Richenthal may,

however, continue to provide services to the Foundation by, among other things, recommending grantees to the trustees and providing advice to theatrical grantees.

<u>The Foundation's Finances, Grant-making and Expenses</u>

9.    At the beginning of 2010, the book value of the Foundation's assets was approximately $8.3 million.  By the end of 2016 (the last year for which IRS Form 990-PF filings have been made), the book value of the Foundation's assets had grown to approximately $11.4 million.

10.    In 2010, the first year that David Richenthal was a trustee, the Foundation made grants totaling just over $400,000, up from $120,000 the previous year.  Over the next several years, the Foundation's total annual grants ranged from approximately $440,000[3] to $660,000.  The Foundation donates to a variety of causes, but has a strong focus on grants to not-for-profit theatres and similar organizations.  Richenthal has testified that he uses his experience as a producer to advise and work with a number of these organizations on behalf of the Foundation and has provided the Attorney General with letters from several such organizations referring to his work with them.

11.    Although the Foundation has increased its activities and grant-making under Richenthal's leadership, the Foundation's administrative expenses have also grown dramatically under his watch.  Under the leadership of David Richenthal's brother, Donald Richenthal, the Foundation incurred very few expenses, with Donald receiving no compensation.  Under David Richenthal's leadership, however, that changed and the Foundation's administrative expenses grew significantly.

---

[3] The $440,000 figure is from 2011, but is listed as $693,025 in the Foundation's IRS Form 990-PF.  The $693,025 amount included an improper grant of $250,000 (discussed below), for which, after retaining counsel in response to the OAG's Investigation, David Richenthal reimbursed the Foundation.

12.     The increase in expenses started in 2010 with the Foundation paying compensation to Ms. von Mueffling and David Richenthal for running it.  In that year, compensation expenses, most of which were paid to Ms. von Mueffling, increased to over $87,000.  Compensation expenses increased further to $263,183 in 2011, $276,758 in 2012 and $344,796 in 2013, with most of the compensation being paid to David Richenthal in these years.

13.     Even more problematic, however, was the increase in other expenses that accompanied the increase in compensation expenses.  Travel and entertainment expenses, which had been non-existent under the leadership of Donald Richenthal and remained at zero when Ms. von Mueffling oversaw the day-to-day operations of the Foundation in 2010, jumped to $87,805 in 2011, then dropped again to a still significant $31,565 in 2012, before skyrocketing to $337,298 in 2013 and dropping back to $50,183 in 2014.

14.     A significant portion of the travel and entertainment expenses that the Foundation incurred in 2011 through 2013 had nothing to do with the Foundation's business.  In addition, other expenses, while arguably related to the Foundation's business had not been authorized by the Foundation's board of trustees and were excessive.  The Foundation incurred these improper expenses, in part, because the trustees failed to oversee Richenthal's actions and the Foundation lacked adequate controls to ensure that its assets were not misused

15.     Taking advantage of the lack of oversight and adequate controls Richenthal repeatedly reimbursed himself for purported Foundation expenses without sufficient documentation and without making any effort to distinguish between expenses that arguably might have been incurred on behalf of the Foundation, such as expenses incurred in connection with a visit to a grantee, and personal expenses.

16.   The trustees did not adequately monitor Richenthal's use of the Foundation's bank accounts, particularly after Ms. von Mueffling's role at the Foundation diminished (and, eventually, ceased) in 2012. In this period, no one other than Richenthal approved his expense claims or reviewed the disbursements on the bank statements. Indeed, Graham admitted, "in retrospect, I understand that I should have taken more responsibility for [monitoring Richenthal's expenses] myself."

17.   Richenthal himself admitted that there were "mistakes in governance" and that he must reimburse the Foundation for expenses that were not incurred in connection with the Foundation's business. In particular, when he was examined under oath during the Investigation, Richenthal acknowledged that he "need[ed] to own the fact that I did this on my own. . . . I took it on myself. They [referring to the improper travel and entertainment expenses] were not authorized by the trustees."

18.   From 2011 through 2014, Richenthal caused the Foundation to reimburse him for approximately $240,000 in expenses that should not have been charged to the Foundation. These improper expenses include personal expenses, such as for personal travel and a garage space for his car, and expenses that Richenthal asserts related to Foundation business but now admits he was not permitted to charge to the Foundation, such as for theater tickets purchased at significant mark-ups through StubHub. After the Investigation commenced and he retained counsel, Richenthal reimbursed the Foundation approximately $145,000 for the improper expenses he charged to it, leaving approximately $100,000 that remains unreimbursed.

19.   Richenthal also caused the Foundation to enter into a related-party transaction whereby he rented a portion of his apartment to the Foundation for use as an office. Graham testified that the trustees were aware of the rental and approved it. The Investigation found that

the trustees did not adequately consider the fairness of the transaction before the arrangement was established. The rental arrangement, pursuant to which Richenthal received $6,250 a month, began in December 2012, but the only minutes discussing the arrangement were from a meeting in 2014, where the board of trustees determined to adjust the monthly rental charge down from $6,250 to $5,000. When Richenthal moved to a new apartment in 2016, the rental arrangement ended.

20.     In addition, in 2011, Richenthal caused the Foundation to issue a grant to Susan Kamil, a woman with whom he had a long-term relationship that ended several years earlier and who had sued him to enforce the terms of their separation agreement. To settle the litigation with Ms. Kamil, Richenthal agreed to issue a grant of $250,000 to her for the care of her brother, who allegedly had serious medical issues. The other trustees were aware of the grant and knew that it had been made in connection with the settlement of Richenthal's dispute with Ms. Kamil, but were not aware that it had been made to Ms. Kamil as a trustee for her brother rather than to an approved charitable organization. The payment was improper and, regardless of the nature of the recipient, should not have been made to aid Richenthal in a personal litigation. After the Investigation commenced, Richenthal reimbursed the Foundation for the grant to Ms. Kamil.

21.     The improper expenditures described herein, which are illustrative only and do not detail all the improper payments made to Richenthal, revealed that, at least until new procedures were put in place after the Investigation commenced, the Foundation lacked a fully functional board of trustees and lacked adequate controls over its disbursements. Not only did the Board fail to institute adequate internal controls, but it failed to exercise real oversight over Richenthal's operation of the Foundation. Graham who had known Richenthal for decades took

steps to ensure that the Foundation's assets were invested properly, but did not, at least until

after the Investigation commenced, take any steps to oversee Richenthal's disbursement of

Foundation funds to himself for purported travel and entertainment expenses.

Legal Findings

22.     Pursuant to EPTL § 8-1.4, the trustees of charitable entities such as the

Foundation, have a fiduciary duty to ensure that the charitable assets entrusted to their care are

administered properly and not wasted.  Here, in violation of EPTL § 8-1.4, the trustees breached

their fiduciary duty of care by: (i) failing to ensure that the Foundation had adequate controls

over its bank accounts; (ii) failing to ensure the Foundation had adequate policies for the

reimbursement of expenses; (iii) failing to adequately oversee Richenthal in his management of

the Foundation's business; (iv) failing to adequately assess the fairness of related party

transactions with Richenthal; and (v) failing to ensure that Richenthal used Foundation

resources, particularly its financial resources, exclusively for its charitable purposes.  In

addition, Richenthal also violated EPTL § 8-1.4 by breaching his fiduciary duty of loyalty to the

Foundation by using the Foundation's assets for his own benefit.

## ADMISSIONS AND AGREEMENT TO RELIEF

23.     Respondents admit the OAG's Findings set forth in paragraphs 1 - 22 above and

agree to the relief and other agreements contained in this Assurance.

24.     The OAG finds the relief and agreements contained in this Assurance appropriate

and in the public interest.  THEREFORE, the OAG is willing to accept this Assurance pursuant

to Executive Law § 63(15) in lieu of commencing a statutory proceeding for violations of

EPTL § 8-1.4 based on the conduct described above during the period from January 1, 2010

thorough the present.

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

## RELIEF

25.   Injunctive Relief:

    a.   Injunction Against Future Violations of EPTL § 8-1.4 and Other Applicable Laws.   Richenthal and the Foundation shall not engage, or attempt to engage, in violations of any applicable laws, including but not limited to EPTL § 8-1.4, and expressly agree and acknowledge that any such conduct is a violation of the Assurance, and that the OAG thereafter may commence the civil action or proceeding contemplated in paragraph 24, *supra*, in addition to any other appropriate investigation, action, or proceeding;

    b.   Permanent Bar on Fiduciary Service.   Richenthal is permanently barred from serving as an officer, director, trustee or in any position where he has any fiduciary responsibilities, including but not limited to, responsibility for financial and/or management oversight, of any not-for-profit or charitable organization incorporated, registered, operating or soliciting contributions in New York or of any other person (individual or entity) that holds charitable assets or solicits charitable contributions in the State of New York.

    c.   Additional Bars.   Richenthal is hereby barred from providing services to the Foundation as an employee or consultant.   The bar imposed pursuant to this paragraph (but not the bar imposed pursuant to subparagraph b of this paragraph) will be lifted if Richenthal completes a training program that is substantially equivalent to the training required to obtain the Certificate of Non-Profit Board Education from BoardSource (www.boardsource.org)

within 3 months of the execution of this Assurance, and provides proof of the

successful completion of such training to the OAG. In the event the bar

imposed by this subparagraph is lifted:

i.    Richenthal may provide services to the Foundation, such as recommending grants and working with grantees, if the board of trustees determines that it is in the best interests of the Foundation for him to do so, but he may not, as set forth in more detail in subparagraph c(ii), infra, have any final authority over, or direct access to, the Foundation's finances;

ii.    Richenthal shall not have any final authority over, or direct access to, the finances of the Foundation. In particular, he shall not have signatory authority on any of the banking, investment or other financial accounts of the Foundation and shall not be permitted to sign checks or to otherwise disburse or withdraw funds from such account;

iii.    Richenthal may attend meetings of the board of trustees, but shall not have a vote at such meetings;

iv.    Any compensation paid to Richenthal: (i) must be approved by the board of trustees based upon their determination that the compensation is fair and reasonable for the services he is providing; and (ii) may not be raised by more than 5% per year in any of the five fiscal years following the date of this Assurance;

v.    The board of trustees shall evaluate Richenthal's performance no less than annually and, in connection with such evaluation, shall consider whether it is in the best interest of the Foundation for him to continue to provide services to it; and

vi.    As long as he provides services to the Foundation, Richenthal may not pursue for-profit theatrical production work, except with express written permission from the board of trustees. The board of trustees shall only grant such permission if it votes unanimously to do so after full disclosure by Richenthal of all material details concerning such work that establishes that the for-profit work is unrelated to the

activities of the Foundation, including but not limited to grants the Foundation has made or will make. In the event that Richenthal receives proceeds from any for-profit theatrical production opportunities in violation of this subparagraph or that arise out of any grants the Foundation made or work Richenthal performed for the Foundation, such proceeds must be turned over to the Foundation.

26.    Programmatic and Other Relief:

a.    Expansion of the Board of Trustees. The Foundation hereby agrees that its board of trustees shall be expanded to 5 members. The Foundation shall not reduce the number of trustees below 5 without prior written approval by the OAG.

    i.    Graham and the other current trustee, Scott Wetzler, who was appointed in 2014 after the Investigation commenced, may each remain as a trustee if they complete a training program that is substantially equivalent to the training required to obtain the Certificate of Non-Profit Board Education from BoardSource (www.boardsource.org) and provide proof of the successful completion of such training to the OAG within three months of the date of this Assurance.

    ii.    Graham agrees that he shall not engage, or attempt to engage, in violations of EPTL § 8-1.4, and expressly agrees and acknowledge that any such conduct is a violation of the Assurance, and that the OAG thereafter may commence the civil action or proceeding contemplated in paragraph 24, *supra*, in addition to any other appropriate investigation, action, or proceeding;

    iii.    Within 30 days of the execution of this Assurance, the Foundation shall nominate three new trustees to serve on the board of trustees of the Foundation and provide written notice to the Attorney General of the nominated trustees. At least two of the three trustees must be

independent and have no personal or business relationship with Richenthal. The notice shall contain the names of the nominated trustees and a copy of their resume and/or curriculum vitae and shall disclose any prior personal or business connections to any of the Foundation Parties.

iv.   If the Attorney General objects in writing within 20 business days of being notified of the selection of the new trustee, the Foundation shall not proceed with the appointment of the trustee objected to, but rather shall propose another trustee and shall notify the Attorney General of the new selection (who may object to that selection in accordance with the procedures set forth herein).

b.   <u>Board Approval of Grant Requests and Disbursements.</u>  All grant requests shall be approved by the board of trustees and all disbursements (including grants) must be authorized and effected by at least one member of the board of trustees.

c.   <u>Limitation on Travel and Entertainment Expenses.</u>  The Foundation may not incur travel and entertainment expenses above $25,000 per year in any of the five fiscal years following the date of this Assurance. Nothing in this subparagraph shall be construed to mean that the OAG has approved $25,000 per year as a reasonable amount of travel and entertainment expenses for the Foundation. The Foundation's trustees must ensure that the Foundation's new policies on such expenses (which it adopted after the commencement of the Investigation) are followed and that only appropriate and reasonable expenses are reimbursed.

d.   <u>Review of Tax Filings.</u>  Every year that it is required to file tax returns with the IRS or the Attorney General's office, the Foundation shall ensure that a

draft copy of its tax returns, including without limitation, its IRS Form 990-PF and its CHAR500, as well as a copy of its most recent annual financial statements and any auditor's letters, are provided to each member of the board of trustees before the tax returns are finalized and shall request that each trustee sign a certification (to be maintained by the Foundation) in which the trustee attests have reviewed the documents. Any trustee that fails to sign the certification and return it to the organization within fifteen business days shall not be permitted to participate in any board meetings until the certification is returned. The Foundation shall retain copies of all such certifications for at least 10 years after they are made.

e. Training for New Trustees. The Foundation shall cause a copy of this Assurance, all organizational documents of the Foundation (including without limitation the trust instrument and all amendments thereto) and a copy of the Attorney General's guide for directors and trustees of not-for profit corporations, Right from the Start: Responsibilities of Directors of Not-For-Profit Corporations (a copy of which is available for download at www.charitiesnys.com/pdfs/Right%20From%20the%20Start%20Final.pdf), or any additional or replacement publication concerning the same subject matter, to be provided to each current trustee of the Foundation and to each new trustee who is appointed to the Foundation's board of trustees. Within one month of the date of this Assurance with respect to existing trustees or, with respect to new trustees, prior to their participation in a board meeting, each trustee shall sign a certification that he or she has read the foregoing materials.

f.   Disclosure of Self-Dealing Transactions.  The Foundation shall, on the next
     Form 990-PF it files (and, to the extent necessary, on any subsequent Form
     990-PF), disclose that the Foundation and its Trustees entered into this
     Assurance and that Richenthal has repaid the Foundation for unreasonable
     expenses incurred by him, both pursuant to this Assurance and during the
     course of the Investigation.  Such disclosure shall include answering Yes to
     Question 1(c) on Part VII-B of Form 990-PF and attaching a statement (in the
     form annexed hereto as Exhibit A) which is acceptable to the OAG,
     describing the repayments  and this Assurance.

g.   Conflict of Interest Policy.  The Foundation shall maintain in place a conflict
     of interest policy that complies with  EPTL § 8-1.9(d) and that, among other
     things, prohibits Richenthal from pursuing for-profit theatrical production
     opportunities while employed by, or that arise out of his work at, the
     Foundation, except as provided for in Paragraph 25(c)(vi) hereof.

h.   Acceptance of this Assurance by OAG is not an approval or endorsement by
     OAG of any of the Foundation's practices or procedures, and Respondents
     shall make no representation to the contrary.

i.   Respondent expressly agrees and acknowledges that a default in the
     performance of any obligation under this paragraph is a violation of the
     Assurance, and that the OAG thereafter may commence the civil action or
     proceeding contemplated in paragraph 24, *supra*, in addition to any other
     appropriate investigation, action, or proceeding, and that evidence that the
     Assurance has been violated shall constitute prima facie proof of the statutory
     violations described in paragraph 24, pursuant to Executive Law § 63(15).

j.   The Parties agree that it would be difficult to value the damages caused by
default in the performance of any obligation under this Assurance, and
therefore agree that each Respondent shall pay to the State of New York a
stipulated penalty of $10,000 for each and every such default by such
Respondent occurring after the effective date of the Assurance.

27.   Oversight/Monitoring:

a.   Periodic Compliance Reports: Respondent Foundation shall provide the OAG
with a report detailing its compliance with the requirements set forth in this
Assurance, particularly paragraph 25 (Injunctive Relief) and paragraph 26
(Programmatic and Other Relief), to be submitted to the OAG on the
anniversary date of this Assurance.  This report shall be in writing and shall
set forth in detail the manner and form of compliance with this Assurance.
The report shall also include a breakdown of travel and entertainment
expenses incurred for expenses over $100 during the period covered by the
report, detailing the nature of the expense, whose expenses (name, title and
relationship to the Foundation) were reimbursed, the business purpose of the
expense, and all persons, whether or not Foundation employees, on whose
behalf the funds were spent (e.g., if a meal with a grantee is paid for this
clause requires the identification of the person at the grantee who was treated
to a meal).  If the Board approves Richenthal's pursuit of for-profit theater
production work, the report shall include a description of the work approved
and shall attach minutes from the meeting where such work was approved.
This report shall be signed by the trustees of the Foundation under oath.
Thereafter, a report of compliance shall be submitted to OAG on an annual

EXECUTION COPY

basis for the following four (4) years.  In any case where the circumstances warrant, the OAG may require Respondents to file an interim report of compliance upon thirty (30) days' notice.

    b.  Record Keeping Requirements:  Respondent Foundation shall retain all records relating to its obligations hereunder, including its approval of expenses, training materials, board minutes, and other activities as set forth herein until at least six years from the date of this Assurance.  During that time, Respondent Foundation shall, upon thirty (30) days written notice from the OAG, provide all documentation and information necessary for OAG to verify compliance with this Assurance.

    c.  Respondents expressly agree and acknowledge that a default in the performance of any obligation under this paragraph is a default and a violation of the Assurance, and that the OAG thereafter may commence the civil action or proceeding contemplated in paragraph 24, *supra*, in addition to any other appropriate investigation, action, or proceeding, and that evidence that the Assurance has been violated shall constitute prima facie proof of the statutory violations described in paragraph 24, pursuant to Executive Law § 63(15).

Monetary Relief:

28.    Monetary Relief Amount: Respondent Richenthal shall pay to the State of New York $150,000 in restitution (the "Monetary Relief Amount").  Payment of the Monetary Relief Amount shall be made in three equal installments of $50,000 each, with the first installment payable on May 15, 2018 and the second and third installment payments of $50,000 each, payable on the July 1, 2019 and July 1, 2020, respectively.

29.     Payment shall be made by attorney check, corporate or certified check or bank draft, which shall be made payable to the "State of New York", and shall reference Assurance No. 18-034; payments shall be addressed to the attention of AAG Steven Shiffman, State of New York, Office of the Attorney General, Charities Bureau, 28 Liberty Street, 19th Floor, New York, New York 10005.

30.     From the total amount specified in Paragraph 28, $25,000 from the first installment payment will be paid to the OAG in compensation for fees and expenses incurred in the conduct of the Investigation. The balance of the amount specified in Paragraph 28, $125,000, will be returned to the Foundation to compensate it for the losses it suffered as a result of the breaches of fiduciary duty by Richenthal.

31.     *Judgment by Confession*:  To secure the installment payments described by paragraph 28, Respondent Richenthal will execute and deliver, at the time of the execution and delivery of this Assurance, the accompanying Affidavit for Judgment by Confession (attached hereto as Exhibit A), confessing judgment for the Monetary Relief Amount of $150,000, plus collection fees of twenty two percent (22%) of any unpaid Monetary Relief Amount at the time of any subsequent default, plus statutory costs of $15.00.  OAG will reduce the Monetary Relief Amount by the principal amount of payments made by Respondent to Plaintiff to calculate the Unpaid Monetary Relief Amount at the time of any subsequent default.

32.     *Default in Payment:*  In the event that Respondent Richenthal fails to timely and properly make payment as required by paragraph 28, the OAG shall provide Respondent with written notice, by first class mail, of such failure.  If Respondent does not cure such failure within 30 days of the OAG's written notice, the OAG may file and enter the applicable Affidavit for Judgment by Confession as a judgment against Respondent Richenthal, at any

EXECUTION COPY

time, and without further notice, for the balance owed pursuant to this Assurance at the time of default, less any payments made prior to default, plus the collection fees and statutory costs described above.

## MISCELLANEOUS

Subsequent Proceedings.

33.     In any subsequent investigation, civil action, or proceeding by the OAG to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided pursuant to paragraph 37, *infra*, the Respondents expressly agree and acknowledge:

a. that any statute of limitations or other time-related defenses are tolled from and after the effective date of this Assurance;

b. that the OAG may use statements, documents or other materials produced or provided by the Respondents prior to or after the effective date of this Assurance; and

c. that any civil action or proceeding must be adjudicated by the courts of the State of New York, and that Respondents irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue.

34.     If a court of competent jurisdiction determines that any of the Respondents has violated the Assurance, such Respondent(s) shall pay to OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

Effects of Assurance:

35.     All terms and conditions of this Assurance shall continue in full force and effect

on any successor, assignee, or transferee of the Respondents. Respondents shall cause this

Assurance to be adopted in any such transfer agreement. No party may assign, delegate, or

otherwise transfer any of its rights or obligations under this Assurance without the prior written

consent of OAG.

36.     Nothing contained herein shall be construed as to deprive any person of any

private right under the law.

37.     Any failure by the Attorney General to insist upon the strict performance by

Respondent of any of the provisions of this Assurance shall not be deemed a waiver of any of

the provisions hereof, and the Attorney General, notwithstanding that failure, shall have the

right thereafter to insist upon the strict performance of any and all of the provisions of this

Assurance to be performed by the Respondents.

Communications:

38.     All notices, reports, requests, and other communications pursuant to this

Assurance must reference Assurance No. 18-034, and shall be in writing and shall, unless

expressly provided otherwise herein, be given by hand delivery; express courier; or electronic

mail at an address designated in writing by the recipient, followed by postage prepaid mail, and

shall be addressed as follows:

       If to the Respondents, to:

          Daniel Kurtz
          Pryor Cashman
          7 Times Square
          New York, NY 10036
          dkurtz@pryorcashman.com

EXECUTION COPY

or, in his absence, to Shveta Kakar at

Shveta Kakar
Pryor Cashman
7 Times Square
New York, NY 10036
skakar@pryorcashman.com

In the event that Mr. Kurtz and/or Ms. Kakar are no longer representing any of the Respondents, the Attorney General may provide any notices or other communications directly to the Respondent(s) unless the Attorney General is notified, pursuant to his paragraph, that new counsel has been appointed.

If to the OAG, to:

Steven Shiffman
Office of the Attorney General
Charities Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
steven.shiffman@ag.ny.gov

or in his/her absence, to the person holding the title of Bureau Chief of the Charities Bureau in the Office of the Attorney General.

Representations and Warranties:

39.     The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by the Respondents and their counsel and OAG's own factual investigation as set forth in the Findings, paragraphs 1 – 22 above.  Each Respondent represents and warrants that neither it nor its counsel has made any material representations to the OAG that are inaccurate or misleading.  If any material representations by Respondent or its counsel are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

40.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by the Respondent in agreeing to

this Assurance.

41.    The Respondents each represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved, and execution of this Assurance is duly authorized.

General Principles:

42.    Unless a term limit for compliance is otherwise specified within this Assurance, the Respondents' obligations under this Assurance are enduring.  Nothing in this Assurance shall relieve Respondents of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

43.    Nothing contained herein shall be construed to limit the remedies available to the OAG in the event that the Respondents violate the Assurance after its effective date.

44.    This Assurance of Discontinuance  represents a voluntary agreement, which OAG accepts in lieu of commencing a civil action against Respondents.

45.    This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

46.    In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

47.    Respondents acknowledge that they have entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.  Respondents further

acknowledge that they have each freely and voluntarily relied on the advice of the same

counsel, knowingly waiving any conflicts of interest.

48.     This Assurance shall be governed by the laws of the State of New York without

regard to any conflict of laws principles.

49.     The Assurance and all its terms shall be construed as if mutually drafted with no

presumption of any type against any party that may be found to have been the drafter.

50.     This Assurance may be executed in counterparts, each of which shall be deemed

to be an original, but all of which, taken together, shall constitute one and the same agreement.

51.     The effective date of this Assurance shall be April 25, 2018.


                        ERIC. T. SCHNEIDERMAN
                        Attorney General of the State of New York
                        120 Broadway
                        New York, New York 10271


                        By:_____
                              James Sheehan
                              Bureau Chief, Charities Bureau

EXECUTION COPY

DAVID RICHENTHAL

STATE OF NEW YORK        }
                         } ss.:
COUNTY OF NEW YORK       }

On this 25ᵗʰ day of _April_ , 2018, David Richenthal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, appeared before the undersigned and acknowledged to me that he/she executed the within instrument by his/her signature on the instrument.

Sworn to before me this
_25ᵗʰ_ day of
_April_ , 2018

NOTARY PUBLIC

SHVETA KAKAR
NOTARY PUBLIC STATE OF NEW YORK
COUNTY OF NEW YORK
LIC. #02KA6326977
COMM. EXP. _06/29/2019_

Page **23** of 25

EXECUTION COPY

PETER GRAHAM

STATE OF NEW YORK     }
                            } ss.:
COUNTY OF NEW YORK   }

On this 25ᵗʰ day of *April*, 2018, Peter Graham, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, appeared before the undersigned and acknowledged to me that he/she executed the within instrument by his/her signature on the instrument.

Sworn to before me this
25ᵗʰ day of
*April*, 2018

NOTARY PUBLIC

SHVETA KAKAR
NOTARY PUBLIC STATE OF NEW YORK
COUNTY OF NEW YORK
LIC. #02KA6326977
COMM. EXP. 06/29/19

Page **24** of 25

EXECUTION COPY

THE RICHENTHAL FOUNDATION

By:  Scott Wetzley
Trustee

STATE OF NEW YORK          }
                            } ss.:
COUNTY OF NEW YORK          }


    On this 25th day of April , 2018, Scott Wetzler known personally to me to
be a Trustee of The Richenthal Foundation, appeared before the undersigned and
acknowledged to me that he/she, as such officer and being authorized so to do, executed the
within instrument for the purposes therein set forth, on behalf of The Richenthal Foundation,
by his/her signature on the instrument as such a trustee.


Sworn to before me this
  25th     day of
  April     , 2018

Shveta Kakar
NOTARY PUBLIC


SHVETA KAKAR
NOTARY PUBLIC STATE OF NEW YORK
COUNTY OF NEW YORK
LIC. #02KA6326977
COMM. EXP. 06/29/19