# Exhibit F



**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**

Eric T. Schneiderman
Attorney General

Division of Social Justice
David B. Nachman
Enforcement Section Chief,
Charities Bureau
212-416-8390

December 19, 2013

Mr. David M. Frankel
Chief Executive Officer
Metropolitan Council on Jewish Poverty
120 Broadway
New York, NY 10271

Dear Mr. Frankel:

    As you know, the Office of the Attorney General ("OAG") has filed felony complaints against William Rapfogel, the former Chief Executive Officer of Metropolitan New York Coordinating Council on Jewish Poverty ("Met Council"), and Joseph Ross of Century Coverage Corp., Met Council's former insurance provider, charging them with theft of charitable assets from Met Council between January 1, 1993 and August 12, 2013. The fact that Rapfogel and other former senior executives at Met Council were able to carry out such a large insurance fraud over such an extended period raises serious questions about Met Council's governance, internal controls and outside auditors. Pursuant to the authority of New York's Not-for-Profit Corporations Law ("N-PCL") and Estates, Powers and Trusts Law ("EPTL"), the OAG's Charities Bureau has examined the adequacy of Met Council's governance processes and internal controls to prevent misappropriation and waste of charitable assets (the "Investigation").

    At this stage of the Investigation, it is apparent that Met Council failed to adopt a number of critical processes and controls which could have mitigated or avoided the loss of its charitable funds. It is also apparent, however, that since the fraud was uncovered, Met Council's Board of Directors (the "Board") has taken important steps to address the misconduct that is the subject of the OAG's criminal complaints and to help restore Met Council's ability to carry out its important mission responsibly. Beginning in August 2013, the Board has investigated these matters with the assistance of outside counsel and forensic auditors, promptly reported its findings to the OAG, and is cooperating thoroughly in the Charities Bureau's Investigation, including by providing documents and analysis and making witnesses available. Met Council also has cooperated in ongoing examinations by the New York City Mayor's Office of Contract Services ("MOCS"), the New York City Department of Investigation ("DOI") and the Office of the State Comptroller ("OSC"). In addition, the Board has addressed the misconduct that is the subject of the OAG's criminal complaints by taking the steps described below to replace Met Council's senior management.

    To conclude the Charities Bureau's Investigation, and to enhance and strengthen the governance, oversight and financial and operational controls at Met Council and its Board, and

thereby prevent misconduct in the future, the Board has further agreed to take the additional steps described below, including the hiring of a new independent auditor and certain ongoing evaluation of its fiscal controls, as well as of its financial condition and cost structure, internally and by a monitor to be appointed under the terms of this Agreement and Met Council's companion agreements with MOCS and DOI. Together with MOCS, DOI and the New York State Division of the Budget ("DOB"), the OAG looks forward to reviewing the additional remedial measures developed and proposed by Met Council to ensure that its financial management and controls incorporate best practices appropriate for an organization of Met Council's size and scope of operations. Met Council's adherence to the steps it has agreed to take under this Agreement and the companion Corrective Action Plan ("CAP") and Monitoring Agreement can allow the relevant State and City agencies to reinstate their contracts with Met Council and enable it to continue to serve the poor and needy in responsible fashion.

### *Steps By Met Council To Strengthen its Governance and Controls*

To date, Met Council has addressed the misconduct that is the subject of the OAG's criminal complaints by (i) terminating Rapfogel's services; (ii) hiring David Frankel as its new Chief Executive Officer ("CEO"); (iii) terminating the consulting services of Rapfogel's predecessor, David Cohen; and (iv) making personnel changes to strengthen its senior management team.

In addition, as agreed with DOB, MOCS, and DOI (collectively, the "Agencies") and with the OAG, Met Council will take the following actions:

### I. New Staff

A. By February 28, 2014, the Board shall hire a General Counsel and a Chief Compliance Officer (who may be the same person as the General Counsel), each acceptable to the Agencies.

B. Met Council will consult with the Agencies regarding the going-forward plans of the current Chief Financial Officer and any potential transition. Met Council has terminated and/or reassigned certain other staff members, including the chiefs of staff and operations.

C. The Board shall terminate the employment of any employee whose continued employment is jointly determined by the Board and the Agencies as an impediment to Met Council's ability to conduct its operations in a legally compliant manner as soon after such determination as the Board and the Agencies agree is reasonably possible.

D. No employee terminated as a result of wrongdoing related to the insurance fraud scheme shall be provided any severance, pension or other benefits that have not irrevocably vested as of the date of such termination.

E. Until such time as the Agencies determine, any new Executive Staff hired by the Board shall be subject to the approval of the Agencies.

## II. Personnel Policies

A. By April 30, 2014, Met Council shall amend its employee manual to include provisions, consistent with best practices for an organization of Met Council's size and scope and acceptable to the Agencies, setting out:
   1. legal and ethical limitations on political activities and contributions by Met Council and its employees; and
   2. a code of ethics.

B. By April 30, 2014, Met Council shall further amend its employee manual to include a whistleblower policy, acceptable to the Agencies, which shall:
   1. include an internal reporting mechanism and procedure by which staff, directors, volunteers, and anyone associated with Met Council or its affiliates may report any complaints and allegations, including but not limited to fraudulent activities and inappropriate behavior;
   2. ensure that the identity of any individual who reports such a complaint or allegation shall be kept strictly confidential;
   3. establish an external "whistleblower hotline" consisting of a telephone number, email address and/or other means of communication by which individuals may report complaints and allegations confidentially;
   4. require a mechanism to report all complaints and allegations to all Board officers and to Met Council's General Counsel, either or both of whom shall make, where appropriate, referrals to relevant outside individuals and agencies; and
   5. establish a policy to protect, from retaliation or other negative consequences, individuals who report such complaints and allegations.

C. By May 15, 2014, Met Council shall:
   1. furnish copies of the code of ethics (point II.A.2.) to each Board Member and Key Person (meaning each director, officer, individual participating in overall financial or policy-making decisions for Met Council, and each person in a position to control and/or direct overall Met Council operations);
   2. post copies of the code of ethics on its website;
   3. furnish copies of the code of ethics to each of Met Council's affiliated businesses and subcontractors working on City Contracts (as defined in the CAP); and
   4. distribute copies of the amended employee manual (point II.A.) to all employees.

D. By May 30, 2014, Met Council shall require each Board Member, Key Person and employee to certify that s/he has reviewed and will abide by the limitations on political activities and contributions and the code of ethics set forth in the amended employee manual (point II.A.), and to so certify annually thereafter.

## III. Compensation/Benefits

A. By April 30, 2014, the Compensation Committee shall, in accordance with its responsibilities set forth in point V.B.3., complete a full examination of Met Council's compensation and benefits package including tuition reimbursement; use of Met Council

3

vehicles, cell phones, computers and other technological equipment; and vacations, compensatory time and other non-salary benefits. The Committee shall provide the Board and executive staff with a report of its findings and recommendations with respect thereto.

B. Effective the date of this Agreement, Met Council shall suspend all reimbursement to employees of tuition and related payments.

C. By June 30, 2014, and after considering the Compensation Committee's report referenced above, Met Council shall establish policies regarding compensation and benefits acceptable to the Agencies that shall:
   1. absent good reason not to do so, implement the recommendations set forth in the Committee's report;
   2. ensure that any reimbursement by Met Council of tuition and related expenses complies with best practices and is determined in an appropriate and consistent manner;
   3. ensure that checks and vouchers issued on Met Council's behalf are issued only for reasonable and valid business purposes (e.g., by specifying the individuals authorized to sign checks and vouchers, the number of signatures required, etc.);
   4. ensure that employee use of cell phones, computers and other technological equipment owned or otherwise funded by Met Council is reasonable and limited to valid business purposes, complies with best practices, and is determined in an appropriate and consistent manner;
   5. ensure that employee vacations and other non-salary benefits comply with best practices and are determined in an appropriate and consistent manner, and explicitly prohibit compensatory time;
   6. ensure that any employee use of vehicles in connection with Met Council work, whether such vehicles are owned or leased by Met Council or by the employees, complies with best practices, causes expenditures by Met Council only for reasonable and for valid business purposes, and the value is appropriately reflected in all relevant reporting and tax accounting;
   7. ensure that any reimbursement by Met Council of travel, dining and related costs complies with best practices, is determined in an appropriate and consistent manner, and causes expenditures by Met Council only for reasonable and valid business purposes; and
   8. acknowledge the Agencies' right to limit State/City participation in any benefits offered by Met Council to its employees if the Agencies deem such benefits to be detrimentally inconsistent with those of other entities that contract with the State/City, whether or not those benefits comply with New York Executive Order 38.

## IV. Other Audit/Finance Issues

A. By February 28, 2014, Met Council shall submit to the Agencies copies of each of the A-133 audits it has submitted to any federal agency since January 1, 2011. Until such time as the Agencies determine, Met Council shall:
   1. provide copies of its A-133 audits to the Agencies at the same time it submits those audits to any federal agency; and

4

2. follow the A-133 audit protocol for all audits in which it is involved, including:
   a. the annual independent audits addressed in point V.D.2.;
   b. all audits of affiliates for which Met Council has financial responsibility, including those affiliates as to which Met Council:
      i. serves as fiscal agent;
      ii. is the sole member; or
      iii. has sole power to appoint members to the board.

B. By February 28, 2014, Met Council shall engage a new outside auditor acceptable to the OAG and the Agencies.

C. By April 30, 2014, Met Council shall submit for the Agencies' approval a plan of action for:
   1. reviewing, verifying and/or correcting all material Met Council financial reports for the years 2011-13, including 990s, 1099s, W-2s, consolidated financial statements, and tax filings; and
   2. conducting future annual audits of Met Council's books and records in accordance with the federal A-133 audit protocol (*see point IV.A.2.*), which shall include review of internal controls and financial activity, and which shall investigate, document and report all questionable and/or unauthorized transactions made by Met Council on, through or in connection with credit cards, petty cash, the vendor payment and/or payroll system, and/or the system for procuring goods or services;
   3. providing to the Agencies whatever additional analyses and documents concerning the amount of premium overcharges paid by Met Council to Century Coverage Corp. as the Agencies reasonably request; and
   4. implementing a computer-based system for recording the time employees spend working for Met Council that accounts for time, attendance, and functions performed and that ties to any billing reports submitted by Met Council to the Agencies.

D. By June 30, 2014, Met Council shall:
   1. implement a centralized purchasing protocol acceptable to the Agencies, setting policies and procedures for vendor selection;
   2. develop, and provide to all relevant staff, training and reference materials relating to the protocol, and thereafter provide such materials to all newly hired relevant staff promptly after hiring; and
   3. within six months of approval of the protocol, for all vendor contracts for goods or services with an annual value of $25,000 or more that are entered into at Met Council's discretion, utilize a competitive procurement process before awarding the contract, except in the case of a bona fide emergency as to which the Board or a Committee thereof has approved such exception.
   4. Going forward, contracts for vendors selected shall be for a term not greater than 3 years and shall require re-bidding through a competitive procurement process prior to renewal.

E. Effective upon the date of this Agreement, Met Council shall suspend the use of all existing Met Council-issued credit cards, except for those held by no more than 20 individuals whose use of credit cards the CEO deems in writing to be most essential for

5

its operations. By April 30, 2014, the Finance Committee shall complete an inquiry, and provide the Board and executive staff with a report of its findings and recommendations, regarding potential alternatives to providing corporate credit cards to employees. This inquiry shall include:
1. a review of approaches to employee use of corporate credit cards taken by other comparably sized nonprofits; and
2. consideration of such potential alternatives as:
   a. requiring employees to use their personal credit cards for Met Council expenses and request reimbursement from Met Council;
   b. establishing lines of credit with frequently used vendors; and
   c. issuing only cards with low credit limits.

F. By May 30, 2014, and after consideration of the Finance Committee's report on credit card alternatives referenced above, Met Council shall establish a policy regarding employee corporate credit card use, acceptable to the Agencies, that shall:
1. absent good reason not to do so, implement the Finance Committee's recommendations regarding alternatives to corporate credit cards;
2. specifically set out Met Council's system of monitoring and control of employee corporate credit card use, including identifying and explaining the justification for the specific job titles at Met Council for which corporate credit cards are deemed necessary;
3. reinforce the prohibition against any personal use of corporate credit cards;
4. ensure that employee use of corporate credit cards complies with best practices and that Met Council's policy regarding such use is appropriately and consistently enforced;
5. ensure that all charges are reviewed by the appropriate supervising personnel and Met Council's finance department, and that all charges by the CEO are reviewed by the Audit Committee *(see point V.D.2.i.)*; and
6. ensure that only reasonable and business-related charges are approved.

G. Met Council's Finance Committee shall, in accordance with specifications determined by the Agencies:
1. by June 30, 2014, conduct an evaluation of:
   a. the financial condition, financial management and cost structure of Met Council to render short-term and long-term prognoses for the agency;
   b. Met Council's fitness to serve as a fiscal conduit for any of its affiliates and/or any other entities; and
   c. Met Council's vendor relationships and contracts.
2. Upon the conclusion of such evaluation, the Finance Committee shall prepare:
   a. a written report of the Finance Committee's findings and recommendations, which the Finance Committee shall send to the Agencies within seven calendar days of its completion, and regarding which Met Council shall subsequently meet with the Agencies to discuss;
   b. a remedial plan of action to address the fiscal or other deficiencies cited in the evaluation, which shall identify:
      i. ways to measure or monitor the progress of the remedial plan; and

6

   ii. what, if any, additional appropriate conditions and controls should be imposed on Met Council in and to continue to serve as a fiscal conduit for its affiliates and/or any other entities.
3. Upon the Agencies' approval of the remedial plan of action prepared by the Finance Committee pursuant to point IV.G.2., Met Council promptly shall implement the plan.

H. By March 31, 2014, Met Council shall amend its by-laws to include provisions, acceptable to the Agencies, that:
1. a. prohibit expenditures, direct or indirect, of Met Council funds for any political purposes including campaign contributions, fundraisers and other events, including any expenditures that violate the Internal Revenue Code's prohibition against political contributions by 501(c)(3) organizations, and including any reimbursement of or request for such expenditures; and
   b. require all political contributions made by senior management of Met Council to be reported to DOI annually on May 31st of each year, as provided by the Monitoring Agreement (Article I(B)(1)(e)); and
2. prohibit personal loans/advances to officers, directors and employees.

## V. Governance

A. By March 31, 2014, the Board shall amend Met Council's by-laws to include provisions satisfactory to the OAG and the Agencies that address the following issues relating to the composition and function of the Board and its committees:
1. processes for recruiting and approving new directors;
2. training and participation requirements for existing and new members (*see point VI*);
3. term limits and non-voting director *emeriti* status;
4. anti-nepotism rules, including a prohibition against family members of paid Met Council management serving on Met Council's or its affiliates' boards and a prohibition against family members of Met Council Board Members serving on the boards of Met Council affiliates for which Met Council serves as a fiscal conduit;
5. conflicts of interest policies and procedures (including but not limited to dealings with elected officials and City employees) acceptable to the OAG and the Agencies;
6. the designation and roles of the Board's standing committees and the responsibilities of their members (including the separate Audit Committee to be established, *see point V.D.*);
7. the requirement that the Board and its committees keep accurate minutes reflecting their deliberations and resolutions, including deliberations and resolutions related to programmatic and fiscal issues;
8. general duties of the Board and its committees, including with regard to fiscal and programmatic oversight and reporting of actual or potential irregularities; and
9. designation of all directors and officers as "mandatory reporters" of suspected fraud or misconduct, required to report such suspected fraud or misconduct immediately but in no event more than 7 business days after discovery, with explicit consequences for failure to do so, e.g., removal.

B. By March 31, 2014, the Board shall:
   1. establish a Governance Committee charged with addressing issues of internal operation and control, to be chaired by a director with appropriate governance experience;
   2. formally separate the existing Audit and Finance Committee into two committees (*see point V.D.1.*); and
   3. establish a Compensation Committee:
      a. to ensure that the total compensation paid to executives is fair, reasonable and commensurate with services provided, taking into account appropriate benchmark and performance criteria; that the terms of employee compensation are appropriately documented; and that best practices are followed with respect to fringe benefits and other non-salary perks for executive and non-executive level employees;
      b. which shall conduct an annual review of the CEO's performance and of such portions of the CEO's compensation that are to be set annually; and
      c. the charter of which shall explicitly provide that any future contracts for Met Council's executive compensation will comply with New York Executive Order 38, "Limits on State-Funded Administrative Costs and Executive Compensation."

C. By June 30, 2014:
   1. in addition to the new member recently added to the Board, the Board shall have added at least two new independent directors, and prior to such appointments the name and credentials of each of those directors shall be submitted to the Agencies to allow them to review such candidates in a timely fashion; and
   2. an equal number of current directors shall step down from the Board or become directors *emeriti* without Board or committee vote.

D. Audit Committee
   1. By March 31, 2014, the Board shall replace the current Audit and Finance Committee with a separate Audit Committee and a separate Finance Committee, each with its own chairperson and members, all of whom shall be independent.
      a. The initial chair of the Audit Committee shall be a qualified director with appropriate experience regarding accounting and internal control issues.
      b. The initial chair of the Finance Committee shall be a qualified director with appropriate financial experience.
      c. For the period of the monitorship described in point VII and in the agreements with the City of New York, the Board shall submit to the Agencies, for their approval, the names and qualifications of the chairs of the Audit Committee and Finance Committee as far in advance prior to their appointment as reasonably possible.

   2. By April 30, 2014, Met Council shall submit for the Agencies' approval a plan of action for future annual audits that shall specifically set out the Audit Committee's role and responsibilities. Consistent with the new provisions of Met Council's amended by-laws, the members of the Audit Committee shall all be independent. The Committee's role and responsibilities shall include:

8

  a. oversight of accounting and financial reporting processes and auditing of financial statements;
  b. securing an annual independent audit;
  c. ensuring that the auditor is provided access to all books, records, files, and other information as needed by the auditor in connection with its work;
  d. before the audit, reviewing the audit's scope and planning with the auditor, including to ensure that the audit follows the protocol for preparing federal A-133 audits (*see point IV.A.2.*);
  e. after the audit, reviewing and discussing the results with the auditor, including
    i. material risks and weaknesses in Met Council's internal controls;
    ii. any restrictions on the scope of the auditor's activities or access to information;
    iii. any significant disagreements between the auditor and management; and
    iv. the adequacy (or inadequacy) of Met Council's accounting and financial reporting processes;
  f. annually considering the auditor's performance and independence;
  g. reporting to the full Board on audit-related activities;
  h. overseeing the adoption, implementation and compliance with Met Council's conflict of interest policies (*see point V.A.5.*) and whistleblower policy (*see point II.B.*); and
  i. ensuring that all of the CEO's expenses as well as the use of corporate credit cards and vehicles by Met Council personnel are properly reviewed.

 E. By May 31, 2014, each standing Committee of the Board shall adopt a committee charter, including provisions consistent with the terms of this Agreement, to be reviewed and voted upon by the entire Board at its next scheduled meeting.

## VI. Training

 A. By February 28, 2014 and annually thereafter, all current Board Members and Key Personnel, as jointly determined by Met Council and the Agencies and identified in the Appendix to be added to this Agreement, shall complete an ethics and non-profit compliance training course consistent with the training and participation requirements for Board Members to be set forth in the amended by-laws, and shall sign a certification of such completion.
  1. The course shall address, among other topics, legal and ethical limitations on political activities and contributions by Met Council and its Board Members, employees, and other affiliated individuals.
  2. The course shall be administered by the outside monitor selected by the Agencies (*see point VII*) or one or more other facilitators approved by the Agencies.
  3. Any newly appointed Board Members and Key Personnel who may succeed the persons identified in the Appendix hereto, and any other individuals employed by or otherwise affiliated with Met Council as jointly determined by Met Council and the Agencies to be appropriate, shall complete an ethics and/or non-profit compliance training course within 3 months of their appointment or employment and annually thereafter, and shall sign a certification of such completion.

B. By March 31, 2014, all Key Personnel, staff and other individuals employed by or otherwise affiliated with Met Council who work directly with Met Council's fiscal operations, as jointly determined by Met Council and the Agencies and identified in the Appendix to this Agreement, shall complete technical assistance training in financial management and fiscal controls administered by a qualified facilitator approved by the Agencies. Any newly hired Key Personnel and individuals who succeed persons identified in the Appendix hereto shall complete such training within 3 months of their appointment or employment and annually thereafter, and shall sign a certification of such completion.

## VII. Monitoring

A. Met Council shall submit to, pay for, and cooperate fully with, monitoring by an outside inspector to be selected by the Agencies, who shall report solely to the Agencies, including with respect to the frequency, duration and nature of its monitoring activities.

B. The monitor shall not report any findings to Met Council without the Agencies' presence or consent.

C. The monitor shall review, assess, and report to the Agencies regarding:
   1. Met Council's compliance with the terms of this Agreement;
   2. Met Council's compliance with all legal and ethical obligations;
   3. Met Council's fitness to serve as a fiscal conduit for any of its affiliates and/or other entities;
   4. Met Council's compliance with any other standards or criteria as determined by the Agencies at any time; and
   5. any actual, potential or suspected misconduct by anyone affiliated with Met Council, provided that the Agencies consent to the monitor's inquiry into such misconduct.

D. All obligations of Met Council set forth in this point VII shall additionally be owed to the Agencies. Met Council shall further owe to MOCS and DOI the obligations set forth in the CAP.

## VIII. Other Assurances

A. By April 30, 2014, Met Council shall formalize in writing the relationships between Met Council and all the organizations within its network including the Jewish Community Councils ("JCCs") and Councils of Jewish Organizations ("COJOs"), outlining their respective functions and responsibilities. This includes affiliates that receive any type of financial assistance and/or in-kind support including, but not limited to food, staff and technical assistance.

B. Met Council shall immediately notify the Agencies if it knows or reasonably should know (as "knowledge" is defined in the CAP) that Met Council and/or any of its employees, officers, directors, agents, or consultants are subpoenaed, interviewed, questioned or otherwise contacted by any City, State or federal agency, official and/or employee in connection with any investigation or proceeding of any kind, whether or not

arising out of or related to the issues giving rise to this Agreement; provided, however, that this notification provision shall not apply to any subpoena, interview, questioning or contact issued, conducted or made in connection with the OAG's pending proceeding against William Rapfogel and investigation of other individuals and conduct arising from or related to the subject matter of that proceeding.

C. Met Council further agrees that it will promptly notify the Agencies in writing of any changes, including additions or deletions, to any and all information that it is required to report on its VENDEX questionnaires or Vendor Responsibility Questionnaires upon its knowledge of the occurrence of such events.

D. Met Council shall complete any vendor review report process required by any City, State or federal agency, official and/or employee, engage in open and good faith dialogue with the Agencies and with any such other agency, official and/or employee regarding recommendations arising from that process, and shall use best efforts to comply with all such resulting recommendations as are jointly deemed by Met Council and the relevant agency/ies, official(s) and/or employee(s) to be reasonable.

E. Met Council acknowledges that nothing in this Agreement shall be deemed to limit, impair or waive in any way, any existing rights of any governmental or regulatory authority, including any City, State or federal authority, to audit, investigate and evaluate past, current and future acts of Met Council and to seek further corrective actions including monetary restitution as appropriate. Without limiting the generality of the foregoing, nothing in this Agreement shall be interpreted to implicate, affect or impair OSC's duties and authority under the New York State Constitution and New York State law.

F. Met Council shall cooperate fully with all audits and investigations by all City, State and federal agencies, officials and employees, including all audits or investigations by the NYC Department of Housing Preservation and Development (HPD) and/or the U.S. Department of Housing and Urban Development (HUD), including by (1) fully and faithfully complying with the terms of the Investigations Clause contained in all City contracts; and (2) upon request, providing to the Agencies as well as the specific agencies, officials and employees conducting a given audit or investigation, all documentation and information necessary to verify compliance with this Agreement or otherwise requested in connection with the audit or investigation.

## IX. Damages

A. As of the date of this Agreement, the total minimum amount of the State of New York's claims arising out of Rapfogel's thefts and the insurance fraud scheme at Met Council is $534,600. By June 30, 2014, Met Council shall pay this amount to the State of New York or by such other means as the parties agree. In the event that Met Council is determined at any future time to owe additional amounts to the State of New York as a result of this or any additional misconduct previously unknown to the State that resulted in damages to or overpayments by the State, the payment of such additional damages and any further consequences shall be determined at that time.

11

B. As of the date of this Agreement, the total minimum amount of the City of New York's claims arising out of Rapfogel's thefts and the insurance fraud scheme at Met Council is $600,000. By June 30, 2014, Met Council shall pay this amount to the City of New York or by such other means as the parties agree. In the event that Met Council is determined at any future time to owe additional amounts to the City of New York as a result of this or any additional misconduct previously unknown to the City that resulted in damages to or overpayments by the City, the payment of such additional damages and any further consequences shall be determined at that time.

## X. Additional Terms

The OAG agrees that, in consideration of the undertakings herein by Met Council, no action will be brought by the Attorney General on his own behalf against Met Council or any present or past director or officer or employee of Met Council (excluding William Rapfogel, David Cohen and Herb Friedman), for claims arising under the N-PCL or EPTL with respect to the transactions, acts and omissions covered by the Investigation, provided that the OAG shall not be barred from representing any other government agency in investigations, actions or proceedings against Met Council. This Agreement shall in no way limit the OAG's ability to investigate and bring any civil action against Met Council, any individual director or officer, or any other person or entity for any act or transaction occurring after the date hereof. Nothing in this Agreement shall be deemed to affect or limit in any way the OAG's pending proceeding against William Rapfogel or any OAG investigation or proceeding involving criminal activity, whether under the Penal Law or otherwise.

Nothing in this agreement shall be deemed to affect or limit in any way the OAG's pending criminal investigation related to Met Council including, but not limited to, any current or former employees or individuals associated in any way with Met Council.

The OAG has agreed to the terms of this Agreement based on, among other things, the representations made to the OAG by Met Council and its counsel, and the OAG's own factual Investigation. To the extent that any material representations are later found to be inaccurate or misleading, or the OAG learns of facts concerning Met Council and/or any of its past, present or future directors or Key Personnel not disclosed to the OAG as of the date of this Agreement that demonstrates a lack of honesty or integrity, whether or not such information constitutes criminally or civilly liable conduct, this Agreement is voidable by the OAG in its sole discretion.

No representation, inducement, promise, understanding, condition, or warranty not set forth in this Agreement has been made to or relied upon by Met Council in entering into this Agreement.

Met Council represents and warrants, through the signatures below, that the terms and conditions of this Agreement are duly approved, and execution of this Agreement is duly authorized. The parties recognize and acknowledge that Met Council is represented by counsel and that the Board has received independent legal advice with respect to the advisability of signing this Agreement. Neither the Met Council Board nor any individual director or officer shall take any action or make any statement denying, directly or indirectly, the propriety of this

Agreement or expressing the view that this Agreement is without factual basis. Nothing in this paragraph affects any Met Council director's or officer's (i) testimonial obligations or (ii) right to take legal or factual positions in defense of litigation or other legal proceedings to which the OAG is not a party. This Agreement is not intended for use by any third party, other than the Agencies, in any other proceeding and is not intended, and should not be construed, as an admission of liability by Met Council or any Met Council director or officer.

The duration of this Agreement is five (5) years from the date of execution. This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties to this Agreement.

This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective successors and assigns, provided that no party, other than the OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the OAG.

If a court of competent jurisdiction shall determine that Met Council or any past or present member of its Board shall have breached this Agreement, Met Council shall pay to the OAG the cost, if any, of such determination and of enforcing this Agreement, including without limitation legal fees, expenses, and court costs.

In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, in the sole discretion of the OAG such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement.

To the extent not already provided under this Agreement, Met Council, upon request by the OAG or the Agencies, shall provide all documentation and information necessary for the OAG and the Agencies to verify compliance with this Agreement.

All notices, reports, requests, and other communications to any party pursuant to this Agreement shall be in writing and shall be directed as follows:

    If to the OAG, to:

        The Office of the Attorney General
        Enforcement Section Chief, Charities Bureau
 &nbsn;      120 Broadway - Third Floor
        New York, NY 10271

    If to Met Council, to:

        David M. Frankel
        Chief Executive Officer
        Metropolitan Council on Jewish Poverty
        120 Broadway
        New York, NY 10271

and:

Andrew J. Levander, Esq.
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

Acceptance of this Agreement by the OAG shall not be deemed approval by the OAG or the Agencies of any of the practices or procedures referenced herein, and neither Met Council nor any member of the Board of Directors shall make any representation to the contrary.

Please acknowledge Met Council's agreement and acceptance of the terms specified in this Agreement by signing below and returning the signed copy to me. By signing below, Met Council's representatives are representing to the Attorney General that they have full authority on behalf of the Met Council Board of Directors to execute this Agreement and bind Met Council and its Board of Directors to the terms thereof. Execution of this Agreement by the Attorney General shall not be construed as waiving any rights the Attorney General has under New York law.

I appreciate your continued cooperation.

Sincerely,

David E. Nachman
Enforcement Section Chief,
Charities Bureau

Accepted and Agreed:

METROPOLITAN NEW YORK COORDINATING COUNCIL ON JEWISH POVERTY

By: _____
David M. Frankel, Chief Executive Officer

DECHERT LLP

By: _____
Andrew J. Levander
*Attorneys for Met Council*

14